# Exhibit 4

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRANDUM OF THE KINGDOM OF DENMARK (SKATTERFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:  All cases. | MASTER DOCKET<br><br>18-md-2865 (LAK)<br><br>**Oral Argument Requested** |

## DEFENDANTS' AND THIRD-PARTY DEFENDANT'S
## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ...............................................................................................2

    A.    SKAT And Its Administration Of Dividend Withholding Tax ..............................2

    B.    SKAT's Administration Of Dividend Withholding Tax ........................................2

    C.    The Plans And Their Trading ................................................................................4

    D.    SKAT's Approval Of Reclaims And Revocation Of Decisions...........................13

STANDARD OF REVIEW ...............................................................................................16

ARGUMENT ...................................................................................................................16

I.    The Revenue Rule Bars SKAT's Claims..............................................................16

    A.    The Summary Judgment Record Shows That The Plans Were Beneficial Owners Under Applicable Danish Tax Law ........................................................16

    B.    In Seeking To Enforce Danish Tax Law, SKAT's Claims Raise Separation of Powers and Sovereignty Concerns........................................................................31

    C.    SKAT Is Collaterally Estopped From Litigating The Revenue Rule Question With Respect To The ED&F Bellwethers.............................................................38

II.    Summary Judgment Should Be Granted On Each Of SKAT's Claims Because Defendants Made No False Statements ...............................................................45

    A.    Statements Regarding Beneficial Ownership And Entitlement To Refunds Are Inactionable Legal Conclusions........................................................................46

    B.    Even If Actionable, SKAT Cannot Prove The Challenged Statements Are False 54

III.    Summary Judgment Should Be Granted On Each Of SKAT's Claims Because The Reclaim Amounts Do Not Belong To SKAT ....................................................57

IV.    SKAT's Claims Are Barred In Whole Or In Part By The Statute Of Limitations ...........58

    A.    Applicable Law...................................................................................................60

    B.    The Danish Limitations Period And SKAT's Duty Of Inquiry............................61

    C.    A Detailed Timeline:  What SKAT Knew And When It Knew It .........................63

    D.    SKAT'S Unjust Enrichment Claims Are Barred By The Three-Year Limitations Period Under New York Law ................................................................71

V.    Summary Judgment Should Be Granted On SKAT's Claims For Reasons Particular To Each Claim...................................................................................72

    A.    Summary Judgment Should Be Granted On SKAT's Equitable Claims Because SKAT Has An Adequate Remedy At Law .............................................72

    B.    Summary Judgment Should Be Granted On SKAT's Payment By Mistake Claim Because Undisputed Facts Show No Mistake Was Made ......................................75

i

C.      Summary Judgment Should Be Granted On SKAT's Negligent Misrepresentation Claim Because SKAT's Reliance On The Alleged Misrepresentation Was Unreasonable ..................................................................................................79

D.      Summary Judgment Should Be Granted On SKAT's Fraud And Negligent Misrepresentation Claims Because Defendants In The ED&F Bellwethers Did Not Possess The Requisite Scienter And Were Not Negligent ............................82

E.      Utah Does Not Recognize Claims For Aiding And Abetting Fraud ...................83

VI.     Summary Judgment Should Be Granted On SKAT's Equitable/Quasi-Contract Claims And To The Extent It Seeks Restitution As To Defendants Who Did Not Receive Monies From SKAT .......................................................................................................................84

A.      SKAT's Equitable Claims Against the Lehman and Bradley Defendants Should be Dismissed Because SKAT Cannot Prove That the Introductory Broker Fees They Received Were Actually Paid At SKAT's Expense .....................................84

B.      SKAT Cannot Prove Entitlement To Restitution In ED&F Bellwether Cases ......88

VII.    Defendant Altbach Is Entitled To Partial Summary Judgment on the Fraud Claims ........89

A.      The Fraud Count Against Altbach Must Be Dismissed .........................................89

B.      The Aiding And Abetting Fraud Count Against Altbach Must Be Dismissed ......94

C.      The Negligent Misrepresentation Count Against Altbach Must Be Dismissed ....95

CONCLUSION ..................................................................................................................................97

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*,
   731 F.2d 112 (2d Cir. 1984)......................................................................................57

*Abraham v. Wechsler*,
   200 N.Y.S. 471 (Sup. Ct. 1923), *aff'd*, 206 N.Y.S. 877 (1st Dep't 1924).............................47

*Abu Dhabi Commerical Bank v. Morgan Stanley & Co.*,
   888 F. Supp. 2d 431 (S.D.N.Y.), *reconsideration granted in part on other grounds*, 888
   F. Supp. 2d 478 (S.D.N.Y. 2012), *aff'd sub nom., Pennsylvania Public School
   Employees' Retirement System v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir. 2014)........94

*Aguinda v. Texaco, Inc.*,
   142 F. Supp. 2d 534 (S.D.N.Y. 2001).........................................................................75

*Alfadda v. Fenn*,
   966 F. Supp. 1317 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 41 (2d Cir. 1998)...........................40, 42

*Amusement Indus., Inc. v. Stern*,
   786 F. Supp. 2d 758 (S.D.N.Y. 2011)......................................................................45, 57

*Andersen v. Homecomings Finance, LLC*,
   2011 WL 3626828 (D. Utah Aug. 17, 2011)..................................................................79

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012).......................................................................................96

*Arcadia Bioscis., Inc. v. Vilmorin & Cie*,
   356 F. Supp. 3d 379 (S.D.N.Y. 2019)..........................................................................61

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
   268 F.3d 103 (2d Cir. 2001)................................................................................ *passim*

*Bascunan v. Elsaca*,
   2021 WL 3540315 (S.D.N.Y. Aug. 11, 2021)................................................................71

*Baugh v. Darley*,
   184 P.2d 335 (Utah 1947)........................................................................................88

*Belcourt v. Grivel, srl*,
   2010 WL 1064466 (D. Utah Mar. 19, 2010) ................................................................60

*Bibicheff v. PayPal, Inc.*,
   2020 WL 2113373 (E.D.N.Y. May 4, 2020), *aff'd*, 844 F. App'x 394 (2d Cir. 2021) ..........84

*Boyle v. Kelley*,
　42 N.Y.2d 88 (1977) ...................................................................................73

*Breiggar Properties, L.C. v. H.E. Davis & Sons, Inc.*,
　52 P.3d 1133 (Utah 2002) ...........................................................................61

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
　373 F.3d 296 (2d Cir. 2004).........................................................................57

*Brumfield v. Trader Joe's Co.*,
　2018 WL 4168956 (S.D.N.Y. Aug. 30, 2018) ...........................................73

*Canada v. Prévost Car Inc.*,
　[2009] DTC 5721, [2009] FCA 57 (Can. Ont.) ..........................................51

*Canon Financial Services, Inc. v. Meyers Associates, LP*,
　2014 WL 4829641 (Sup. Ct., N.Y. County, Sept. 26, 2014), *aff'd*, 139 A.D.3d
　575 (1st Dep't 2016) ....................................................................................95

*Canosa v. Ziff*,
　2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ...............................................94

*Capruso v. Village of Kings Point*,
　23 N.Y.3d 631 (2014) ..................................................................................61

*Charid Properties, Inc. v. Berger*,
　327 N.Y.S.2d 821 (2d Dep't 1971), *aff'd*, 32 N.Y. 667 (1973)..................47

*China Shipping Container Lines Co. v. Big Port Service DMCC*,
　2019 WL 9362547 (S.D.N.Y. Jan. 15, 2019) .............................................40

*CIG Exploration, Inc. v. Hill*,
　824 F. Supp. 1532 (D. Utah 1993), *aff'd sub nom. CIG Expl., Inc. v. Tenneco Oil
　Co.*, 83 F.3d 431 (10th Cir. 1996).................................................................72

*City of Long Beach v. Total Gas & Power North America Inc.*,
　465 F. Supp. 3d 416 (S.D.N.Y. 2020), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021)..90, 91

*Clark v. Daby*,
　751 N.Y.S.2d 622 (3d Dep't 2002)..............................................................84

*Commercial Fixtures & Furnishings, Inc. v. Adams*,
　564 P.2d 773 (Utah 1977)......................................................................88, 89

*Corporation of Bergen v. Olsen*,
　Denmark, Eastern Provincial Court (Oct. 23, 1924), available in *Annual Digest of
　Public International Law Cases* 263-64 (1933)............................................34

*Corsello v. Verizon N.Y., Inc.*,
18 N.Y.3d 777 (N.Y. 2012) ........................................................................................84

*CSX Corp. v. Children's Investment Fund Management (UK) LLP*,
562 F. Supp. 2d 511 (S.D.N.Y. 2008), *vacated in part & remanded on other
grounds*, 654 F.3d 276 (2d Cir. 2011) .......................................................................48

*CSX Corp. v. Children's Investment Fund Management (UK) LLP*,
654 F.3d 276 (2d Cir. 2011).......................................................................................48

*Cucchiaro v. Cucchiaro*,
627 N.Y.S.2d 224 (Sup. Ct. 1995).............................................................................46

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962)....................................................................................................72

*Deer Crest Associates I, L.C. v. Deer Crest Resort Group, L.L.C.*,
2006 WL 722216 (D. Utah Mar. 16, 2006), *aff'd sub nom. Deer Crest Assocs.
I, L.L.C. v. Avalon Deer Valley, L.L.C.*, 566 F.3d 1246 (10th Cir. 2009)................88

*Desert Miriah, Inc. v. B & L Auto, Inc.*,
12 P.3d 580 (Utah 2000) ............................................................................................88

*Dinaco, Inc. v. Time Warner, Inc.*,
346 F.3d 64 (2d Cir. 2003)..........................................................................................93

*DIRECTV, Inc. v. Free*,
2006 WL 8456439 (W.D.N.C. Aug. 4, 2006) ...........................................................48

*DirecTV, Inc. v. Lewis*,
2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005) ..........................................................46

*DiTucci v. Ashby*,
2020 WL 956890 (D. Utah Feb. 27, 2020) ................................................................83

*Doehla v. Wathne Ltd., Inc.*,
1999 WL 566311 (S.D.N.Y. Aug. 3, 1999).........................................................79, 81

*E.J. Brooks Co. v. Cambridge Security Seals*,
31 N.Y.3d 441 (N.Y. 2018) ......................................................................................84

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,
165 F. Supp. 2d 615 (S.D.N.Y. 2001)........................................................................80

*Estate of Hatch, ex rel. Ruzow v. NYCO Minerals Inc.*,
704 N.Y.S.2d 340 (3d Dep't 2000).....................................................................75, 78

*European Community v. RJR Nabisco, Inc.*,
 355 F.3d 123 (2d Cir. 2004), *cert. granted, judgment vacated*, 544 U.S. 1012,
 125 S. Ct. 1968 (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005) .......................28, 31

*European Community v. RJR Nabisco, Inc.*,
 424 F.3d 175 (2d Cir. 2005) ........................................................................................28, 34

*Federal Housing Finance Agency v. UBS Americas, Inc.*,
 858 F. Supp. 2d 306 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ...........................96

*Federal Treasury Enterprise Sojuzplodoimport v. Spirits Int'l N.V.*,
 400 F. App'x 611 (2d Cir. 2010) ............................................................................................74

*Federated Capital Corp. v. Libby*,
 384 P.3d 221 (Utah 2016) .......................................................................................................60

*Ferrera v. Borgships, Inc.*,
 1996 WL 80106 (E.D. La. Feb. 16, 1996), *aff'd*, 98 F.3d 1337 (5th Cir. 1996) ...................75

*First Equity Corp. of Florida v. Standard & Poor's Corp.*,
 690 F. Supp. 256 (S.D.N.Y. 1988), *aff'd*, 869 F.2d 175 (2d Cir. 1989) ...............................92

*Foley v. Transocean Ltd.*,
 861 F. Supp. 2d 197 (S.D.N.Y. 2012) ....................................................................................56

*Ford v. Unity Hospital*,
 32 N.Y.2d 464 (1973) .............................................................................................................91

*Fraternity Fund Ltd. v. Beacon Hill Asset Management*,
 LLC, 479 F. Supp. 2d 349 (S.D.N.Y. 2007) ....................................................................94, 95

*Gandy v. Barber*,
 641 F. App'x 835 (10th Cir. 2016) .........................................................................................53

*Geoffrey E. Macpherson, Ltd. v. Brinecell, Inc.*,
 98 F.3d 1241 (10th Cir. 1996) ...............................................................................................56

*Georges v. United Nations*,
 834 F.3d 88 (2d Cir. 2016) .....................................................................................................53

*Glencova Investment Co. v. Trans-Resources, Inc.*,
 874 F. Supp. 2d 292 (S.D.N.Y. 2012) ...................................................................................48

*Global Finance Corp. v. Triarc Corp.*,
 93 N.Y.2d 524 (1999) .............................................................................................................60

*Gras v. Stevens*,
 415 F. Supp. 1148 (S.D.N.Y. 1976) .......................................................................................74

vi

*Guaranty Trust Co. of New York v. York*,
   326 U.S. 99 (1945) ...................................................................................73

*Hagood v. Sonoma County Water Agency*,
   81 F.3d 1465 (9th Cir. 1996) .................................................................50

*Henry v. Bank of America*,
   48 N.Y.S.3d 67 (1st Dep't 2017) ...........................................................61

*Heywood v. Dep't of Commerce, Division of Real Estate*,
   414 P.3d 517 (Utah Ct. App. 2017) .......................................................44

*HSH Nordbank AG v. UBS AG*,
   941 N.Y.S.2d 59 (1st Dep't 2012) ..........................................................81

*Hussein v. UBS Bank USA*,
   446 P.3d 96 (Utah Ct. App. 2019) .........................................................82

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
   227 F.3d 8 (2d Cir. 2000) .......................................................................96

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
   12 N.Y.3d 132 (N.Y. 2009) ....................................................................84

*IKB Deutsche Industriebank AG v. McGraw Hill Financial, Inc.*,
   634 F. App'x 19 (2d Cir. 2015) ..............................................................60

*Indofood Int'l Finance Ltd. v. JPMorgan Chase Bank, NA*,
   [2005] EWHC 2103 (Ch) .......................................................................51

*In re Bayou Hedge Fund Investment Litigation*,
   472 F. Supp. 2d 528 (S.D.N.Y. 2007) ...................................................86

*In re First Central Finance Corp.*,
   377 F.3d 209 (2d Cir. 2004)...................................................................73

*In re Fitzgerald*,
   117 F.3d 1428 (10th Cir. 1997) (unpublished opinion) .........................88

*In re Fyre Festival Litigation*,
   399 F. Supp. 3d 203 (S.D.N.Y. 2019)....................................................95

*In re Mirena IUD Products Liability Litigation*,
   29 F. Supp. 3d 345 (S.D.N.Y. 2014)......................................................42

*In re Namenda Indirect Purchaser Antitrust Litigation*,
   2021 WL 2403727 (S.D.N.Y. June 11, 2021) .......................................73

*In re Parmalat Securities Litigation*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ...................................................................90

*In re Parmalat Securities Litigation*,
    684 F. Supp. 2d 453 (S.D.N.Y. 2010) ...................................................................92

*In re SKAT Tax Refund Scheme Litigation*,
    356 F. Supp. 3d 300 (S.D.N.Y. 2019) ........................................................... *passim*

*In re Time Warner Inc. Securities Litigation*,
    9 F.3d 259 (2d Cir. 1993) ......................................................................................96

*Italverde Trading, Inc. v. Four Bills of Lading*,
    2009 WL 499502 (E.D.N.Y. Feb. 27, 2009) ..........................................................42

*ITT World Directories, Inc. v. CIA Editorial de Listas, S.A.*,
    525 F.2d 697 (2d Cir. 1975) ............................................................................75, 78

*J.A.O. Acquisition Corp. v. Stavitsky*,
    8 N.Y.3d 144 (2007) ..............................................................................................79

*Jamal v. Caroline Garden Tenants Corp.*,
    173 A.D.3d 843 (2d Dep't 2019) ...........................................................................42

*Jardine v. Brunswick Corp.*,
    423 P.2d 659 (1967) ........................................................................................80, 82

*Jehly v. Brown*,
    327 P.3d 351 (Colo. App. 2014) ............................................................................94

*Jurgensen v. Felix Storch, Inc.*,
    2012 WL 2354247 (S.D.N.Y. June 14, 2012) .......................................................97

*Kaufman v. Cohen*,
    760 N.Y.S.2d 157 (1st Dep't 2003) .......................................................................71

*Klas v. Van Wagoner*,
    829 P.2d 135 (Utah Ct. App. 1992) .......................................................................80

*Knight v. Post*,
    748 P.2d 1097 (Utah Ct. App. 1988) ...............................................................88, 89

*Kramer v. Showa Denko K.K.*,
    929 F. Supp. 733 (S.D.N.Y. 1996) ........................................................................86

*Krog Corp. v. Vanner Group, Inc.*,
    72 N.Y.S.3d 178 (3d Dep't 2018) ..........................................................................71

*Lefferts v. Lefferts*,
  276 N.Y.S. 809 (1st Dep't 1935) ...............................................................46

*Legurnic v. Ciccone*,
  63 F. Supp. 3d 241 (E.D.N.Y. 2014) ....................................................86, 87

*Leo Feist, Inc. v. Debmar Publishing Co.*,
  232 F. Supp. 623 (E.D. Pa. 1964) ............................................................40

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ................................................................93, 94

*Litvinoff v. Wright*,
  54 N.Y.S.3d 22 (2d Dep't 2017) .................................................................72

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
  412 F. Supp. 3d 392 (S.D.N.Y. 2019), *aff'd*, 13 F.4th 247 (2d Cir. 2021) .............93

*Macris & Associates, Inc. v. Neways, Inc.*,
  16 P.3d 1214 (Utah 2000) ...................................................................42, 43

*Mandarin Trading Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (N.Y. 2011) .......................................................................84

*Magalnick v. Empire State Mutual Life Insurance Co.*,
  180 N.Y.S.2d 575 (2d Dep't 1958) ..............................................................46

*Magi XXI, Inc. v. Stato Della Cita Del Vaticano*,
  22 F. Supp. 3d 195 (E.D.N.Y. 2014) ............................................................73

*Martineau v. Currutt*,
  2022 WL 180735 (D. Utah Jan. 19, 2022) .......................................................83

*McDonald v. Piedmont Aviation, Inc.*,
  793 F. Supp. 75 (S.D.N.Y. 1992) ................................................................73

*McGarry v. Miller*,
  158 A.D.2d 327 (1st Dep't 1990) ................................................................91

*Menowitz v. Brown*,
  991 F.2d 36 (2d Cir. 1993) ......................................................................42

*Mikkelson v. Quail Valley Realty*,
  641 P.2d 124 (Utah 1982) ........................................................................82

*Miller v. Livanis*,
  189 A.D.3d 446 (1st Dep't 2020) ................................................................42

*Morales v. New Valley Corp.*,
  999 F. Supp. 470 (S.D.N.Y. 1998) ...................................................................48

*Mueller v. Michael Janssen Gallery Pte. Ltd.*,
  225 F. Supp. 3d 201 (S.D.N.Y. 2016)...............................................................84

*Mugavero v. Arms Acres, Inc.*,
  680 F. Supp. 2d 544 (S.D.N.Y. 2010)..............................................................86

*National Bank of Canada v. Artex Indus., Inc.*,
  627 F. Supp. 610 (S.D.N.Y. 1986) ...................................................................72

*Netherby Ltd. v. G.V. Licensing, Inc.*,
  1993 WL 463679 (S.D.N.Y. Nov. 9, 1993)................................................46, 53

*Oberg v. Sanders*,
  184 P.2d 229 (Utah 1947).................................................................................45

*Onanuga v. Pfizer, Inc.*,
  369 F. Supp. 2d 491 (S.D.N.Y. 2005)..............................................................71

*Ostler v. Retirement Board*,
  400 P.3d 1099 (Utah Ct. App. 2017) ..........................................................42, 43

*Pace v. Parrish*,
  247 P.2d 273 (Utah 1952).................................................................................82

*Paramount Film Distribution Corp. v. State*,
  30 N.Y.2d 415 (1972).......................................................................................72

*Pasquantino v. United States*,
  544 U.S. 349 (2005)....................................................................................36, 38

*Pensee Associates, Ltd. v. Quon Indus., Ltd.*,
  241 A.D.2d 354 (1st Dep't 1997) ....................................................................90

*Prince v. Bear River Mutual Insurance Co.*,
  56 P.3d 524 (Utah 2002)...................................................................................82

*Public Patent Foundation, Inc. v. Quigley Corp.*,
  2011 WL 3055382 (S.D.N.Y. July 20, 2011) ..................................................56

*Rabo Agrifinance, Inc. v. Bliss*,
  227 F. Supp. 3d 1249 (D. Utah 2017)..............................................................83

*Republic of Colombia v. Diageo North America Inc.*,
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) .........................................................31, 32

*Republic of Honduras v. Philip Morris Cos.*,
341 F.3d 1253 (11th Cir. 2003) .......................................................................28

*Reynolds v. Lifewatch, Inc.*,
136 F. Supp. 3d 503 (S.D.N.Y. 2015)................................................................73

*Richard Parks Corrosion Technology, Inc. v. Plas-Pak Indus., Inc.*,
2015 WL 5708539 (D. Conn. Sept. 29, 2015) ....................................................86

*Richmond v. Weston*,
2004 WL 440187 (Utah Ct. App. Mar. 11, 2004)................................................80

*Russell/Packard Development, Inc. v. Carson*,
78 P.3d 616 (Utah. Ct. App. 2003), *aff'd*, 108 P.3d 741 (Utah 2005) ...................60

*Safeco Insurance Co. of America v. Burr*,
551 U.S. 47 (2007)........................................................................................50

*Scheiner v. Wallace*,
832 F. Supp. 687 (S.D.N.Y. 1993) ............................................................40, 43

*Schlaifer Nance & Co. v. Estate of Warhol*,
119 F.3d 91 (2d Cir. 1997)..............................................................................79

*Shah v. Intermountain Healthcare, Inc.*,
314 P.3d 1079 (Utah Ct. App. 2013) ................................................................45

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
248 F. Supp. 3d 428 (S.D.N.Y. 2017)...............................................................92

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018).........................................................45, 95

*Skatteforvaltningen v. Solo Capital Partners LLP*
[2022] EWCA Civ 234 ..............................................................29, 39, 41, 42

*Skatteforvaltningen v. Solo Capital Partners LLP*,
[2021] EWHC 974 (Comm)......................................................................38, 41, 43

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ..........................................................................74

*St. Paul Fire & Marine Insurance Co. v. Heath Fielding Ins. Broking Ltd.*,
976 F. Supp. 198 (S.D.N.Y. 1996) ...................................................................96

*Stuart v. American Cyanamid Co.*,
158 F.3d 622 (2d Cir. 1998)............................................................................60

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
2010 WL 4038826 (E.D.N.Y. Oct. 14, 2020) ..................................................18, 72, 87

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)...............................................................................92

*Tenamee v. Schmukler*,
438 F. Supp. 2d 438 (S.D.N.Y. 2006)................................................................71

*The Sample Inc. v. Pendleton Woolen Mills, Inc.*,
704 F. Supp. 498 (S.D.N.Y. 1989) ....................................................................16

*Turner Network Sales, Inc. v. DISH Network L.L.C.*,
413 F. Supp. 3d 329 (S.D.N.Y. 2019)................................................................77

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) ...............................................................................49

*United States ex rel. Erickson v. Uintah Special Services District*,
395 F. Supp. 2d 1088 (D. Utah 2005) ..........................................................47, 49

*United States v. Federative Republic of Brazil*,
748 F.3d 86 (2d Cir. 2014).................................................................................31

*United States v. Harra*,
985 F.3d 196 (3d Cir. 2021)...............................................................................49

*United States v. Karron*,
750 F. Supp. 2d 480 (S.D.N.Y. 2011), *aff'd*, 481 F. App'x 703 (2d Cir. 2012)....................50

*United States v. Migliaccio*,
34 F.3d 1517 (10th Cir. 1994) ...........................................................................49

*United States ex rel. Ryan v. Staten Island Univ. Hospital*,
2011 WL 1841795 (E.D.N.Y. May 13, 2011) ...............................................57, 88

*United States v. Wardell*,
218 F. App'x 695 (10th Cir. 2007) .....................................................................31

*United States v. Whiteside*,
285 F.3d 1345 (11th Cir. 2002) .....................................................................49, 50

*UST Private Equity Investments Fund, Inc. v. Salomon Smith Barney*,
733 N.Y.S.2d 385 (1st Dep't 2001) ...................................................................79

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*,
348 F. Supp. 2d 255 (S.D.N.Y. 2004) (Kaplan, J.)............................................94

*Waran v. Christie's Inc.*,
315 F. Supp. 3d 713 (S.D.N.Y. 2018).................................................................16

*Wardley Better Homes & Gardens v. Cannon*,
61 P.3d 1009 (Utah 2002).................................................................................94

*Webster v. Wells Fargo Bank, N.A.*,
2009 WL 5178654 (S.D.N.Y. Dec. 23, 2009), *aff'd sub nom. Webster v. Penzetta*,
485 F. App'x 23 (2d Cir. 2012)........................................................................56

*Williams v. Dow Chemical Co.*,
2004 WL 1348932 (S.D.N.Y. June 16, 2004)....................................................61

*Zuyder Zee Land Corp. v. Broadmain Building Co.*,
86 N.Y.S.2d 827 (Sup. Ct. 1949), *aff'd*, 92 N.Y.S.2d 607 (1st Dep't 1949)..........47

**Docketed Cases**

*Skatteforvaltningen v. Raubritter Pension Plan*, No. 18-cv-04833-LAK ........................61, 71, 72

**Statutes Codes & Regulations**

26 C.F.R. § 1.1441-1(b)(1) ...............................................................................27

26 C.F.R. § 1.1473-1(d) ....................................................................................27

26 U.S.C.
§ 401(a)..................................................................................13, 54, 76
§ 871(m)........................................................................................25, 55
§ 6203.................................................................................................34

47 U.S.C. § 605(e)(4).......................................................................................48

Rev. Rul. 2002-44, 2002-2 C.B. 84 ...................................................................20

Rev. Rul. 2004-37, 2004-1 C.B. 583 .................................................................23

U.C.C.
§ 8-501......................................................................................23, 37, 55

Utah Code Ann.
§ 78B-2-305 ..................................................................................60, 70
§ 78B-2-103 .........................................................................................60

**Rules**

Fed. R. Civ. P. 56(a)........................................................................................16

Fed. R. Evid. 602 .............................................................................................56

N.Y. C.P.L.R.

    § 202 ........................................................................................................60
    § 213(1) ....................................................................................................71
    § 213(8) ....................................................................................................71
    § 214(3) ....................................................................................................71

**Other Authorities**

Dicey, Morris & Collins, The Conflict of Laws, R5-019 (15th ed.)................................41, 42, 43

IRS, *Topic No. 201 The Collection Process*, https://www.irs.gov/taxtopics/tc201 ......................34

IRS, *U.S. Withholding Agent Frequently Asked Question*,
    https://www.irs.gov/businesses/international-businesses/us-withholding-agent-
    frequently-asked-question..............................................................................27

OECD Model Tax Convention Commentary on Article 10 (2014)................................................20

Restatement (2d) of Agency § 7.08 cmt. c.......................................................................96

Restatement (Second) of Agency § 34 cmt.h......................................................................91

S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. (2014) (statement of Robert B.
    Stack, Deputy Assistant Sec'y for Int'l Tax Affs., Dep't of Treasury) ................................35

SKAT, *Claiming refund of Danish dividend tax*,
    https://skat.dk/data.aspx?oid=2244931&vId=0&lang=US....................................................17

*The Granting of Treaty Benefits with respect to the Income of Collective Investment
    Vehicles*, OECD, https://www.oecd.org/tax/treaties/45359261.pdf .......................................18

## PRELIMINARY STATEMENT

After a discovery period in which the parties exchanged millions of pages of documents, elicited hundreds of hours of testimony, and responded to dozens of written discovery requests, a core set of indisputable facts compels the entry of judgment on behalf of Defendants.[1] *First*, Defendants can now show that this is not a case about "garden variety fraud," but instead that its resolution requires the enforcement of Danish tax law. The Revenue Rule therefore applies, and it requires the Court to end this case. *Second*, SKAT's claims are predicated on a set of purported false statements, but the statements are either inactionable conclusions of law, provably true, or both. *Third*, the undisputed facts establish that SKAT should have known about its claims before the end of 2014, rendering all of its lawsuits untimely under the governing statute of limitations. Several additional bases for summary judgment are set forth below.

The plaintiff, an agency of the Kingdom of Denmark, recently announced that its civil litigation budget to resolve its claims globally exceeds *four billion kroner* (over $500 million). In contrast, Defendants in this case are individuals and their individual retirement savings plans. SKAT has brought the force of a nation against them in its effort to recover tax refunds that it paid out following its administrative decision that the defendants in this case (and others around the world) were entitled to them. SKAT made that administrative decision with full knowledge that multiple applicants could seek reclaims for the same dividends and that multiple applicants could, in good faith, claim to be the beneficial owners of those dividends under Danish tax law. SKAT's

---

[1] Defendants are Acer Investment Group, LLC, American Investment Group of New York, L.P. Pension Plan (the "AIG Plan"), Basalt Ventures LLC Roth 401(k) Plan (the "Basalt Plan"), David Schulman, Doston Bradley, John van Merkensteijn, Michael Ben-Jacob, RAK Investment Trust, Richard Markowitz, Riverside Associates Defined Benefit Plan (the "Riverside Plan"), RJM Capital Pension Plan (the "RJM Plan"), Roadcraft Technologies LLC Roth 401(k) Plan (the "Roadcraft Plan"), Robert Crema, Robert Klugman, Roger Lehman, Ronald Altbach, Routt Capital Trust, Stacey Kaminer, The FWC Capital LLC Plan (the "FWC Plan"), The Proper Pacific LLC 401K Plan (the "Proper Pacific Plan"), and ED&F Man Capital Markets Ltd. ("ED&F") (third-party defendant).

initial determination that Defendants were entitled to tax refunds was correct, and this Court should

not second-guess that determination based on SKAT's belated reinterpretation of Danish tax law.

## STATEMENT OF FACTS

### A. SKAT And Its Administration Of Dividend Withholding Tax

SKAT is the agency of the government of the Kingdom of Denmark charged with the

assessment and collection of Danish taxes. Rule 56.1 Joint Stmt. ("JSUMF"), Dkt. 790 (Apr. 22,

2022), ¶ 1. SKAT is part of the Danish Ministry of Taxation. *Id.* ¶¶ 2-3. It collects tax revenue

and disburses tax refunds. *Id.* ¶¶ 5-6. In that capacity, it is little more than a conduit. When SKAT

deposits tax revenues into bank accounts held in its name at the Danish Central Bank, those funds

belong to the Kingdom of Denmark and not to SKAT itself. *Id.* ¶¶ 9, 11. SKAT otherwise has no

discretion as to what to do with the money it collects, all of which is spent by the Ministry of

Finance in accordance with spending legislation enacted by the Danish Parliament. *Id.* ¶¶ 10, 12-

15. Nor does SKAT suffer any financial consequence if its collections fall short of expectations.

Defs.' Statement of Material Facts ("DSMF") ¶ 1.

### B. SKAT's Administration Of Dividend Withholding Tax

Danish tax law requires Danish companies that issue dividends to withhold a portion of the

dividend as taxes. JSUMF ¶ 18. Accordingly, between 2012 and 2015, Danish companies paid a

27% withholding tax on dividends directly to SKAT, and 73% of the gross dividend amount was

paid out to the market. *Id.* While dividends received by investors are generally subject to tax

regardless of domicile, not all dividend recipients are subject to Denmark's full 27% tax rate on

Danish dividends; for example, the double taxation treaty between the United States and Denmark

(the "Treaty") sets the maximum tax rate on American shareholders of Danish shares at 15%. *Id.*

¶ 22; Rule 44.1 Declaration of Kasper Bech Pilgaard ("Pilgaard Decl.") Ex. 39 art. 10(2). Certain

tax-preferred investors, including U.S. pension plans who are beneficial owners, are exempt from

2

taxes on Danish dividends entirely. JSUMF ¶ 22; Pilgaard Decl. Ex. 40 ("2006 Protocol").

Denmark has therefore designed and administered a process in which beneficial owners of Danish

dividends who are subject to reduced taxes (including no tax) can apply for and recover tax

withheld from dividends from SKAT. It is not possible to obtain a refund of Danish dividend tax

from any other part of the Danish government, from any Danish bank, or from any Danish issuer

of securities. JSUMF ¶¶ 34-36; DSMF ¶¶ 9-10.

SKAT allows foreign investors to seek reclaims of dividend withholding tax by submitting

completed copies of SKAT Form 06.003 and supporting documentation. JSUMF ¶ 23. The

required paperwork is limited: a typical reclaim submission at issue in this litigation—including

all attachments—spanned five pages.[2] Form 06.003 included a box allowing the applicant to

indicate whether the submission was made by or on behalf of the "beneficial owner." *Id.* ¶ 25.

(SKAT agrees that it construes the phrase "beneficial owner" to refer to beneficial owner status

under Danish law, which can include Danish tax law. *Id.* ¶¶ 26-27.) SKAT did not require

applicants seeking refunds of dividend withholding tax to explain the circumstances surrounding

their acquisition of the Danish shares or dividends, did not ask whether the shares had been

purchased from a short-seller, did not ask when the applicant had purchased the shares, did not ask

if the applicant had loaned the shares, did not ask how long the applicant owned the shares, did

not ask whether the applicant was registered as the owner of the shares with the Danish central

securities depository, did not ask whether the applicant's custodian held the shares directly or at a

---

[2]      Reclaim agents typically sent SKAT a cover letter, a power of attorney authorizing the reclaim agent to act on behalf of the Plan, a completed Form 06.003, a Dividend Credit Advice prepared by the Plan's custodian and confirming the Plan's receipt of the dividend, and IRS Form 6166 confirming that the Plan was a tax-exempt pension plan and resident of the United States. *See, e.g.*, JSUMF ¶ 177. SKAT required nothing more.

sub-custodian, and did not ask if or how the applicant had financed its purchase. *Id.* ¶¶ 40-48, 64; Pilgaard Decl. ¶ 137.

In 2012, the Danish parliament enacted Section 69B of the Withholding Tax Act, which extended the time in which SKAT was required to pay out reclaims from 30 days to six months. Pilgaard Decl. ¶ 141. The increase was meant to allow SKAT time to properly investigate refund requests, which could be "complex[]" and might require "in-depth investigations." *Id.* ¶ 143. Despite the broad authority and ample time afforded to SKAT for the evaluation of refund requests, as a matter of practice SKAT did not conduct any investigations. JSUMF ¶ 33. All dividend withholding tax reclaim requests were reviewed by a single SKAT employee, who approved them as a matter of course if the applicant included the paperwork that SKAT had decided was necessary to show entitlement to a reclaim. *Id.* ¶¶ 32, 33, 51; Declaration of Andrew Dulberg ("Dulberg Decl") Ex. 109 at 60:6-13.

### C.    The Plans And Their Trading

#### 1.    The Plans

Defendants in the bellwether cases include seven U.S. pension plans and their trustees or participants. JSUMF, Ex. A, Dkt. 790-1. Each plan was organized under the laws of the United States. JSUMF ¶ 78. Each was a single participant retirement savings plan formed by an LLC associated with a self-employed individual, except in the case of the Riverside Plan, which is a defined benefit plan. *Id.* ¶¶ 79-81, 89-90, 250-51, 261-62, 266. One-person retirement plans are a common retirement savings tool, and the IRS maintains a webpage that specifically describes them. Declaration of Nicholas Bahnsen ("Bahnsen Decl.") Ex. 9, ¶ 21 ("Reish Report"). The

4

oldest bellwether plan was formed in 1995; the most recent was formed in 2014.[3]  The AIG Plan and Riverside Plan received determination letters from the IRS that those plans were qualified as to form (JSUMF ¶¶ 259, 268), and the RJM Plan, Basalt Plan, and Roadcraft Plan relied on determination letters from the IRS approving the form of those plans (*id.* ¶ 86).

Although the Treaty does not require that a pension plan be qualified as tax-exempt under the Internal Revenue Code in order to be exempt from tax on Danish dividends (nor did SKAT impose that requirement itself), the plans at issue in this case were in fact so qualified.  After the events at issue in this litigation—and after SKAT had sought and obtained substantial assistance from the IRS—the IRS conducted an audit of the RJM Plan.  JSUMF ¶ 96.  The audit spanned two years, and the plan provided the IRS with hundreds of documents, including statements the plan received from Solo Capital Partners LLP that reflected the precise trades at issue in this case.  *Id.* ¶¶ 97-101.  At the conclusion of the audit, the IRS issued the most favorable result it can:  a "no change" letter indicating that the plan remained qualified and no corrective action was required. *Id.* ¶ 102.[4]  Furthermore, the IRS has not disqualified any of the bellwether plans despite having communicated directly with SKAT about the alleged fraud it now presents to this Court.

### 2. The Trading

As this Court recognized, there are certain factual differences between the trading for which Solo Capital served as custodian and the trading for which ED&F served as custodian.  But there are also key common features to trades conducted by each bellwether plan:

- Each plan purchased shares of Danish corporations on a date before the "ex-dividend date," meaning that the plan owned the shares on a date and at a price that

---

[3]    The AIG Plan prototype 401(k) plan was formed in 2002 and the Riverside Plan was formed in 1995.  JSUMF ¶¶ 250, 261.  The RJM Plan was formed in 2013, and the Basalt Plan, Roadcraft Plan, FWC Plan, and Proper Pacific Plan were formed in 2014.  *Id.* ¶¶ 79-81, 89-90.

[4]    IRS agents are instructed in their guiding manual to assess qualification issues in the audits they conduct.  Bahnsen Decl. Ex. 11, ¶ 71 (Reish Reply Report).

provided it with an economic entitlement to any dividends issued thereafter (JSUMF ¶¶ 113, 320);

- The prices each plan paid reflected market prices (*i.e.*, they fell within the high and low prices of the stock on the date of the trade) (*see* JSUMF ¶ 116);

- Each plan paid commissions on its purchase of Danish shares (*see* JSUMF ¶ 115);

- Each purchase of Danish shares was reflected in trade confirmations issued by brokers and in account statements issued by custodians (JSUMF ¶¶ 113, 124, 320, 322);

- Each plan's account was credited in an amount equal to the expected dividend payment net of withholding tax (*see* JSUMF ¶¶ 125, 324-45); and

- Each plan received dividend credit advice statements and account statements issued by the relevant custodians that reflected the receipt of dividends (JSUMF ¶¶ 125-27, 324-45).

In the sections that follow, Defendants briefly describe specific bellwether trades.

### a. A Solo Bellwether Trade

The details of a trade conducted by the RJM Plan are illustrative of the trades conducted through the Solo Custodians. On April 11, 2013—on the day of the issuer's annual general meeting and one day before the "ex-dividend" date—the RJM Plan contacted a New York based broker called FGC Securities and asked to purchase 10,400 shares of the Danish freight and logistics giant Maersk. JSUMF ¶¶ 111, 129, 131. It named its price: 43,680.2893 Danish kroner (DKK) per share. *Id.* ¶ 129. It asked for the trade to settle on April 17, 2013. *Id.* FGC Securities, an independent dealer-broker registered with FINRA, filled the order and provided the RJM Plan with a trade confirmation. *Id.* ¶ 132; *see also* Bahnsen Decl. Ex. 13, ¶ ¶ 15 & n.29 ("Carr Rebuttal Report"). The confirmation stated that on April 11, 2013, the RJM Plan purchased 10,400 shares of Maersk stock at the price the Plan had requested. JSUMF ¶ 132. The confirmation also showed a commission fee payable to FGC Securities in the amount of DKK 11,356.88. *Id.* The RJM Plan subsequently received a statement from its custodian, Solo Capital, listing the purchase of the

10,400 Maersk shares. *Id.* ¶ 144. Because shares of Danish securities are dematerialized, meaning that they exist *only* as electronic book entries and not as physical paper certificates, the book entries in the RJM Plan's account statements evidence the RJM Plan's ownership. *Id.* ¶¶ 20-21; *see also* Pilgaard Decl. ¶¶ 151, 154, 157.

From the time when the trade confirmation was generated on April 11, 2013, *see* JSUMF ¶ 132, the RJM Plan owned the shares as a matter of Danish tax law. This is beyond dispute. SKAT publishes a Legal Guide, which says: "A share has been purchased or sold on the date on which a final and binding agreement on purchase or sale is in place." Pilgaard Decl. ¶ 156. In support of that unremarkable proposition, SKAT's Legal Guide invokes a series of Danish judicial decisions; in one, the Supreme Court of Denmark held that the moment in time when shares were purchased and ownership was transferred was when the *fondsnota*—the trade confirmation from the broker—was signed. *Id.* ¶ 159.

As a matter of Danish tax law, ownership requires nothing more. It requires no additional steps or subsequent documentation, nor does it depend upon what happens next. Pilgaard Decl. ¶ 157. Indeed, Danish courts have found ownership of shares is transferred upon the entry into the agreement to buy them even if the parties postpone the delivery of shares until the following *year*. *Id.* ¶ 163. Delivery of shares or settlement of the trade is no precondition of ownership under Danish tax law; rather, a binding agreement to purchase shares gives rise to the buyer's ownership position. *Id.* ¶¶ 155-70.

Thus, on April 11, 2013, as a matter of Danish tax law, the RJM Plan owned 10,400 shares of Maersk stock, and it therefore also owned the dividend declared that same day at the company's Annual General Meeting. Upon execution of the trade, the RJM Plan was exposed to the economic risk that the price of the stock would decline; at the same time, the RJM Plan was entitled to the

upside, including any dividend paid by the company. Bahnsen Decl. Ex. 12, ¶ 145 ("Carr Report"). To hedge its exposure to the risk of fluctuation in the price of Maersk stock, the RJM Plan asked FGC Securities to sell 104 flex futures contracts on Maersk stock at a price of DKK 42,821.31 per share. JSUMF ¶¶ 118-19, 134. (Each futures contract covered 100 shares, matching the number of shares the Plan had purchased, *see id.* ¶ 135, and the fact that the RJM Plan sought to enter into a futures contract at a lower price than its purchase of Maersk shares makes economic sense—the market price of a stock that pays a dividend typically declines after the company has paid the dividend.) FGC Securities issued a second trade confirmation, this one reflecting the execution of the futures sale, and the confirmation stated that the flex futures trade had been cleared through the clearing service BClear. *Id.* Records produced in this case by JPMorgan, which served as a sub-custodian to Solo Capital, reflect the holding of these futures contracts in Danish securities. *Id.* ¶ 120.

Next, the RJM Plan entered into a stock loan to fund the purchase of the shares. On April 16, 2013, the RJM Plan agreed to lend its 10,400 shares of Maersk, as soon as it received them, in exchange for cash collateral of DKK 43,680.2893 per share. JSUMF ¶ 136. The stock lending agreement was based upon an industry-standard security lending agreement template. *Id.* ¶ 137.

At its Annual General Meeting (held on April 11, 2013), Maersk approved a dividend payment. JSUMF ¶¶ 109, 305; Carr Report ¶ 154; Bahnsen Decl. Ex. 14 at Ex. 4 ("Carr Reply Report). The RJM Plan received a statement from Solo Capital showing that it had received a dividend amount net of withholding tax in its account. JSUMF ¶ 145. The RJM Plan also received a Dividend Credit Advice ("DCA") from Solo Capital, stating that the RJM Plan's account had been credited with a payment that represented a dividend net of withholding tax, from which 27% had been withheld, paid on the 10,400 shares of Maersk. *Id.* ¶ 144. The RJM Plan understood

8

that it was properly entitled to the net dividend under Danish law: On the trade date, it had acquired book-entry ownership of the relevant Maersk shares, and so it held the right to both potential risk and reward on the shares. *See* Carr Report ¶¶ 43, 52, 145; Pilgaard Decl. ¶¶ 151, 188. The RJM Plan had no obligation to transfer the net dividend to any other party, and there is no evidence that it did.

On April 23, 2013, the Goal Taxback Limited reclaim agent ("Goal") submitted a tax reclaim application to SKAT on behalf of the RJM Plan. JSUMF ¶ 177. The application included a cover letter, a completed Form 06.003 making a "claim for refund of Danish dividend tax" and specifying the RJM Plan as the "beneficial owner," the DCA provided by Solo Capital, and an IRS Form 6166. *Id.* SKAT approved the request and paid the reclaim. *Id.* ¶¶ 228-29.

On June 13, 2013, the RJM Plan closed out its position in Maersk: it recalled the loaned shares, it sold them (through FGC Securities), and it bought flex futures contracts (again through FGC Securities). JSUMF ¶¶ 138-42. FGC Securities provided trade confirmations reflecting both transactions, and both are reflected in the RJM Plan's custodial account statement. *Id.*; *see also* Dulberg Decl. Exs. 44-45, 47, 68.

### b. An ED&F Bellwether Trade

ED&F executed eleven relevant transactions to acquire Danish securities on behalf of the Riverside Plan, JSUMF ¶ 319 & App'x B, and fourteen relevant transactions to acquire Danish securities on behalf of the AIG Plan, *id.* ¶ 318 & App'x B. Although the details of each transaction vary, there are certain elements that are consistent among all of them:

- ED&F received a written trade request from Kaminer and/or Acer[5] to purchase a given number of shares of Danish securities on behalf of the Riverside Plan and/or

---

[5] Kaminer was Acer's head trader from 2009 to 2017. Kaminer Decl. ¶¶ 1, 4. Acer was designated as agent for the Riverside Plan and AIG Plan with respect to those plans' trading through ED&F. JSUMF ¶¶ 286-90; Kaminer Decl. ¶ 7.

the AIG Plan. Some such trade requests specified the price of the shares to be acquired and the timing of the settlement of the transaction. DSMF ¶¶ 142, 151, 160, 169, 178, 187, 196, 205, 218, 227, 236, 245, 254, 260, 266, 275, 281, 289, 298, 307, 315, 324, 340, 350, 359; Declaration of Brandon Dillman ("Dillman Decl.") Ex. 96; Declaration of Stacey Kaminer ("Kaminer Decl.") ¶¶ 1, 7-12.

- ED&F, upon purchasing the requested shares, provided Kaminer and/or Acer with a written trade confirmation for the Riverside Plan and/or the AIG Plan that conformed with the trade request that ED&F received from Kaminer. DSMF 143, 152, 161, 170, 179, 188, 197, 206, 219, 228, 237, 246, 255, 261, 267, 276, 282, 290, 299, 308, 316, 325, 341, 351, 360; Kaminer Decl. ¶¶ 13, 14.

- ED&F received, for each and every trade executed on behalf of the Riverside Plan and/or the AIG Plan, one or more SWIFT messages from its sub-custodian confirming the settlement of the shares identified in the trade confirmation. DSMF ¶¶ 144, 153, 162, 171, 180, 189, 198, 208, 220, 229, 238, 247, 256, 262, 268, 277, 283, 291, 300, 309, 317, 326, 342, 352, 361.

- The Riverside Plan and/or the AIG Plan, through Acer, received an Account Equity statement from ED&F showing that, as of the beginning of the ex-dividend date, the Riverside Plan and/or the AIG Plan held the number of shares specified in the trade confirmation in its account at ED&F. DSMF ¶¶ 146, 155, 164, 173, 182, 191, 200, 210, 222, 231, 240, 249, 272, 286, 293, 302, 310, 319, 330, 345, 354, 365; *see also* Kaminer Decl. ¶ 15.

- The Riverside Plan and/or the AIG Plan's ED&F account was credited with an entry showing "CASH DIV" in the amount expected in light of the shareholding listed on its Account Equity statement, the dividend rate announced for the dividend event, and an expected tax withholding equal to 27% of the gross dividend. DSMF ¶¶ 140, 149, 158, 167, 176, 185, 194, 205, 216, 225, 234, 243, 264, 278, 287, 296, 304, 313, 324, 339, 348, 359; Kaminer Decl. ¶¶ 16.

- For transactions in which the Riverside Plan and/or the AIG Plan, through its sub-custodian and ED&F, received a dividend payment directly from the relevant Danish issuer, ED&F received from its sub-custodian a SWIFT message confirming the payment of a dividend net of withholding tax. For transactions in which the Riverside Plan and/or the AIG Plan was forwarded a dividend payment by the outside party from whom ED&F acquired the shares on behalf of the Riverside Plan and/or the AIG Plan, ED&F received an email confirmation of the seller's agreement to make such payment and/or confirmation of such payment. DSMF ¶¶ 202, 213, 224, 233, 242, 251, 259, 271, 280, 312, 321, 332, 347, 356, 367.

An example is instructive to illustrate how one trade—which is among those that even SKAT's own expert does not dispute resulted in a "real" dividend payment[6]—worked in practice. On March 11, 2015, ED&F informed Kaminer by email that there appeared to be available liquidity in the market to purchase 1,700,000 shares of Danish transportation company DSV A/S at a price of DKK 219.20, as well as the opportunity to sell a single-stock future tracking the price of DSV shares with April expiry at a price of DKK 217.6942. DSMF ¶ 205; Kaminer Decl. ¶ 12 & Ex. A. The upcoming dividend event for DSV common stock had an ex-dividend date of March 13, 2015. JSUMF ¶ 304. Kaminer responded that two pension plans, the Riverside Plan and the Linden Associates Defined Benefit Plan, were interested in purchasing those 1,700,000 shares at the prices provided, with 850,000 shares to be allocated to each of the two pension plans. DSMF ¶ 205; Kaminer Decl. ¶ 12 & Ex. A.

On March 11, 2015, the execution desk of ED&F's internal inter-dealer broker purchased 1,700,000 shares of DSV stock from Morgan Stanley to be settled in four "shapes" of 425,000 shares, with a trade date of March 11, 2015 and a settlement date of March 13, 2015. DSMF ¶ 209. That execution desk then sold 1,700,000 shares of DSV, also with a trade date of March 11, 2015 and a settlement date of March 13, 2015, in four sets of 425,000 shares, to ED&F's equity finance desk, which was trading on behalf of the Riverside Plan and the Linden Plan. *Id.* ¶ 206. ED&F's equity finance desk received confirmations of that trade, which were sent to Kaminer. *Id.*; Kaminer Decl. ¶ 14.

---

[6] SKAT's expert admits that the following five of eleven trades conducted by ED&F for the Riverside Plan for which the Riverside Plan made a tax reclaim application to SKAT resulted in the payment of "real" dividends: March 2015 trade for 2,000,000 shares of TDC A/S; March 2015 trade for 850,000 shares of DSV A/S; March 2015 trade for 1,200,000 shares of Danske Bank A/S; March 2015 trade for 1,400,000 B shares of Novo Nordisk A/S; and March 2015 trade for 300,000 shares of Pandora A/S. *See* Dillman Decl. Ex. 99 ("Wade Report") App'x F.

11

ED&F received SWIFT messages showing the settlement of the two sets of 425,000 shares of DSV attributable to the Riverside Plan. DSMF ¶ 208. The SWIFT messages show trade dates of March 11, 2015, as expected, and that the trades settled on the expected date of March 13, 2015. *Id.* The shares settled into ED&F's custodial account number 05295142806 at its sub-custodian, Skandinaviska Enskilda Banken ("SEB"). *Id.* The record date for the DSV dividend event was March 16, 2015. JSUMF ¶ 304.

The Riverside Plan's daily ED&F Account Equity statement dated March 13, 2015—the ex-dividend date for DSV, *see* JSUMF ¶ 304—shows that the Riverside Plan sold its 850,000 shares of DSV on that date with an intended settlement date of March 17, 2015, which would be after the record date for DSV. DSMF ¶ 210; Kaminer Decl. ¶ 15. In other words, because the Riverside Plan's 850,000 shares of DSV were delivered into ED&F's custodial account at SEB on March 13, 2015, and would not be delivered out of that account until March 17, 2015, SEB would hold custody of the 850,000 shares of DSV on the March 16, 2015 record date. DSMF ¶ 210. ED&F's internal dividend reconciliation sheet shows that ED&F held 1,700,000 shares of DSV in its SEB depot account number 05295142806 on the record date, and ED&F received a Message Type 566 SWIFT message from SEB showing a dividend payment in the net amount of DKK 1,985,600 on 1,700,000 total shares of DSV held in ED&F's custodial account number 05295142806. DSMF ¶ 212. ED&F credited the Riverside Plan's account with its half of that total net dividend payment, DKK 992,800. DSMF ¶ 214; Kaminer Decl. ¶ 16.

ED&F then produced a tax voucher for the Riverside Plan, which stated that the Riverside Plan was holding 850,000 shares of DSV stock "over the dividend date." JSUMF ¶ 331; Kaminer Decl. ¶ 17. The tax voucher indicated an "Amount Received" of DKK 992,800 and withholding tax "[s]uffered" in the amount of DKK 367,200. JSUMF ¶ 331. The tax voucher produced by

ED&F represented that ED&F "has no beneficial interest in the holding and will not be reclaiming the tax." *Id.* ED&F provided that tax voucher to Goal Taxback, which acted as the tax reclaim agent for the Riverside Plan. *Id.* ¶¶ 335, 367-68. The Riverside Plan's account statement reflecting receipt of a dividend designated as a "CASH DIV" and the subsequent receipt of a tax voucher from ED&F, confirmed for Acer that the relevant pension plan was entitled to a tax refund from the Danish government. DSMF ¶ 215; Kaminer Decl. ¶ 18.

On March 18, 2015, Goal sent to SKAT a tax reclaim application on behalf of the Riverside Plan, including a cover letter with payment instructions, a completed Form 06.003 (making "claim … for refund of Danish dividend tax in the amount of DKK 367,200 and specifying the Riverside Plan as "Beneficial Owner"), the ED&F tax voucher, the power of attorney granted to Goal by the Riverside Plan, and an IRS letter dated January 22, 2015 certifying that the Riverside Plan was "qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation." JSUMF ¶ 367; *see also* Dillman Decl. Ex. 145. SKAT paid the full amount requested by Goal through the submitted tax reclaim application, and the Riverside Plan received the refund. JSUMF ¶¶ 377-78, 382.

### D. SKAT's Approval Of Reclaims And Revocation Of Decisions

Between 2012 and 2015, the bellwether plans submitted to SKAT 49 requests for reclaims of dividend withholding tax. JSUMF ¶¶ 172-203, 358, 367. Pursuant to the procedures described above (*see supra* § SOF.B), SKAT made an administrative decision to approve payment of each of them. *Id.* ¶¶ 228, 378.

On June 16, 2015, a Danish attorney telephoned and emailed the director of SKAT's anti-fraud unit. *See* Bahnsen Decl. Ex. 84. "I hereby notify SKAT … of assumed fraud in connection with the disbursement of withheld dividend taxes in the range of up to DKK 500,000,000," he

13

wrote. *Id.* "The key figure is allegedly a Mr Sanjay Shah who owns [] Solo Capital," he explained. *Id.* Two days later, he emailed again, sharing with SKAT a list of 25 pension plans that "allegedly were the formal owners of the shares … in connection with their requests for disbursement of withheld dividend taxes." *Id.* The lawyer cautioned that he may not have "spelled correctly" the names of the plans, but he provided the names of multiple plans that are now associated with main and backup bellwether cases, including (as written) the "RIM Capital Pension Plan," "Bernina LLC," and "Delian LLC Pension Plan." *Id.*[7]

In July, SKAT received additional warnings from the British Embassy. JSUMF ¶ 69. On July 29, 2015, a representative of Her Majesty's Revenue & Customs provided SKAT with a "formal disclosure of information" including "the names of several registered and non-registered entities and nominals, which are suspected to be involved in the fraud impacting on Denmark." Dulberg Decl. Ex. 15. Echoing the Danish lawyer, HMRC warned that "[t]he principal company involved is suspected to be Solo Capital Partners." *Id.* On August 6, 2015, HMRC provided SKAT with "a list of approximately 180 additional pension companies allegedly used by Solo in the suspected Dividend Arbitrage fraud in Denmark." *Id.* This information was expressly provided "under Article 25 of the Tax Treaty" between the UK and Denmark. *Id.* The list included the names of four of the five plans at issue in the Solo bellwether cases. *Id.*[8]

Following its receipt of this information, SKAT deployed the investigative apparatus available to it as a sovereign agency. Representatives of SKAT flew to Washington, D.C. to meet with IRS officials (JSUMF ¶ 230), and the IRS shared information with SKAT pursuant to Article

---

[7]     None of the other pension plans associated with the bellwether cases, and none of the plans who transacted through ED&F, was mentioned in the lawyer's email.

[8]     The list did not include the Proper Pacific Plan.

26 of the US-Denmark Treaty, which allows SKAT to "use the information" for purposes of "the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention." Treaty art. 26(1). As SKAT later explained, the purpose of its communications with the IRS was to determine whether its "previous administrative decisions to accept WHT applications on behalf of U.S. pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded)." JSUMF ¶ 235.

Ultimately—years after making its decision to approve the reclaim requests—SKAT issued letters to the Plans informing them that it had "decided to revoke the previous decisions on dividend tax refunds." JSUMF ¶ 236. SKAT offered a roving series of reasons in support of its decisions, including several that fundamentally misapprehend the relevant facts and applicable law: that the Plans purportedly lacked the capital to make the investments; that the Plans were newly established; that the Plans had one participant only; that the Plans had not submitted Form 5500 to the IRS. *Id.* ¶ 237.[9] Eventually, SKAT filed the hundreds of lawsuits across the United States that have been consolidated for pretrial purposes in this MDL.

---

[9]    As a factual matter, each plan in the Solo bellwether cases obtained the capital necessary to purchase Danish securities by loaning those securities out in exchange for collateral equal to the purchase price.

There is nothing improper, legal or otherwise, about single-participant pension plans. *See* Reish Report ¶ 21. Nor is there any requirement under the Treaty (or Danish tax law) that a pension plan have multiple participants, that it exist for a defined period of time before seeking reclaims, or that it submit Form 5500 to the IRS. In fact, as a matter of U.S. law, *plans* do not submit Form 5500 to the IRS, but their *sponsoring entities* do. The RJM Plan's sponsoring entity did, in fact, submit Form 5500-EZ to the IRS, but in any event, failure to submit a Form 5500, even where necessary, does not disqualify a plan under the Internal Revenue Code. *See* Bahnsen Decl. Ex. 10 ¶ 170 (Reish Rebuttal Report). And of course, had the Danish government at any time prior to 2015 considered any of these additional elements relevant to a determination of entitlement to reclaim withheld dividend tax, it could have adjusted its process to require this information in the reclaim applications. It did not.

## STANDARD OF REVIEW

A party is entitled to summary judgment when it shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a defendant seeks summary judgment on a fraud claim, the "plaintiff has the burden of providing sufficient evidence that would allow a reasonable jury to find, by clear and convincing evidence, that each of the elements of fraud has been met." *The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 505 (S.D.N.Y. 1989); *see also Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018) (granting defendant summary judgment because plaintiff failed to offer clear and convincing proof regarding two elements of fraud claim).

## ARGUMENT

### I.      The Revenue Rule Bars SKAT's Claims

In denying Defendants' motion to dismiss, the Court expressly contemplated revisiting its Revenue Rule determination "in light of discovery and a fuller presentation." *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 308 (S.D.N.Y. 2019). The extensive record marshalled in this case now shows that the Revenue Rule bars SKAT's claims.

#### A.      The Summary Judgment Record Shows That The Plans Were Beneficial Owners Under Applicable Danish Tax Law

Beneficial ownership was (and is) an essential threshold requirement for entitlement to a tax refund under SKAT's dividend withholding tax regime. Under the double taxation treaty between Denmark and the United States, a full refund of tax withheld on Danish dividends is available to a qualifying "pension fund" that is a "beneficial owner." 2006 Protocol art 10(3), art. 22(2). In accordance with this requirement, SKAT's "Claim to Relief from Danish Dividend Tax" at all relevant times expressly required refund applicants to identify the "beneficial owner." Dulberg Decl. Ex. 4. As SKAT's corporate representative explained, the very purpose of the

16

refund application process was to confirm that the refund claimant was the "beneficial owner." Bahnsen Decl. Ex. 39 ("Ekstrand Tr.") 254:4-12; *see also id.* Ex. 44 ("Jeppesen Tr.") 86:2-20.[10]

The question of beneficial ownership is thus central to SKAT's tax refund application process. *See* Jeppesen Tr. 94:18-25 ("The essential question is whether the person applying for the refund is in fact the beneficial owner."). The point has been made repeatedly in deposition testimony, by SKAT's corporate representative and by SKAT's current and former employees alike: "[Y]ou have to be the beneficial owner in order to claim a refund." Ekstrand Tr. 136:19-25; *see also* Bahnsen Decl. Ex. 42 ("Brøchner Tr.") 85:4-9; Ekstrand Tr. 144:16-24, 232:1-234:4; Jeppesen Tr. 86:2-20, 132:2-133:3; Bahnsen Decl. Ex. 40 ("Rømer Tr.") 81:3-13.

### 1.   The question of "beneficial ownership" must be decided under Danish tax law.

Each of SKAT's claims proceeds on the theory that the Plans falsely represented that they were beneficial owners. Resolution of SKAT's claims thus necessarily turns on the question of whether the pension plan defendants were in fact "beneficial owners" within the meaning of the Danish tax refund regime. *See* Jeppesen Tr. 139:19-140:4 ("Whether they were the beneficial owner or not is the question."). Indeed, it is SKAT's own stated position that the question of beneficial ownership is what this case is "all about." Ekstrand Tr. 232:1-14 ("But fundamentally, this is a case that is all about whether or not you are the beneficial owner of the shares where you are attempting to claim a refund[.]"). Deciding whether the alleged misrepresentations of

---

[10]     SKAT's published instructions for reclaim applications also list beneficial ownership among the dividend withholding tax refund requirements. *See* SKAT, *Claiming refund of Danish dividend tax*, https://skat.dk/data.aspx?oid=2244931&vId=0&lang=US (last visited Apr. 27, 2022) ("The shareholder was the beneficial owner of the shares when the dividend distribution was approved.").

beneficial ownership were true or false requires enforcement of Danish tax law, which prescribes the meaning of beneficial owner.[11]

The starting point is the Treaty. For an undefined term like "beneficial ownership," the Treaty dictates that the term takes its meaning from the law of the State imposing the tax—here, Denmark. Treaty art. 3(2); *see also* Pilgaard Decl. ¶¶ 146-84 (explaining how Danish law, including Danish tax law, gives meaning to "beneficial ownership"). The United States Technical Explanation to the Treaty's 2006 Protocol revising Article 10 (concerning dividends) elaborates:

> The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (*i.e.*, the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State.

Pilgaard Decl. Ex. 41 ("Technical Explanation to 2006 Protocol") at 32.[12] As Defendants' expert Stephen E. Shay—an experienced treaty negotiator and former Deputy Assistant Secretary for International Tax Affairs in the U.S. Department of the Treasury—explains in his report, the

---

[11] As described below, *see infra* Section II, all of SKAT's claims turn on the allegation that the Plans falsely represented that they were entitled to tax refunds. For the reasons described in the accompanying text, the Revenue Rule applies to bar SKAT's claims. It is worth noting, though, that the rationale for applying the Revenue Rule is especially strong with respect to some of SKAT's equitable claims. For instance, to prove a claim for payment by mistake, SKAT would need to show "[1] that plaintiff made a payment under a mistaken apprehension of fact, [2] that defendant derived a benefit as a result of this mistaken payment, and [3] that equity demands restitution by defendant to plaintiff." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2020). To evaluate that claim, the Court would need to interpret and, potentially, enforce Danish tax law in examining both elements [1] and [3]. To determine whether SKAT's payments were "mistaken," the Court would need to determine whether the Plans falsely stated that they were entitled to the relevant dividends under Danish tax law. To determine whether SKAT's payments were "inequitable," the Court would conduct an equitable analysis, which would certainly involve analyzing the basis for the Plans' good faith belief that they were the beneficial owners of the relevant dividends as a matter of Danish tax law. In short, to evaluate SKAT's claim for payment by mistake, this Court would repeatedly interpret and, potentially, enforce Danish tax law. That is prohibited by the Revenue Rule and is true of all of SKAT's claims against all defendants in this MDL.

[12] *See also The Granting of Treaty Benefits with respect to the Income of Collective Investment Vehicles* 9, OECD (adopted by the OECD Committee on Fiscal Affairs on April 23, 2010), https://www.oecd.org/tax/treaties/45359261.pdf ("Because the term 'beneficial owner' is not defined in the Model, it ordinarily would be given the meaning that it has under the law of the State applying the Convention, unless the context otherwise requires.").

decision to follow a domestic law definition of beneficial ownership in the Treaty, rather than an international law definition, is a considered one. *See* Bahnsen Decl. Ex. 8, ¶ 54 ("Shay Report").[13] The international law definition of the term is "uncertain," and relying on the domestic law definition allows parties to the treaty to develop the meaning "in light of [each country's] tax policies and the role the term plays in its tax law." *Id.* ¶ 54.6.[14] This approach safeguards the United States' interests, including its leverage in treaty negotiations. *Id.* ¶ 54.2.

As SKAT's former legal director Leif Normann Jeppesen testified, determining "who is actually the beneficial owner[]" was and is a "taxation decision," reserved in the first instance to SKAT and presents "a complicated question of Danish tax law." Jeppesen Tr. 126:17-127:2, 142:16-143:18; *see also id.* at 85:5-24 (confirming that SKAT needed to make a "tax determination as to who is the beneficial owner").[15]

Three principles of Danish tax law are relevant here.

*First*, for purposes of Danish tax law, a purchaser becomes the owner of shares in a Danish company "when a final and binding and unconditional agreement between the parties has been validly concluded." Pilgaard Decl. ¶ 155; *see also* SKAT Further Particulars Regarding the Validity of WHT Refund Applications ¶ 15.3 ("For the purposes of Danish tax laws (including in

---

[13]     SKAT did not submit any rebuttal to Professor Shay's expert report, nor did it even take his deposition. Accordingly, SKAT has no legitimate basis to assert that there is any genuine dispute relating to Professor Shay's opinions.

[14]     Even if Danish tax law looks to other sources (like international law) in assessing questions of beneficial ownership, consideration of those sources is simply part of the process of applying Danish tax law.

[15]     Consistent with the Treaty, SKAT and numerous of its employees confirmed that in determining who was the beneficial owner of shares that were the subject of reclaim applications, they applied Danish tax law. *See, e.g.*, Jeppesen Tr. 143:8-18 (admitting that SKAT's administrative determinations were "determination[s] of Danish tax law"); Daugaard Tr. 109:19-110:22 (confirming that legal authorities governing question of refund entitlement all "concern Danish tax law"); Madsen Tr. 89:12-90:23 (acknowledging that "SKAT could decline to pay out reclaims based on … Danish tax law"); RFAs 42, 44, 45, 48, and 49 (admitting that in determining entitlement to refunds, SKAT considered Danish tax law when applicable). Moreover, in the English Action, SKAT expressly maintained that withholding tax refund applications were governed by the Danish Withholding Tax Act. *See* Further Particulars ¶¶ 5-7, 32-33, 39, 45, 48-49.

relation to the liability to pay withholding tax and the eligibility for a refund of withholding tax),

a share is acquired or disposed of at the time when a final and binding agreement exists on the

acquisition or disposal.").  This is evidenced by a trade confirmation, Pilgaard Decl. ¶ 169, and it

is true regardless of what happens after the trade date, so long as the purchaser has not sold its

shares prior to the ex-dividend date, *id.* ¶¶ 158-63 (explaining that Danish courts have deemed

ownership over securities to have transferred when an offer to purchase shares was accepted, rather

than when the shares were ultimately delivered); *cf.* Rev. Rul. 2002-44, 2002-2 C.B. 84 (under

U.S. law, "[i]n the context of determining holding period … both stocks and bonds are considered

acquired or sold on the respective trade dates" (cleaned up)).

*Second*, the owner of shares in a Danish company before the ex-dividend date is entitled to

the dividend.  Pilgaard Decl. ¶ 188 (noting that "[a]ny buyer who buys a share before the 'ex-

dividend date' will be entitled to the dividend").  Denmark will impose taxes on that individual

whether the dividend comes directly from the issuing company or as a dividend compensation

payment.  *Id.* ¶ 202 ("[W]hen an owner of shares receives a dividend compensation payment, the

owner is considered to have received a dividend for the purpose of Danish tax law.").

*Third*, the beneficial owner of dividends under Danish tax law is the party entitled to use

and enjoy the dividends.  Pilgaard Decl. ¶ 188; *accord* OECD Model Tax Convention Commentary

on Article 10 (2014), ¶ 12.4 (recipient of dividend is "beneficial owner" only if its "right to use

and enjoy the dividend" is "unconstrained" by any "contractual or legal obligation to pass on the

payment received to another person").[16]

---

[16]     In the English Action, SKAT indicated that it understood the "beneficial owner" to be the "entity that actually
benefits from the interest economically and has the power freely to determine the use to which it is put, as opposed to
an intermediary or nominee that is bound to pay the amounts it receives to another person."  Re-Amended Schedule
5T ¶ 14.

## 2. The Plans were beneficial owners of the dividends.

Against this backdrop, the undisputed factual record shows that the Plans were the beneficial owners of the shares and the dividends. In each and every case, the Plans entered into binding and unconditional contracts to purchase shares of Danish company stock on the date of the annual general meeting, or before the issuer's ex-dividend date in the case of special or interim dividends. *See* JSUMF ¶¶ 111, 113. Each Plan received a trade confirmation from an independent and regulated inter-dealer broker that listed the essential terms of the trade, including the share price, the number of shares, the trade date, and the associated commissions (which each Plan paid). *See id.* ¶ 115. These documents establish the transfer of ownership of the shares from the seller to the buyer; because each transfer occurred before the ex-dividend date, under Danish tax law they establish ownership of the shares and the entitlement to any associated dividend income. *See* Pilgaard Decl. ¶ 155 (explaining that "[i]t is a fundamental principle of Danish law, including Danish tax law, that ownership of a given asset is obtained when a final and binding and unconditional agreement between the parties has been validly concluded").

Then, the Plans received net dividend payments, reflected by book entry credits in their accounts. And, just like any other cash in any other shareholder's account, the Plans could use and enjoy those dividends for any purpose.[17] (SKAT has argued in other contexts that the Solo bellwether plans were obligated to pay a significant portion of any *reclaim* to the Solo Custodians or pursuant to partnership agreements, but that has nothing to do with the net dividend payment received by each Plan, which represented 73% of the gross dividend, and which each Plan retained in its entirety.) Accordingly, the Plans were the beneficial owners of the shares and the dividends,

---

[17] The fact that the Plans' custodians could theoretically apply those dividend payments to satisfy an obligation of the Plan to the custodian—which SKAT does not contend ever actually happened—does not negate the fact that the Plan had the right to the dividend in the first place. *See, e.g.*, Bahnsen Decl. Ex. 19, ¶ 76 (Second Salter Report).

and reclaim agents acting on the Plans' behalf checked a box on SKAT Form 06.003 indicating that the reclaims were being sought on behalf of the "beneficial owner." *See* JSUMF ¶¶ 25, 177 (exemplary); Sample Form 06.003, Dulberg Decl. Ex. 4.[18]  SKAT issued decisions reflecting its view that these requirements were met when it approved the Plans' claims between 2012 and 2015. *See* JSUMF ¶¶ 228-29.

In denying Defendants' motion to dismiss, the Court observed that Defendants had neither "placed the fact, or timing, of ownership in dispute," nor made clear "how, if at all, the timing argument is related to the question of beneficial ownership as distinct from any other kind of ownership." *In re SKAT*, 356 F. Supp. 3d at 315.  The record now confirms precisely how timing matters.  Only a beneficial owner, as defined by Danish tax law, is entitled to a refund for dividend withholding tax.  *See supra* SOF.B.  And a claimant may establish beneficial ownership by having "a legal, binding agreement" to purchase shares "at the latest, on the date of the annual general meeting" of the issuer.  JSUMF ¶ 49 (quoting Ekstrand Tr. 144:16-145:16); *see also* DSMF ¶ 31 (Lisbeth Rømer understood beneficial ownership to require only ownership of shares at the time the company declared a dividend); Ekstrand Tr. 145:8-16 (confirming that "[a]s long as a legal, binding agreement has been made on the purchase and payment" of shares "on or before the date of the annual general meeting, the purchaser's entitled to the dividend declared at that meeting").

SKAT takes a contrary view.  According to SKAT, the Solo Bellwether Plans' trading was circular and no custodian held any shares on behalf of the Solo Bellwether Plans; since there were "no shares," SKAT's theory goes, the Solo Bellwether Plans did not receive any dividends from

---

[18]     On SKAT's understanding, for purposes of processing withholding tax refund applications, the "beneficial owner" was not necessarily the registered owner of the security.  *See* Bahnsen Decl. Ex. 47 ("Sorensen Tr.") 44:8-12, 49:10-51:2; *see also* Jeppesen Tr. 123:20-126:6; Sorensen Tr. 42:16-43:7 (the term "beneficial owner" does not "mean anything" to VP Securities), 58:7-12 (VP Securities does not use the term "beneficial owner"), 132:16-23, 141:13-142:7.

which tax could be withheld, and the statements on the reclaim applications that they were the beneficial owners were false. With respect to the ED&F Bellwether Plans, the undisputed facts establish that shares *were* in fact acquired, and SKAT's only contention is that the shares did not carry dividends or that the dividends beneficially belonged not to the ED&F Bellwether Plans, but to ED&F itself for the purposes of Danish tax law and the Treaty. Needless to say, the Solo Bellwether Plans and the ED&F Bellwether Plans disagree with SKAT's characterization of their trading activities and its implications for beneficial ownership. But for purposes of this Revenue Rule argument, what matters is that the parties' dueling positions require this Court to choose between two conflicting views of beneficial ownership.

In the Plans' view, beneficial ownership is determined by the Danish tax law principles outlined above, under which a purchaser owns shares and their associated dividends when he enters into a binding contract to purchase before the ex-dividend date. There are no shares that are identified or held in accounts at that time, but that is no matter because it is the contractual right that gives rise to beneficial ownership under Danish tax law.

Also in the Plans' view, beneficial ownership is confirmed by ordinary market principles, which hold that book entries reflecting stock purchases and dividends suffice to establish an entitlement to those positions. *See* Carr Report ¶ 29 & n.19; *see also, e.g.*, U.C.C. § 8-501(b)(1) (explaining that, in general, a "person acquires a security entitlement if a securities intermediary … indicates by book entry that a financial asset has been credited to the person's securities account"); Rev. Rul. 2004-37, 2004-1 C.B. 583 (in the U.S., "[a] person acquires a beneficial ownership interest in property when he or she has been transferred both the right to share in an increase in the value of the property and the obligation to share in the risk of loss in its value"). Moreover, Danish law allows a custodian with equal and offsetting positions—like Solo Capital—

to engage in "netting" and internalized settlement (Pilgaard Decl. ¶¶ 204-08), such that the custodian does not *need* to obtain external shares in order to settle its customers' transactions. Carr Report § V.

To credit SKAT's theory, this Court must choose *not* to enforce these straightforward principles of Danish tax law and to instead adopt SKAT's idiosyncratic litigation position—not held by the agency at the time it approved the reclaim applications by "applying Danish tax law"— that, after the date of the trade and entitlement to ownership, shares must subsequently be located in a sub-custodial account and traced to the agency's satisfaction in order to establish a claim to beneficial ownership. That position is contrary to Danish tax law, *see* Pilgaard Decl. ¶¶ 151, 155 (explaining that, under Danish law, "dematerialization of Danish listed shares … did not lead to any change in when a buyer obtains ownership of a security," and further noting that share ownership "is obtained when a final and binding and unconditional agreement between the parties has been validly concluded"),[19] and enforcing it here to vindicate SKAT's claims poses the very perils the Revenue Rule is meant to avoid. *See In re Skat*, 356 F. Supp. 3d at 318 ("[R]endering a decision under Danish law on the question of beneficial ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the same question would be exactly the type of harm or embarrassment against which the revenue rule is designed to protect.").

SKAT's failure at the time it approved the reclaim applications to trace the applicants' dividends back to those issued directly from the issuer (or to demand that the applicants conduct such a tracing exercise)—and its failure to require that shares appear in the books and records of a

---

[19] Notably, "validly concluded" does not require settlement. Instead, all it requires is acceptance of an offer to purchase shares. *See* Pilgaard Decl. ¶ 162 (citing Danish City Court case in which "Court came to the conclusion that the ownership of the shares was transferred when the offer to purchase the shares was accepted," and that "[d]elivery of the shares was not a precondition to finalize the transfer of ownership").

sub-custodian—reflects its judgment that no such exercise was required under Danish tax law.
Indeed, sovereigns may make decisions about how to impose tax (or not) on dividend
compensation payments—namely, payments that are made within the trading market and not
directly from the issuer—and the Revenue Rule is designed precisely to avoid second guessing
those decisions in foreign courts.  For example, the United States taxes dividend compensation
payments—sometimes referred to as "dividend equivalent payments"—made to foreign investors
with respect to derivative instruments like notional principal contracts and allow for recovery of
excess withholding tax.  *See* 26 U.S.C. § 871(m); *see also* Bahnsen Decl. Ex. 48 ("Wade Tr.")
273:16-275:9 (SKAT's own trading expert describing pension plans' holdings as "derivative
positions").  Importantly, this reflects the United States' judgment to tax dividend compensation
payments directly and to do so on instruments like derivative contracts where neither the investor
nor its custodian hold underlying equities.  Denmark could have constructed its tax law and reclaim
administration process to ensure that dividend compensation payments were taxed, including
where those payments were not associated with any direct shareholdings.  By its own telling,
Denmark appears to have failed to do that—and SKAT may now have also concluded that its
administration of the withholding tax regime in Denmark between 2012 and 2015 was
incompatible with the Danish tax law definition of share ownership, in which contractual
commitments evidenced by trade confirmations and book entries determine the owner of shares.
The Revenue Rule bars this Court from engaging by dint of this litigation in retroactively setting
tax policy for the Danish government.

### 3. SKAT's characterization of the reclaim applications as illegitimate and fraudulent does not change the Revenue Rule analysis.

Based on the pleadings, the Court credited SKAT's allegations that (1) the Plans had "no
legitimate connection to the Danish tax system," and (2) SKAT sought to "recover for what

amounted to theft" or "garden variety commercial fraud," and concluded that either or both of these allegations took SKAT's claims outside the remit of the Revenue Rule. *In re SKAT*, 356 F. Supp. 3d at 308, 311. With the benefit of the summary judgment record, neither conclusion is tenable.

*First*, even if SKAT disagrees as to whether the Plans are the beneficial owners of the dividends they claim, the Plans' "connection to the Danish tax system" is legitimate; indeed, that connection is prescribed by Danish tax law, which reflects a sovereign policy choice to collect dividend withholding tax at source and channel reclaims exclusively through a government administrative process. In other words, there is nothing to distinguish this case from the prototypical Revenue Rule case. Although this case involves allegedly fraudulent claims for tax refunds, rather than tax evasion, that difference merely reflects the choices Denmark has made in how to administer its tax system. But the application of the Revenue Rule does not depend on the manner or methods by which a foreign sovereign's tax system is harmed; to the contrary, the Revenue Rule respects the choices sovereigns make and insulates them from foreign court review.

In an exercise of its sovereign prerogative, Denmark chose—like some but not all countries have done—to withhold dividend tax at the source. Shay Report ¶¶ 21, 48-49. Under that system, Danish companies pay dividends net of withholding tax, and parties that contend they are entitled under applicable treaties to a refund of that withheld tax must apply to SKAT. *See id.* ¶ 49; Pilgaard Decl. ¶ 131 (describing "two alternative systems in place in Denmark" during the relevant time period through which claimants could "obtain a refund of dividend withholding tax," and

both went through SKAT). There is no other method to do so.[20] Applicants cannot petition the dividend-issuing company to pay gross dividends; they cannot seek to recover withheld tax from the company, the Danish National Bank, the Danish central securities depository, or any other entity. *See* JSUMF ¶¶ 33-35; DSMF ¶¶ 9-10. Denmark has made SKAT the exclusive arbiter of entitlement to withheld dividend tax refunds, and it has vested SKAT with exclusive authority to decide whether the reclaim application meets the Danish tax-law requirements and should be paid.[21]

The Plans took the view that they were subject to tax on the dividends received, that they qualified for benefits under the Treaty, and that they were entitled—indeed, *required*—to make their case to SKAT, and to no one else. That SKAT now takes the litigation position that certain trading was circular and rendered the claim to beneficial ownership nugatory does not make the Plans' engagement with the Danish tax system illegitimate. The Plans took the prescribed path to

---

[20] Contrast Denmark's policy decision to structure its withholding tax system this way with the policy decision made by the United States. Rather than forcing corporations to withhold a flat percentage of dividend withholding tax and then directing non-residents to apply to the governmental tax collection agency to recover over-withheld dividend withholding tax (as Denmark has done), the United States "employs a system of relief at source." Shay Report ¶ 49. In the United States' system, "withholding agents"—often companies paying dividends on their shares or financial institutions—*themselves* assess non-residents' claims to reduced levels of dividend withholding tax pursuant to a relevant treaty. *See* 26 C.F.R. § 1.1441-1(b)(1); *id.* § 1.1473-1(d) (defining "withholding agent"); *see generally* IRS, *U.S. Withholding Agent Frequently Asked Question*, https://www.irs.gov/businesses/international-businesses/us-withholding-agent-frequently-asked-question (last visited Apr. 28, 2022). The United States' system puts the primary onus on withholding agents, rather than the government, to ensure compliance. Shay Report ¶¶ 56.1, 56.2. In contrast, in Denmark's system, "it is the responsibility of the revenue authority, in this case SKAT, to get the tax refund right." *Id.* ¶ 58.1. In any event, how a country chooses to administer its dividend withholding tax system is only a matter of administration; it does not change what is being taxed or the amount of tax due. If tax reclaim countries like Denmark could escape application of the Revenue Rule solely by virtue of how they design their domestic tax administrative systems, that would lead "to a material asymmetry in application of judicial collection assistance based upon the sovereign's policy decisions." *Id.* ¶ 59.1.

[21] Not surprisingly, Danish law makes clear that SKAT's responsibility in administering dividend withholding tax is significant, and the agency has been empowered to investigate reclaim applications for *six months* before reaching a determination given "the complexity of many withholding tax cases" and the fact that "in-depth investigations often need to be carried out." Pilgaard Decl. ¶ 143.

advance a position that, as discussed above, was at a minimum a bona fide claim of beneficial ownership.

*Second*, SKAT's characterization of these claims as "garden variety commercial fraud" is incorrect for all the reasons discussed above.[22] But it also does not change the Revenue Rule analysis. To start, the fact that SKAT characterizes a litigation dispute over beneficial ownership as "fraud" does not immunize its claims from the Revenue Rule: International tax law treats fraud claims as a species of ordinary tax revenue claims subject to the Revenue Rule. *See infra* Section I.B. Indeed, the Second Circuit has applied the Revenue Rule to bar foreign sovereigns' RICO claims that were based on allegations of wire and mail fraud. *See Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001) ("*Canada*"); *Eur. Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 128 (2d Cir. 2004) ("*EC I*"), *cert. granted*, *judgment vacated*, 544 U.S. 1012, 125 S. Ct. 1968 (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005). And it is the substance of the claim, rather than its form, that counts. *See In re Skat*, 356 F. Supp. 3d at 311; *Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 182 (2d Cir. 2005) ("*EC II*"). "If it were otherwise, litigants could freely avoid the impact of the revenue rule by bringing tax claims under the guise of non-tax-related causes of action." *Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253, 1256 (11th Cir. 2003).

To be sure, a foreign sovereign's claim alleging fraud with no connection at all to the foreign sovereign's tax system—a true "garden variety commercial fraud," *In re SKAT*, 356 F.

---

[22]     Indeed, it is difficult to square that characterization with Defendants' actual conduct. The RJM Plan, for example, clearly believed it had purchased millions of dollars of securities, in fact paid commissions on those purchases, disclosed those purchases to the Treasury Department, disclosed the relevant accounts associated with those purchases to FinCEN, and filed all required paperwork with SKAT, which promptly approved its requests only to decide later that it reached the wrong decision and informed the Plan that it had revoked its previous approvals. This is not fraud at all, but simply a dispute over entitlement to tax refunds under principles of Danish tax law, which is non-justiciable under the Revenue Rule.

Supp. 3d at 308—would not be barred by the Revenue Rule. A U.S. computer vendor that absconded with funds paid by a foreign tax authority for an IT system that was never delivered could likely be sued in U.S. court. The highway robbery, by an American, of a SKAT truck delivering tax kroner would not be barred by the Revenue Rule. But that is not the case here; this is not an ordinary commercial transaction but instead involves an application of Denmark's sovereign authority to withhold, collect, and pay taxes.[23] And if a sovereign had a bona fide claim that a party had simply stolen its money—a stick-up at the treasury, for example—that claim might not be barred by the Revenue Rule either, as both this Court and the UK Court of Appeal have suggested. *See In re SKAT*, 356 F. Supp. 3d at 311; *Skatteforvaltningen v. Solo Cap. Partners LLP* [2022] EWCA Civ 234 [¶¶ 128, 143].[24] Notwithstanding SKAT's protestation that it seeks only to recover "stolen," non-tax money, SKAT paid the Plans upon SKAT's approval of their claims to beneficial ownership, through a process that Denmark chose among various options to implement its tax laws. While SKAT now takes the view that the applications—which included all the information Denmark decided was needed—failed to establish the Plans' beneficial ownership, its claims of "fraud, pure and simple" do not hold up. There is, at the least, a genuine legal dispute regarding whether the Plans were, in fact, the beneficial owners of the Danish

---

[23]    Relatedly, SKAT has conceded that SKAT's determinations on refund applications were sovereign acts. *See* SKAT's Mem. of Law in Supp. Mot. to Dismiss Utah Plans' Countercls. at 10-11, Dkt. 180 (Aug. 19, 2019); *see also* Mem. Op. at 2, Dkt. 261 (Jan. 23, 2020) (act of state doctrine applied to bar Utah Plans' counterclaims because "[h]olding that an agency of Denmark unlawfully denied an application for a tax refund would require examining the validity of a sovereign act by the Danish government in Denmark").

[24]    Defendants respectfully submit that the UK Court of Appeal decision is incorrect, and note that the defendants in that case have sought further appellate review. In any event, the UK court's reasoning is inapposite here, as it did not focus on the separation of powers concerns that animate the Revenue Rule in the Second Circuit. *See, e.g.*, *Skatteforvaltningen v. Solo Cap. Partners LLP* [2022] EWCA Civ 234 [¶ 139] (noting that "at least in this jurisdiction, the preferred rationale for the revenue rule … is that an assertion of sovereign authority by a foreign state within the territory of our Courts is not admissible here").

dividends at issue.[25]   And resolving that dispute will necessarily involve determining what beneficial ownership requires under Danish tax law.  Pilgaard Decl. ¶ 146.

Indeed, some of the tax reclaim applications at issue in this case indisputably concerned the receipt of what SKAT calls "real dividends."  Far from "fraud, plain and simple," there is no dispute that ED&F *did* purchase shares and *did* receive dividends to support a significant number of tax vouchers it issued on behalf of the ED&F Bellwethers.  SKAT's expert, Mr. Wade, identified an entire set of transactions "under which ED&F Man or one of its clients did in fact obtain a real dividend," Dillman Decl. Ex. 99 ("Wade Report") ¶ 162, which Wade defined as a dividend paid by the issuer net of withholding tax, *see id.* ¶ 70.[26]  In other words, the ED&F Bellwethers made tax reclaim applications to SKAT based on the receipt of an acknowledged "real dividend" net of withholding tax.  Those applications thus correspond, on a one-to-one basis, with withholding tax collections made by SKAT, and any decision SKAT made as to whether or not the pension plans were entitled to reclaim that tax would implicate the enforcement of Danish tax laws.  Of course, it cannot be the case that *some* of SKAT's claims are barred by the Revenue Rule while others may proceed:  The Revenue Rule analysis does not turn on whether the litigation concerns "real" dividends or dividend equivalent payments.

---

[25]     SKAT's logic that Solo Capital held "no shares" and therefore Defendants engaged in fraud ignores the realities of the modern financial system.  In Denmark, physical shares gave way to electronic book entries as early as 1988, Pilgaard Decl. ¶¶ 148-49, and custodians could engage in net settlement at least as early as the 1990s, *id.* ¶ 207. As a Bank of England policy statement explains, "If a PB [Prime Broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may internally net these amounts to avoid having to fund the positions elsewhere."  Carr Reply Report ¶ 70.

[26]     Each of the ED&F tax vouchers submitted by the ED&F Bellwethers in support of their tax reclaim applications contained a statement that ED&F "has no beneficial interest in the holding and will not be reclaiming the tax."  *See* ED&F-00038285.  Nor is there any evidence in the record that ED&F in fact made any attempt to reclaim the tax withheld on the acquired shares—it did not.

Nor, finally, does it matter that this case involves SKAT's attempts to reclaim amounts previously paid out, as opposed to amounts never collected in the first place (because of tax evasion, for example). As discussed below, extant U.S. bilateral tax treaties make clear that the political branches consider allegedly fraudulent refund requests to be "revenue claims," which all agree properly form the basis for a Revenue Rule bar. *See infra* § I.B. And, in any event, the distinction between applying the Revenue Rule to bar a foreign sovereign's claims based on (1) alleged "tax evasion"—*i.e.*, the avoidance of paying tax revenue on the front end—rather than, as is the case here, (2) a dispute over the rightful owner of repaid dividend withholding tax on the back end, is itself illusory. The Revenue Rule does not depend on how a foreign sovereign designs and administers its tax system. In a tax reclaim withholding system like Denmark's, a claim to recoup an allegedly incorrect tax refund is "functionally indistinguishable" from a claim for underpaid tax in a relief at source withholding tax system like that of the United States. *See* Shay Report ¶ 77. Indeed, for purposes of tax enforcement, there is "no relevant difference" between the two. *Id.*; *see also id.* ¶ 18.2; *cf. United States v. Wardell*, 218 F. App'x 695, 696-98 (10th Cir. 2007) (affirming sentence of defendant convicted of "tax fraud" even though defendant paid no tax and merely submitted "false returns" seeking tax refunds to which he was not entitled).

**B.    In Seeking To Enforce Danish Tax Law, SKAT's Claims Raise Separation of Powers and Sovereignty Concerns**

Vindicating SKAT's claims would require this Court to endorse SKAT's view about what Danish tax law requires in order to establish beneficial ownership. Because SKAT's claims depend entirely on Danish tax law, they thus seek "direct" and/or "indirect" enforcement of foreign tax law, which is barred by the Revenue Rule. *See United States v. Federative Republic of Brazil*, 748 F.3d 86, 93 n.7 (2d Cir. 2014); *EC I*, 355 F.3d at 131; *Canada*, 268 F.3d at 131; *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 385 (E.D.N.Y. 2007) ("*Colombia*").

31

The discussion above explains why SKAT's claims seek to enforce Danish tax law, and thus run afoul of the Revenue Rule.  Here, we focus on two concerns, which, as this Court has previously explained, animate application of the Revenue Rule:  (1) "preserv[ing] separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government," and (2) "ensur[ing] respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices."  *In re SKAT*, 356 F. Supp. 3d at 310; *see Colombia*, 531 F. Supp. 2d at 389 (courts are required to consider these concerns in determining whether to apply the Revenue Rule (citing *Canada*, 268 F.3d at 113)).

*First*, as to separation of powers, vindicating SKAT's claims "would be ignoring and undermining the treaty negotiation process and the clearly expressed views of the political branches of the United States government and instead engaging in ad hoc judicial policymaking in the delicate realm of foreign affairs."  *Canada*, 268 F.3d at 122.  As the Second Circuit has explained, the political branches play the "leading role" in "the domestic collection of foreign taxes and the enforcement of United States taxes abroad."  *Id.* at 115.  They fulfill that role "through the medium of negotiated tax treaties providing for mutual cooperation."  *Id.*  The Revenue Rule plays a critical role in backstopping this function, ensuring that the political branches' primacy in foreign collection assistance is not undermined by foreign sovereigns' recourse to U.S. courts.  Shay Report ¶ 69.

Many bilateral tax treaties negotiated by the U.S. provide for some form of mutual collection assistance.  Shay Report ¶ 65.  Importantly, none of those treaties precludes such assistance in cases where a fraudulent request for a refund has been alleged (even when no tax revenue has been paid or collected).  For example, the U.S.-Belgium tax treaty provides limited

collection assistance to the extent necessary to ensure that treaty benefits are enjoyed by persons entitled to those benefits under the terms of the treaty. *See* Bahnsen Decl. Ex. 68 ("U.S.-Belgium Treaty") art. 26(1); Shay Report ¶ 65.1. But the U.S.-Belgium Treaty (and others like it) do not obligate the U.S. to carry out administrative measures that are different from those used in the collection of its own taxes or that would be contrary to its sovereignty, security, or public policy. *See* U.S.-Belgium Treaty art. 26(2); Shay Report ¶ 65.1.

Other treaties negotiated by the U.S.—including the U.S.-Denmark Treaty—allow broader collection assistance relating to revenue claims of the foreign sovereign. *See* Shay Report ¶ 65.2; Treaty art. 27. Those treaties include carefully negotiated limits on the provision of such collection assistance. In those treaties where collection assistance is broader, there are stricter conditions, including requirements that such claims be fully and finally adjudicated in the foreign country before any assistance is provided. *See* Treaty art. 27(2).[27]

This account of the United States' treatymaking proves three points critical to this Court's Revenue Rule analysis.

*First*, permitting collection assistance in U.S. courts—against U.S. nationals in particular[28]—is a decision clearly reserved to the political branches, and one that they undertake with great care and reservation. *See* Shay Report ¶¶ 65.2(i), 66, 68-69. For example, in the U.S.-Denmark Treaty, the U.S. has explicitly agreed not to provide collection assistance against its own nationals. *See* Treaty art. 27(8). Entertaining these cases will undermine the delicate balance the

---

[27]  *See also, e.g.*, Bahnsen Decl. Ex. 67 ("Canadian Protocol") art. 15, ¶ 2 (Protocol 3, Mar. 19, 1995); *id.* Ex. 68 ("U.S.-Netherlands Treaty") art. 31, ¶ 2; Japanese Protocol art. XIII, ¶ 5.

[28]  In the Japanese Protocol—the only treaty in which the U.S. has agreed to provide collection assistance against its own nationals, including nationals who submit fraudulent claims for refund to the Japanese treasury—the U.S. established specific rules governing Japan's ability to seek that assistance, and Japan made the reciprocal concessions. *See* Japanese Protocol art. XIII; Shay Report ¶ 65.2(ii).

political branches have struck by creating an unwarranted asymmetry in international tax collection assistance. Denmark would receive collection assistance in U.S. courts, even though the Treaty does not grant the U.S. the same benefit in Danish courts (or through administrative channels). *See Canada*, 268 F.3d at 122.[29] Indeed, the U.S.-Denmark Treaty guarantees that the collection assistance it allows shall not "be construed as imposing on either Contracting State the obligation to carry out administrative measures" at variance with each State's typical practices in its own tax collection. Treaty art. 27(10). In asking this Court to hear its "fraud" claims for collection of tax revenue, SKAT eschews the prescribed procedure for securing collection assistance from the IRS and, instead, seeks to bypass the U.S.'s administrative measures entirely.[30] Denmark could negotiate an addition to the U.S.-Denmark Treaty to allow for collection assistance in this case. In fact, Japan has done exactly that. *See* Shay Report ¶ 66.1; Bahnsen Decl. Ex. 69 ("Japanese Protocol") art. XIII. This Court should respect the considered judgment of the political branches and refuse to hear SKAT's claims in the courts. *See EC II*, 424 F.3d at 180 (Revenue Rule designed to ensure that "executive branch, not the judicial branch" will "decide when our nation will aid others in enforcing their tax laws").

---

[29] In this respect, it is worth noting that Danish courts appear also to apply the Revenue Rule. *See Corporation of Bergen v. Olsen*, Denmark, Eastern Provincial Court (Oct. 23, 1924), available in *Annual Digest of Public International Law Cases* 263-64 (1933) (dismissing case as "unsuitable for decision by the Danish courts" when the Norwegian City of Bergen sued a Danish national in Danish provincial court seeking to reclaim taxes that the Danish national allegedly owed in Norway). *See* Bahnsen Decl. Ex. 74.

[30] In the normal course, for instance, the IRS might make an assessment for taxes owed. *See* 26 U.S.C. § 6203. Then, the IRS would "give notice to each person liable" under that assessment, "stating the amount and demanding payment thereof." *Id.* § 6303(a). The goal of this procedure is to facilitate administrative resolution—short of court actions—of tax-related issues. *See* IRS, *Topic No. 201 The Collection Process*, https://www.irs.gov/taxtopics/tc201 (last visited Apr. 28, 2022) (upon receiving notice, "[i]t's important to contact us and make arrangements to pay the tax due voluntarily. If you don't contact us, we may take action to collect the taxes.").

*Second*, although SKAT has suggested otherwise,[31] allegedly fraudulent tax refund applications such as those at issue here are treated just like any other revenue claim as to which foreign sovereigns negotiate for collection assistance. As a result, they are equally subject to the Revenue Rule's prohibition on judicial collection assistance. In the few tax treaties where the U.S. has agreed to provide broad collection assistance, it has not distinguished between ordinary tax revenue claims and claims relating to the fraudulent submission of tax returns or claims for refunds. To the contrary, the U.S. executive branch has made clear its concluded view that "a fraudulent claim for refund" is a "revenue claim." The Japanese Protocol, which entered into force after the Court issued its ruling on Defendants' motion to dismiss,[32] confirms that the United States views "revenue claims" to include "a fraudulent claim for refund." Japanese Protocol art. XIII; *see also* Shay Report ¶¶ 65.2(ii) (explaining that Japanese Protocol's collection assistance provision "makes no distinction between a fraudulent claim for refund of a tax that has been paid and a refund for a tax that was never paid"); *id.* ¶ 66.2 (Japanese Protocol "strongly suggests that the United States would not consider a case involving a fraudulent (or incorrect) refund of tax as outside the scope of a collection assistance article."); S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 34 (2014) (statement of Robert B. Stack, Deputy Assistant Sec'y for Int'l Tax Affs., Dep't of Treasury) (Japanese Protocol would allow Japan "to request, in certain cases, assistance from the IRS in the collection of a Japanese *revenue claim* against a U.S. citizen," but "the scope of

---

[31] *See* MTD Opp. at 13, No. 1:18-cv-4047, Dkt. 47 (Oct. 1, 2018) (suggesting that such claims fall outside the Revenue Rule because they do "not seek[] to collect unpaid tax").

[32] Although the Japanese Protocol had been negotiated some time earlier, it only entered into force after the Court issued its decision on the motion to dismiss; the parties did not mention it in their briefs. The Court thus did not have the benefit of the Japanese Protocol in reaching its decision that the separation of powers concerns reflected in the Revenue Rule did not warrant barring SKAT's claims.

*such requests* is limited only to situations in which the citizen has either[] filed a fraudulent tax return (or a fraudulent claim for refund)[.]" (emphases added)).[33]

And where it was deemed appropriate to provide for collection assistance with respect to such revenue claims (including fraud claims), the U.S. has decided to contract for such assistance with foreign sovereigns in an exercise of its treaty power. Because the executive branch is the "sole organ of the federal government in the field of international relations," *Pasquantino v. United States*, 544 U.S. 349, 369, 125 S. Ct. 1766, 1779 (2005) (cleaned up), and because the U.S. has definitively construed ordinary revenue claims to include claims relating to the submission of a fraudulent claim for refund, this Court should defer to the United States' judgment and apply the Revenue Rule to bar "the enforcement of the revenue claims of foreign States" in U.S. courts. *Canada*, 268 F.3d at 112 (cleaned up).

*Third*, respect for sovereignty requires application of the Revenue Rule here. As the Court has already stated, "rendering a decision under Danish law on the question of beneficial ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the same question would be exactly the type of harm or embarrassment against which the revenue rule is designed to protect." *In re Skat*, 356 F. Supp. 3d at 318. The record now before the Court demonstrates that such an outcome is a distinct possibility. If the Court finds for Defendants on the merits, it will do so because it disagrees with SKAT's position regarding the requirements of beneficial ownership

---

[33]     Although the U.S.'s other in-force bilateral treaties are not as explicit as the Japanese Protocol, they also support the same understanding because they nowhere distinguish between fraudulent claims for refunds and "revenue claims." For instance, consider the tax treaties between the U.S. and the other five countries that offer "broad" collection assistance—Denmark, Canada, France, Netherlands, and Sweden. *See* Shay Report ¶ 65.2. None of those tax treaties defines "revenue claim" to exclude fraudulent claims for refund. *See* Treaty art. 27; Canadian Protocol art. 15; Bahnsen Decl. Ex. 70 (U.S.-France Treaty) art. 28; U.S.-Netherlands Treaty art. 31; Bahnsen Decl. Ex. 71 (U.S.-Sweden Treaty) art. 27.

under Danish tax law, both in this lawsuit and also in prior administrative determinations.  *See* JSUMF ¶¶ 228-29.

Relatedly, because the concept of beneficial ownership is defined by Danish tax law, *see supra* § I.A.1, this Court's consideration of SKAT's claims will touch on fundamental policies undergirding Danish tax law.  The Court's resolution of SKAT's claims could potentially result in tension with well-grounded policies in this Court's home locale.  SKAT's view—that book entry ownership is insufficient to confer beneficial ownership under Danish tax law—is idiosyncratic and appears to contravene the settled securities and tax laws of other regimes, including the United States and Denmark.  *See* Carr Report ¶ 29 & n.19; U.C.C. § 8-501(b)(1); Pilgaard Decl. ¶¶ 151, 188.   In this case, there is no dispute that shares of listed Danish corporations existed in dematerialized form—in other words, only as book entry records—and that the Plans possessed book entries indicating their ownership of the relevant Danish shares and dividends.  *See* JSUMF ¶ 20; Carr Rebuttal Report ¶ 80 & n.103.  The Revenue Rule exists to guard against courts' undertaking analyses like this one.  *See Canada*, 268 F.3d at 113 (explaining that Revenue Rule guards against possibility of court's close examination of foreign revenue laws, *even when* policies undergirding law seem to comport with public policy in court's locale).

Even if the Court still believes that it need only "recognize," rather than "enforce," Danish tax law, separation of powers and sovereignty concerns still support the application of the Revenue Rule to bar SKAT's claims.  *See In re SKAT*, 356 F. Supp. 3d at 317 (noting that, even if it had only to "recogni[ze] or appl[y]" Danish tax law, that might be barred by the Revenue Rule "depend[ing] on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns").  By allowing this case to proceed, the Court would run the risk that it would need to *enforce* Danish tax law.  That risk, too, is barred by the Revenue Rule.

As courts have acknowledged, what exactly constitutes "enforcement" of a foreign tax law is a slippery concept.  *See Pasquantino*, 544 U.S. at 368, 125 S. Ct. at 1778-79 (remarking that it can be "difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it") (cleaned up); *see also In re SKAT*, 356 F. Supp. 3d at 317 (adopting *Colombia*'s attempt to establish a spectrum to evaluate the issue).  *Pasquantino* was a federal wire fraud prosecution involving defendants' smuggling liquor from the United States into Canada.  Even there, the Court granted that the "prosecution 'enforces' Canadian revenue law in an attenuated sense, but not in a sense that clearly would contravene the revenue rule."  *Pasquantino*, 544 U.S. at 353, 366, 125 S. Ct. at 1170, 1178.  Whereas in *Pasquantino* the link between Canadian revenue laws and the U.S.'s criminal prosecution was "attenuated," the link between Danish tax law and this case is much more obvious.  The plaintiff here is the tax agency of a foreign government and, to resolve SKAT's claims, this Court will need to divine the requirements of "beneficial ownership" under Danish tax law and then apply them to the facts at hand.  If the Court concludes that the Plans were not beneficial owners, this Court will enforce Danish tax law:  It will award the Danish government a money judgment based on a determination of beneficial ownership under Danish tax law.  Pilgaard Decl. ¶ 146.  The Revenue Rule applies to end the case here.

### C.    SKAT Is Collaterally Estopped From Litigating The Revenue Rule Question With Respect To The ED&F Bellwethers

With respect to the ED&F Bellwethers, the Revenue Rule has been litigated once already, by SKAT itself, before the English High Court of Justice.  Indeed, a multi-day trial—dubbed the "Revenue Rule Trial"—was conducted in England to answer the very question at issue here, *i.e.*, whether SKAT's claims for the return of withholding tax refunds are, in essence, claims for the enforcement of Danish tax law.  *See* Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Cap.*

38

*Partners LLP*, [2021] EWHC 974 (Comm) [¶¶ 4, 88-89].  At the conclusion of that trial, Justice

Baker answered this question in the affirmative, determining that each of SKAT's claims was, "in

substance, a claim to tax," and that SKAT's action was therefore barred in its entirety under the

revenue rule.  *See id.* ¶¶ 118-20, 177 (concluding that "all of SKAT's claims fall to be dismissed").

SKAT chose not to appeal Justice Baker's decision in England with respect to ED&F, a

tactical decision made for what SKAT's counsel described as "pragmatic reasons."  *See* Dillman

Decl. Ex. 141, *Skatteforvaltningen v. Solo Cap. Partners LLP*, [2022] EWCA Civ 234 [¶ 27].  It

is not difficult to discern why.  For each of the securities trades that formed the basis for the tax

reclaim application SKAT now contests in the ED&F Bellwether actions, ED&F received

confirmation from its outside sub-custodian of the delivery of the shares.  *See* SOF.C.2.b.  For

each tax reclaim application submitted by the ED&F Bellwethers, their authorized agent received

trade confirmations from ED&F confirming the underlying transaction, account equity statements

showing the claimed shareholding as of the ex-dividend date, and credits to their ED&F cash

accounts in the amount of the expected net dividend.  *Id.*  Tellingly, even SKAT's own expert

admits that, for over half of the securities transactions underlying the ED&F Bellwether tax reclaim

applications, a "real" dividend was paid by a Danish issuer through ED&F.  *See* Wade Report

¶ 162.  Having opted against appeal in England, SKAT now seeks a second bite at the apple in this

proceeding.  But SKAT's effort to revisit the Revenue Rule runs squarely afoul of the doctrine of

collateral estoppel, which bars any such "relitigation of issues actually litigated and necessary to

the outcome of a prior action," including "issues decided by the courts of foreign countries." *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 41 (2d Cir. 1998).[34]

### 1. The English Action and the Revenue Rule Trial

In 2018, SKAT brought suit in the High Court of Justice (the "English Action"), alleging that it had issued millions of dollars in dividend withholding tax refunds on the basis of purportedly false or fraudulent statements contained in refund applications received between August 2012 and July 2015. *See, e.g.*, JSUMF ¶ 291; Dillman Decl. Ex. 137 ("Re-Re-Am. Particulars"), Re-Re-Amended Particulars of Claim ¶¶ 3(a)-(b), 13, 52.

SKAT's claims in the English Action were directed at several categories of defendants, including the "Alleged Fraud Defendants" and the "Non-Fraud Defendants." Re-Re-Am. Particulars ¶¶ 2(b)-(c). ED&F was named among the "Non-Fraud Defendants." *See id*. ¶¶ 2(c), 3(k). SKAT stated expressly that it was not alleging fraud or dishonesty against ED&F and that it was not contending that any of the tax reclaim applications submitted on behalf of ED&F's pension plan clients were part of any fraudulent scheme, including any fraudulent scheme allegedly perpetrated by the "Alleged Fraud Defendants." JSUMF ¶ 293. Nor did SKAT allege that the Danish securities transactions executed by ED&F were anything other than actual trades involving actual shares. Instead, SKAT alleged unjust enrichment and negligent misrepresentation in connection with the production of "tax vouchers" by ED&F and the other Non-Fraud Defendants specified in the Particulars of Claim. *See* Dillman Decl. Ex. 136, Re-Amended Schedule 5T ¶¶ 2,

---

[34]    *See also China Shipping Container Lines Co. v. Big Port Serv. DMCC*, 2019 WL 9362547, at *7 (S.D.N.Y. Jan. 15, 2019) (giving preclusive effect to decisions and orders of the Courts of Singapore); *Scheiner v. Wallace*, 832 F. Supp. 687, 695 (S.D.N.Y. 1993) (giving collateral estoppel effect to English judgment); *Leo Feist, Inc. v. Debmar Publ'g Co.*, 232 F. Supp. 623, 624 (E.D. Pa. 1964) (giving collateral estoppel effect to finding of English court).

3-25.[35]  SKAT's claims against ED&F in the English Action involved the same shares and the

same transactions as its claims against ED&F's pension plan clients in the MDL.  JSUMF ¶ 291.

The English High Court of Justice determined to try the case in stages, the first of which

was to address a single, threshold question:  Whether any of SKAT's claims fell within a rule of

English law known as "Dicey Rule 3," under which English courts are prohibited from, among

other things, hearing any action brought for the direct or indirect enforcement of a "revenue …

law of a foreign State."  Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Cap. Partners LLP*,

[2021] EWHC 974 (Comm) [¶ 4] (quoting Dicey, Morris & Collins, The Conflict of Laws, R5-

019 (15th ed.)).  Following the Revenue Rule trial, the Court held that while SKAT's claims were

"framed … as private law causes of action," they were in substance "claim[s] to tax" by which

SKAT sought "indirectly to enforce … Danish revenue law."  *See id.* ¶¶ 119-20.  Justice Baker

concluded that all of SKAT's claims were therefore foreclosed under Dicey Rule 3, mandating

dismissal in full.  *Id*. ¶¶ 118-20, 177 ("[B]y the application of Dicey Rule 3 in these proceedings,

all of SKAT's claims fall to be dismissed."); *see also* Dillman Decl. Ex. 141, *Skatteforvaltningen

v. Solo Cap. Partners LLP*, [2022] EWCA Civ 234 [¶ 9] ("In a closely-reasoned and

comprehensive judgment, the judge concluded that all SKAT's claims were inadmissible as a

consequence of Dicey Rule 3.").

SKAT chose not to pursue an appeal of Justice Baker's decision with respect to the

applicability of Dicey Rule 3 to SKAT's claims against ED&F.  *See* Dillman Decl. Ex. 141,

*Skatteforvaltningen v. Solo Cap. Partners LLP*, [2022] EWCA Civ 234 [¶¶ 7, 27, 145].  The

English Court of Appeal found that SKAT was therefore bound by the lower court's holding and

---

[35]     SKAT has amended its Particulars of Claim five times, most recently in August 2020.  At all relevant times
while SKAT's claims against ED&F in England were pending, ED&F remained a "Non-Fraud Defendant."  *See*
Dillman Decl. Ex. 135, Fifth Amended Particulars of Claim ¶¶ 2(c), 3(k).

that SKAT's action against ED&F was, by necessary implication, a "revenue matter." *See id.* ¶¶ 150, 153-54.[36]  The Court of Appeal accordingly affirmed Justice Baker's dismissal of SKAT's claims against ED&F.  JSUMF ¶ 298.

### 2. The collateral estoppel effect of the English Action

To "determine the preclusive effect of a foreign country judgment," a court "should normally apply either federal or state law, depending on the nature of the claim." *Alfadda*, 966 F. Supp. at 1329-30.  Because jurisdiction here is based on diversity, the law of the relevant forum state—Utah—governs.[37]  *See, e.g.*, *Italverde Trading, Inc. v. Four Bills of Lading*, 2009 WL 499502, at *5 (E.D.N.Y. Feb. 27, 2009).

Under Utah law, collateral estoppel applies where (i) the issue in question is "identical in the previous action and in the case at hand"; (ii) the issue was "decided in a final judgment on the merits in the previous action"; (iii) the issue was "competently, fully, and fairly litigated"; and (iv) the "party against whom collateral estoppel is invoked" was "either a party or privy to a party in the previous action." *Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1222 (Utah 2000) (cleaned up); *see also Ostler v. Ret. Bd.*, 400 P.3d 1099, 1105 (Utah Ct. App. 2017).  All of the requirements for collateral estoppel under Utah law are satisfied here.[38]

---

[36]    The Court of Appeal additionally held that the application of Dicey Rule 3 as against SKAT's claims against ED&F was not inconsistent with the Brussels Recast Regulation.  *Skatteforvaltningen v. Solo Cap. Partners LLP*, [2022] EWCA Civ 234 [¶¶ 147-54].

[37]    "An MDL transferee court 'applies the substantive state law … of the jurisdiction in which the action was filed.'" *In re Mirena IUD Prods. Liab. Litig.*, 29 F. Supp. 3d 345, 350 (S.D.N.Y. 2014) (citing *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993)).  The ED&F Bellwether cases were transferred to this Court from the United States District Court for the District of Utah.  Thus, Utah substantive law applies.

[38]    The result would be the same under New York state law or the law of the Second Circuit.  *See, e.g., Miller v. Livanis*, 189 A.D.3d 446, 447 (1st Dep't 2020) ("When a party has been afforded a full and fair opportunity to litigate an issue and loses, collateral estoppel will bar him from litigating the issue a second time."); *Jamal v. Caroline Garden Tenants Corp.*, 173 A.D.3d 843, 844 (2d Dep't 2019); *Alfadda*, 966 F. Supp. at 1330.

First, there is no question that SKAT was a "party to the prior adjudication":  The plaintiff in the Revenue Rule Trial is the plaintiff here.  *See Macris*, 16 P.3d at 1222.

Second, the issues are identical.  As this Court has written, the revenue rule "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws."  *In re SKAT*, 356 F. Supp. 3d at 310.  The rule of English law at issue in the Revenue Rule Trial—Dicey Rule 3—contains an identical (and, indeed, almost identically worded) prohibition, barring English courts from hearing any action for the "enforcement, either directly or indirectly, of a … revenue … law of a foreign State."  Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Cap. Partners LLP*, [2021] EWHC 974 (Comm) [¶ 4] (quoting Dicey, Morris & Collins, The Conflict of Laws, R5-019 (15th ed.)).  Thus, the issue before this Court— whether SKAT's claims seek, directly or indirectly, to enforce Danish tax law—is precisely the issue that was decided against SKAT in the English Action.  *See Scheiner v. Wallace*, 832 F. Supp. 687, 695 (S.D.N.Y. 1993) ("Under the doctrine of collateral estoppel, the issue identity prong is satisfied if the pleadings, parties and claims reveal significant similarities.").  Indeed, Justice Baker expressly held that SKAT's claims against ED&F—based on the same shares, the same transactions, and the same tax refund applications at issue in the MDL, JSUMF ¶ 291—sought "indirectly to enforce … Danish revenue law."  Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Cap. Partners LLP*, [2021] EWHC 974 (Comm) [¶ 120].

Third, the judgment in the Revenue Rule Trial was a final judgment on the merits, rendered after the conclusion of a trial dedicated to the Revenue Rule issue.  *See Ostler*, 400 P.3d at 1106 ("An issue is completely, fully, and fairly litigated when it is properly raised, submitted for determination, and actually determined.").  SKAT was given a "full and fair opportunity" to litigate the issue, and it did so.  *See Macris*, 16 P.3d at 1224.  That SKAT chose to waive appellate review

of the judgment (with respect to the claims against ED&F) does not make the judgment any less final for purposes of issue preclusion.  *See Heywood v. Dep't of Com., Div. of Real Est.*, 414 P.3d 517, 524-25 (Utah Ct. App. 2017).

Even were SKAT not entirely precluded by the Revenue Rule from pursuing its claims against ED&F, its claims would fail not only for the all the reasons discussed above, but also because SKAT seeks to pursue its claims in this U.S. court with respect to tax reclaim applications that SKAT admits involved the receipt of actual dividends.  Far from "fraud, plain and simple," there is no dispute that ED&F *did* purchase shares and *did* receive dividends to support a significant number of tax vouchers issued on behalf of the ED&F Bellwethers.  As SKAT's expert Graham Wade explained, the transactions included in his Appendix F (to which Wade refers as the "Cum-Cum" transactions) are "transactions under which ED&F Man or one of its clients did in fact obtain a real dividend," *i.e.*, a dividend paid by the issuer net of withholding tax.  Wade Report ¶¶ 70, 162.  Each of the ED&F tax vouchers submitted by the ED&F Bellwethers in support of their tax reclaim applications contained a statement that ED&F "has no beneficial interest in the holding and will not be reclaiming the tax."  *See* JSUMF ¶¶ 324-45.  Nor is there any evidence in the record that ED&F in fact made any attempt to reclaim the tax withheld on the acquired shares—they did not.  In other words, the ED&F Bellwether Plans (not ED&F) made tax reclaim applications to SKAT in instances where SKAT has acknowledged a "real dividend" net of withholding tax.  Those applications thus correspond, on a one-to-one basis, with withholding tax collections made by SKAT, and any decision SKAT made as to whether or not the pension plans were entitled to reclaim that tax would implicate the enforcement of Danish tax laws.

44

## II.  Summary Judgment Should Be Granted On Each Of SKAT's Claims Because Defendants Made No False Statements

To the extent SKAT's claims are even cognizable under the relevant law governing each

case,[39] they all require SKAT to prove the alleged falsity of statements made to the agency as part

of the reclaim process:[40]

1. *Beneficial Ownership.*  SKAT alleges that it was false to describe the Plans on Form 06.003 as beneficial owners.  RJM Am. Compl. ¶¶ 3-6, 28(b)(i), 38-39, 59; *see also* JSUMF ¶¶ 25-28 (describing "beneficial ownership" elements of Form 06.003).

2. *Entitlement to Refunds Under the Treaty.*  SKAT alleges that it was false to assert that the Plans were entitled under the Treaty to refunds of the dividend withholding tax.  RJM Am. Compl. ¶¶ 4-5, 29, 39.

3. *Receipt of Dividends.*  SKAT alleges that it was false to represent in tax refund applications that the Plans had received dividends.  RJM Am. Compl. ¶¶ 4-6, 28(b)(i), 37, 59.

4. *Tax Withholding.*  SKAT alleges that it was false to represent in tax refund applications that the Plans had received those dividends net of withholding tax.  RJM Am. Compl. ¶¶ 4-6, 28(b)(i), 37-38, 59.

None of these statements is actionably false or misleading.  The first two are non-actionable

statements of law.  Moreover, the statement that the Plans were "beneficial owners" was an

objectively reasonable interpretation of complex legal issues that cannot be false as a matter of

---

[39]  *See, e.g.*, *infra* § V.E (aiding and abetting not cognizable under Utah law).

[40]  Falsity is an element of all six of SKAT's causes of action.  It is an element of a fraud claim premised on false statements, a necessary predicate to the claim of aiding and abetting fraud, and an element of a negligent misrepresentation claim.  *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 772 (S.D.N.Y. 2011) (fraud); *id.* at 778 (negligent misrepresentation); *Oberg v. Sanders*, 184 P.2d 229, 234 (Utah 1947) (fraud); *Shah v. Intermountain Healthcare, Inc.*, 314 P.3d 1079, 1085 (Utah Ct. App. 2013) (elements of negligent misrepresentation same as fraud save scienter); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (aiding and abetting); *see also* RJM Am. Compl. ¶¶ 61-62, 88.  And, because of the way in which SKAT has pleaded its equitable and quasi-contract claims, each requires SKAT to prove a false representation.  *Compare, e.g.*, RJM Am. Compl. ¶ 10 (alleging that "false representations" caused SKAT "to make payments to which the Defendants were not entitled"), *with id.* ¶ 80 (unjust enrichment claim based upon receipt of refunds "to which they were not entitled"), *and id.* ¶ 84 (money had and received claim based upon receipt of refunds "to which they were not entitled" as a result of "fraudulent scheme"), *and id.* ¶ 74 (payment by mistake claim based on SKAT's understanding that Defendants' claims were valid).

law.  In any event, all four statements were true, and no reasonable jury could conclude otherwise from this summary judgment record.

### A. Statements Regarding Beneficial Ownership And Entitlement To Refunds Are Inactionable Legal Conclusions

Two of the four statements upon which SKAT bases its claims are not actionable as a matter of law because they are legal conclusions rather than statements of fact.  New York law, for example, does not permit fraud claims based on a "misrepresentation of the law or the legal effect or consequence of a personal transaction or contract."  *Lefferts v. Lefferts*, 276 N.Y.S. 809, 811 (1st Dep't 1935); *see also Cucchiaro v. Cucchiaro*, 627 N.Y.S.2d 224, 229-30 (Sup. Ct. 1995) (noting that "a false statement concerning the law is not considered a factual misrepresentation which will support an action based upon fraud"); *Magalnick v. Empire State Mut. Life Ins. Co.*, 180 N.Y.S.2d 575, 576 (2d Dep't 1958) (noting that fraud claim cannot rest on "a misrepresentation of law or a mere expression of opinion on the part of the defendant as to the legal effect or consequence of what plaintiff did").

New York courts have long applied that principle to dismiss fraud claims based on alleged misrepresentations of the law.  For example, in *DirecTV, Inc. v. Lewis*, plaintiff DirecTV allegedly caused "economic loss" to the defendant by representing that he possessed an "unlooper" device that was "illegal."  2005 WL 1006030, at *11 (W.D.N.Y. Apr. 29, 2005).  The court dismissed the defendant's counterclaim for fraud and misrepresentation, reasoning that even if DirecTV had been wrong about the legality of the unlooper device, "DirecTV's expression of its opinion that its possession is illegal is not an opinion that can form the basis for a fraud claim."  *Id.*; *see also, e.g.*, *Netherby Ltd. v. G.V. Licensing, Inc.*, 1993 WL 463679, at *4 (S.D.N.Y. Nov. 9, 1993) (dismissing defendants' fraud counterclaim because plaintiff's representation that certain licenses were exclusive—even though court later held them to be non-exclusive—"was merely an opinion about

the legal effect of the licenses"); *Charid Props., Inc. v. Berger*, 327 N.Y.S.2d 821, 822 (2d Dep't 1971) (no liability for fraud based on defendants' allegedly "misrepresent[ing] their own opinion as to the legal interpretation of the provisions of the amended lease"), *aff'd*, 32 N.Y. 667 (1973); *Zuyder Zee Land Corp. v. Broadmain Bldg. Co.*, 86 N.Y.S.2d 827, 828 (Sup. Ct. 1949) (no liability for fraud based on defendant's representations in contract regarding extent of tenant's obligation to pay because, in part, "the representation, involving as it did the interpretation of a written document, falls in the category of an opinion or statement of law which, even when inaccurate, cannot afford a basis for recovery in fraud"), *aff'd*, 92 N.Y.S.2d 607 (1st Dep't 1949); *Abraham v. Wechsler*, 200 N.Y.S. 471, 472 (Sup. Ct. 1923) (defendant could not be liable for alleged misrepresentation that building was "occupied in a lawful manner in compliance with the requirements of the various departments of the city of New York" because it was "the expression of an opinion by defendant as to the law" and there was a dispute regarding whether the tenants' uses of their apartments were actually unlawful), *aff'd*, 206 N.Y.S. 877 (1st Dep't 1924).

Likewise, as to the ED&F Bellwethers, the general rule under Utah law is that "[a] claim of fraud cannot be predicated upon an asserted misrepresentation of law." *United States ex rel. Erickson v. Uintah Special Servs. Dist.*, 395 F. Supp. 2d 1088, 1099 (D. Utah 2005).

### 1. Statements concerning "beneficial ownership" were not actionably false.

Whether the U.S. pension plans were "beneficial owners" presents a legal question—specifically, as described above, a question of Danish tax law. *See* JSUMF ¶¶ 26-28; Technical Explanation to 2006 Protocol at 32 ("The term 'beneficial owner' is not defined in the Convention, and is, therefore, defined as *under the internal law of the country imposing tax* (i.e., the source country).") (emphasis added). SKAT and its employees also confirmed that the "question of who is actually the beneficial owner[]" of particular shares "is a complicated question of Danish tax

law." Jeppesen Tr. 126:17-127:2.  Courts have consistently held, across a range of substantive legal contexts, that whether an entity is a "beneficial owner" of certain shares or dividends presents a legal question.  *See, e.g.*, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 548 (S.D.N.Y. 2008) (Kaplan, J.) (declining to "rule on the legal question whether TCI is a beneficial owner under" U.S. securities law), *vacated in part & remanded on other grounds*, 654 F.3d 276 (2d Cir. 2011).[41]

Because beneficial ownership is a technical legal status, the statement that any Plan was the beneficial owner presents a legal conclusion that is not actionable as "false" and cannot support any of SKAT's claims.  *DirecTV* is instructive.  There, even if DirecTV had been wrong in its assertions about the legality of the defendant's unlooper device, "DirecTV's expression of its opinion that its possession is illegal is not an opinion that can form the basis for a fraud claim." *DirecTV, Inc.*, 2005 WL 1006030, at *11.[42]  Exactly the same principle applies here.  There is no meaningful difference between a representation that an unlooper device was "illegal"—a legal conclusion premised on an interpretation of federal telecommunications law—and a representation that a party was a "beneficial owner."  Under New York and Utah law, those representations of

---

[41]     *See also, e.g.*, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 297 n.8 (2d Cir. 2011) (Winter, J., concurring) ("[B]eneficial ownership is a legal question."); *Glencova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 295, 306 (S.D.N.Y. 2012) (determining "the beneficial ownership of shares in a closely-held corporation" under Delaware law presented the "legal issue[] to be decided"); *Morales v. New Valley Corp.*, 999 F. Supp. 470, 472 (S.D.N.Y. 1998) (examining "the legal question of whether defendants were beneficial owners of New Valley B Preferred at the time of their short-swing transactions" as defined under U.S. securities law), *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999).

[42]     Indeed, DirecTV's legal opinion was not entirely straightforward.  DirecTV's basis for alleging that possession of an unlooper was illegal was its interpretation of a federal statute that does not mention unloopers at all. *See* 47 U.S.C. § 605(e)(4) (imposing criminal penalties on manufacturers and sellers of devices "primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services"); *see also DIRECTV, Inc. v. Free*, 2006 WL 8456439, at *4-5 (W.D.N.C. Aug. 4, 2006) (holding that "[Section] 605(e)(4) targets upstream manufacturers and distributors, not the ultimate consumer of pirating devices" and that "even if Section 605(e)(4) were to apply to the individual consumer, this provision does not prohibit the mere purchase and use" of a device).  Like DirecTV, Defendants here formed an inactionable opinion of law by applying the non-obvious legal requirements of beneficial ownership to their particular factual scenario.

legal conclusions simply are not actionable as false. *See, e.g.*, *Uintah Special Servs. Dist.*, 395 F. Supp. 2d at 1099 (it was not possible for the defendant to misrepresent its relationship with the local county as that "is not an issue of fact—it is an issue of law dictated by the governing Utah statutes").

SKAT's claims based on representations that the Plans were "beneficial owners" fail for the additional, independent reason that a statement that represents an objectively reasonable interpretation of applicable law cannot as a matter of law be false. Indeed, in the criminal context, courts routinely hold that when "reasonable people could differ" as to the interpretation of applicable regulations, the government "failed to meet its burden of proving the *actus reus* of the offense—actual falsity[—]as a matter of law." *United States v. Whiteside*, 285 F.3d 1345, 1352-53 (11th Cir. 2002); *see also United States v. Connolly*, 24 F.4th 821, 843 (2d Cir. 2022) (reversing wire-fraud convictions because government failed to prove falsity of representations, made by bank's LIBOR submitters, that were based on reasonable interpretations of ambiguous instructions); *United States v. Harra*, 985 F.3d 196, 215-20 (3d Cir. 2021) (reversing defendants' false statement convictions because their interpretation of relevant SEC reporting requirement was objectively reasonable, and holding that "ambiguity is relevant to falsity in its own right" rather than "exclusively to scienter"); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) (reversing conviction for mail fraud because jury instructions failed to inform jury that government bears burden to negate any reasonable interpretations that would make defendant's statement correct). There is no reason why this principle ought not apply with equal force in this civil

case[43]—it is merely a gloss on what it means for a statement to be false, which does not vary depending on whether civil or criminal liability is at stake. *See, e.g.*, *United States v. Karron*, 750 F. Supp. 2d 480, 490 (S.D.N.Y. 2011) (criminal conviction for theft of federal funds precluded defendant from denying liability on civil false claims act claim where the "falsity of her submissions" presented "the same issues" in "the criminal and civil cases"), *aff'd*, 481 F. App'x 703 (2d Cir. 2012); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70, 127 S. Ct. 2201, 2216 (2007) (defendant in civil case does not act "willfully" where his interpretation of governing law is "not objectively unreasonable," regardless of his subjective intent).

This principle applies with particular force where the allegedly false statement reflects unsettled or complex areas of law or regulation. For example, in *Whiteside*, the defendant had classified debt interest as 100% capital-related on a cost report submitted to the government for Medicare/Medicaid reimbursement. The government asserted that the statement was false because, at the time the relevant loan was *originated*, the funds were not capital-related; the defendant insisted, however, that the debt was capital-related at the time it submitted the report. But this question of timing—whether an interest expense must be reported in accordance with the original purpose of the loan—was unanswered by any "Medicare regulation, administrative ruling, or judicial decision." A government witness agreed that the regulations "can be interpreted different ways." *Whiteside*, 285 F.3d at 1352-53. The competing interpretations of applicable law left the government unable to prove "actual falsity." *Id.* at 1353.

---

[43]     Indeed, courts commonly apply this logic when adjudicating civil causes of action of which falsity is an element. *See, e.g.*, *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) (holding in False Claims Act case that relator's evidence showed only "a disputed legal issue" regarding "[h]ow precise and how current the cost allocation needed to be in light of the statute's imprecise and discretionary language," which was "not enough to support a reasonable inference that the allocation was false within the meaning of the False Claims Act").

A similar uncertainty exists here—and demands the same result. SKAT itself has struggled to parse the precise meaning of what it meant to be a "beneficial owner" of Danish dividends. For instance, before August 2015, SKAT provided no guidance regarding who, as between one who lends shares to a borrower and one who subsequently buys those shares from the borrower without knowledge they are borrowed, is the beneficial owner of the dividend associated with the shares. DSMF ¶ 28. In that hypothetical scenario, as SKAT's chief internal legal officer himself recognized, both parties could claim in good faith to be the "beneficial owner" of the dividend-issuing security and to be entitled to a reclaim. DSMF ¶ 33. SKAT instructed reclaim applicants to submit certain documentation—DCAs, certificates of residency, and its own Form 06.003—which it modified after the events at issue in this litigation—and provided no guidance whatsoever on what else was necessary to satisfy the test of "beneficial ownership."[44]

Moreover, before 2016, no Danish court had *ever* discussed beneficial ownership "in the context of purchases of securities from stock borrowers, or purchases that relied on third-party funding, or securities transactions with extended settlement terms or that failed to settle altogether, or cases involving trading that was either alleged to be circular or fictitious." Pilgaard Decl. ¶ 172. Still today, the meaning of "beneficial ownership" as a matter of Danish tax law "remains unsettled." *Id.* ¶ 171. Courts outside Denmark, in analogous circumstances, have also acknowledged that the meaning of the phrase "still remains less than fully clear," especially with respect to disputes at the intersection of domestic and international law. *Indofood Int'l Fin. Ltd. v. JPMorgan Chase Bank, NA*, [2005] EWHC 2103 (Ch) [¶ 40]; *see also, e.g., Canada v. Prévost*

---

[44] From the facts that SKAT had to make a determination of beneficial ownership to determine entitlement to reclaims and that SKAT required only the information it requested, one can infer that SKAT believed at the time that it needed no other information to determine beneficial ownership, and its present claims to the contrary represent an attempt to retroactively rewrite its own rules.

*Car Inc.*, [2009] DTC 5721, [2009] FCA 57, ¶¶ 8-12 (Can. Ont.) (noting that it was "common ground" that there was "no settled definition of 'beneficial ownership'" under Canadian law, the relevant bilateral tax treaty, or the OECD Model Convention).

In this context, the statement that the Plans were beneficial owners is not actionable as false. As explained above, a host of facts gave the Plans a bona fide claim to beneficial ownership. *See supra* § I.A.2. To briefly re-state, the Plans purchased shares of Danish securities before the ex-dividend date, and their custodial accounts reflect book entry credits for the shares and the corresponding net dividend payments. Having received dividends—and with full opportunity to use and enjoy them—the income was attributable to the Plans for purposes of Danish tax law, and therefore those Plans were the beneficial owners. *Compare, e.g.*, Technical Explanation to 2006 Protocol at 32 ("[t]he beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State"), *with* Pilgaard Decl. ¶ 203 ("Under Danish tax law, dividend income often is and certainly can be attributable for tax purposes to a party who receives a dividend payment, including a dividend compensation payment. Moreover, when an owner of shares receives a dividend compensation payment, that dividend income is attributable to the owner for tax purposes under Danish tax law.").

At a minimum, the assertion that the Plans were the beneficial owners reflects an objectively reasonable interpretation of the requirements for beneficial ownership under Danish tax law. Even though SKAT takes a different view, this Court need not resolve the dispute (and indeed it cannot, based on the Revenue Rule, *see supra* § I). The mere recognition that the Plans had an objectively reasonable position—namely, that they were the beneficial owner of the shares and they owned the dividends that flowed from those shares and that were reflected in book entry

credits to their accounts—requires judgment as a matter of law in favor of Defendants. Because the record contains no evidence from which a reasonable jury could conclude that Defendants' interpretation of the Danish law concerning "beneficial ownership" was not objectively reasonable, it is undisputed on this record that the statements were not false.

### 2. Statements concerning entitlement to refunds under the Treaty were not actionably false.

Similarly, to the extent the Plans represented that they were entitled to refunds under the Treaty, those representations were statements of law that are categorically inactionable. Take, for example, the reclaim agent Syntax's cover letters to SKAT stating that it had, "[i]n connection with the Convention for the Avoidance of Double Taxation between Denmark and the United States of America," enclosed reclaim applications on behalf of "a qualifying U.S. pension fund." *E.g.*, SKAT_MDL_001_00082801 at -827; *see also* JSUMF ¶ 92.[45] That statement is plainly a legal conclusion about the requirements of the Treaty as applied to the factual circumstances of the relevant plan. *See Georges v. United Nations*, 834 F.3d 88, 93 (2d Cir. 2016) (explaining that "the interpretation of a treaty is a question of law" (cleaned up)); *Gandy v. Barber*, 641 F. App'x 835, 839 (10th Cir. 2016) (same). Again, it is indistinguishable from a statement that a license was "non-exclusive," or that an unlooper device was "illegal." As a matter of law, these statements cannot have been false. *See, e.g.*, *Netherby Ltd.*, 1993 WL 463679, at *4; *DirecTV, Inc.*, 2005 WL 1006030, at *11. The analysis should end there.

Yet the claim is doubly doomed because, just like the statement that the Plans were "beneficial owners," the statement that the Plans were entitled to the benefit of the Treaty is at

---

[45]     Other reclaim agents did not include similar language. *See, e.g.*, SKAT_MDL_001_00059293 (reclaim submission from Goal Taxback Limited). Accordingly, to the extent that reclaim agent Goal Taxback Limited submitted applications to SKAT, those applications did not include the statement SKAT now challenges as false and misleading.

least an objectively reasonable conclusion of law that is therefore inactionable. The Treaty confers benefits to a "pension fund," defined as "a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan[.]" Treaty art. 22(2)(e). Every plan defendant was "organized under the laws of" the United States "to provide a pension to employees, including self-employed individuals, pursuant to a plan." JSUMF ¶¶ 78-81, 89-90, 250-51, 261-62. And even though the Treaty did not require the plans to be qualified under the Internal Revenue Code, each plan was, in fact, tax qualified. The IRS itself said so: each Plan obtained from the IRS a Form 6166 stating that the plan was "a pension … plan qualified under section 401(a) of the U.S. Internal Revenue Code." *Id.* ¶¶ 92-93. The legal conclusion that the Plan Defendants satisfied the limited criteria for being a "pension fund" as set forth in the Treaty was both true and, at a minimum, objectively reasonable.

### B.     Even If Actionable, SKAT Cannot Prove The Challenged Statements Are False

SKAT argues that Defendants made false statements regarding (1) beneficial ownership, (2) entitlement to refunds under the Treaty, and (3) receipt of dividends (4) net of taxes. *See supra* § II. Even if the Court disagrees with Defendants that statements (1) and (2) are inactionable legal statements, Defendants are still entitled to summary judgment as to all the challenged statements because none was false as a matter of law.

Statements (1) and (2) were true. As set forth at length above, the Plans were the beneficial owners of the dividends. They also qualified as "pension funds" under the Treaty, and so were entitled to the relevant refunds. *See supra* §§ I.A.2, II.A.2.

Statements (3) and (4) were also true: There is no genuine dispute that each Plan received net dividend payments. Following each Plan's purchase of Danish securities, the Plan received a

DCA confirming that its account had been credited with a net dividend payment, which represented an amount equal to the gross dividend less the dividend withholding tax.  JSUMF ¶¶ 126-27.[46] And those DCAs were accurate:  book entries crediting the Plans' custodial accounts with amounts equal to the net dividends appear in the Plans' custodial statements.  *Id.* ¶ 125.  SKAT asserts that all of this is "fictitious," but name-calling does not make it so, and conclusory labels are no substitute for evidence demonstrating that a genuine factual dispute exists.  The book entry credits of net dividend amounts exist, and they are not undermined by SKAT's refrain that there were "no shares."  A custodian *does not need shares* for an investor to be the owner of them.  *See, e.g.*, Carr Reply Report § V; U.C.C. § 8-501(c) ("a person acquires a security entitlement if a securities intermediary … indicates by book entry that a financial asset has been credited to the person's securities account … even though the securities intermediary does not itself hold the financial asset").[47]

SKAT cannot meet its burden to prove that any of the ED&F Bellwethers made a false statement to SKAT.  This is particularly true regarding the trades to which SKAT's expert refers as "Cum-Cum" transactions, which he admits did give rise to the payments of "real dividends."  *See* Wade Report ¶ 162 & App'x F.  SKAT's expert's definition of a "real dividend"—a dividend payment received directly from the Danish issuer or through a chain of custodians, *see id.* ¶ 70— necessarily means that they were paid net of tax, for issuers withhold 27% withholding tax at the source and pay it directly to SKAT.  JSUMF ¶¶ 18-19.  And though we have not seen support for

---

[46]    Nor did SKAT require any reclaim applicant to confirm that dividend withholding taxes had actually been paid to the Danish tax authorities as a prerequisite to approving the refund.  Pilgaard Decl. ¶ 136.

[47]    Nor does an investor need to own shares or even receive dividends from an issuer in order to be subject to withholding tax and eligible for refunds of excess withholding tax in the case of derivative contracts under U.S. tax law.  *See* 26 U.S.C. § 871(m).  Moreover, the EU and Denmark expressly permit the use of net settlement of securities transactions through book entries, and recognize that such settlements are binding on third parties.  *See* Pilgaard Decl. ¶¶ 204-08.

the proposition that "real dividends" are a recognized concept under Danish tax law, the fact that SKAT does not dispute that such dividends were received in the case of a significant number of transactions executed by the ED&F Bellwether Plans underscores the fact that any representations they made regarding the payment of dividends net of taxes were truthful.

Indeed, SKAT has an insurmountable evidentiary hurdle: SKAT has no admissible evidence of falsity regarding the ED&F Bellwether Plans' status as beneficial owners, their receipt of dividends, or the suffering of withholding tax. Even after years of discovery, several letters rogatory issued, millions of pages of documents produced, and over fifty depositions, SKAT still lacks the critical proof necessary to establish falsity, rendering summary judgment on SKAT's claims proper. *Geoffrey E. Macpherson, Ltd. v. Brinecell, Inc.*, 98 F.3d 1241, 1247 (10th Cir. 1996) (affirming grant of summary judgment for defendant where no reasonable juror could determine statements were false). Unsurprisingly, SKAT failed to elicit testimony from any witness with personal knowledge of any falsities. And because SKAT never even attempted to depose a single former ED&F employee who had worked on ED&F's trading desk, there is no testimony in the record from someone with personal knowledge as to the statements at issue. *See* Fed. R. Evid. 602 (requiring testimony to be based on personal knowledge).

Because all four of the statements SKAT challenges as false were, in fact, true (or at least not actionably false), judgment should enter for Defendants on all of SKAT's claims. *See, e.g.*, *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 214-15 (S.D.N.Y. 2012) (statements that "appear to all be true on their face" could not "amount to violations of the securities laws"); *Pub. Pat. Found., Inc. v. Quigley Corp.*, 2011 WL 3055382, at *3 (S.D.N.Y. July 20, 2011) (dismissing claim for false marking where challenged "statement is true, not false"); *Webster v. Wells Fargo Bank, N.A.*, 2009 WL 5178654, at *11 (S.D.N.Y. Dec. 23, 2009) (dismissing fraud claim because,

in part, alleged misstatement was "literally true" and thus plaintiffs "do not and cannot allege falsity"), *aff'd sub nom. Webster v. Penzetta*, 485 F. App'x 23 (2d Cir. 2012).

## III. Summary Judgment Should Be Granted On Each Of SKAT's Claims Because The Reclaim Amounts Do Not Belong To SKAT

Each of SKAT's claims requires proof that SKAT itself—not the Kingdom of Denmark, or some other entity—is the rightful owner of the funds that SKAT now seeks to recover.[48] Because Danish taxes belong *to the Kingdom*, and not to SKAT, any wrongfully paid refunds of withholding tax likewise belong *to the Kingdom*, and not to SKAT. Summary judgment should be granted based on the undisputed facts that (1) dividends paid by Danish companies are taxed by the Kingdom—not by SKAT, JSUMF ¶ 11; (2) SKAT cannot keep the tax revenue it collects, and indeed has no discretion as to what to do with it, *id.* ¶¶ 9-10, (3) SKAT deposits the money it collects into a bank account that belongs to the Kingdom,[49] *id.* ¶ 11, and (4) any financial loss from a tax-revenue shortfall—including the alleged loss suffered here—is borne by the Kingdom, not by SKAT. *See* DSMF ¶ 1; *see generally* Brøchner Tr. 22-29. SKAT's ministerial role as an agency charged with assessing and collecting taxes on the Kingdom's behalf, *see* JSUMF ¶¶ 1, 4, is no basis for SKAT to claim that it ever owned the withholding tax amounts refunded to Defendants,

---

[48] A fraud claim, for example, requires a plaintiff to show he or she suffered "pecuniary loss," *Amusement Indus.*, 786 F. Supp. 2d at 772, and a negligent misrepresentation claim requires a plaintiff to show it relied on the misrepresentation "to his or her detriment," *id.* at 778. The same requirement applies to SKAT's equitable and quasi-contract claims. *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (element of unjust enrichment claim is that defendant was enriched "at plaintiff's expense"); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984) (element of "money had and received" claim is that "defendant received money belonging to plaintiff"); *United States ex rel. Ryan v. Staten Island Univ. Hosp.*, 2011 WL 1841795, at *5 (E.D.N.Y. May 13, 2011) (element of "payment by mistake" claim is that "equity demands restitution by defendant to plaintiff").

[49] That SKAT itself maintains certain bank accounts does not affect the analysis. All taxes flowing into any SKAT accounts are distributed in accordance with an annual budget passed by the Danish parliament. *See* Brøchner Tr. 25:24-26:12. At no time does SKAT have any actual authority or control over any monies in its bank accounts. *See id.* at 26:13-20.

that it is entitled to them now, or that it suffered any pecuniary harm or detriment from the refunds' supposedly wrongful disbursement.

Because any money judgment assessed against Defendants in these actions would be remitted to the Kingdom, its rightful owner—and not to SKAT—all of SKAT's claims fail as a matter of law.

## IV.    SKAT's Claims Are Barred In Whole Or In Part By The Statute Of Limitations

All of SKAT's claims are governed by a three-year limitations period that began to run on the date SKAT paid each refund.[50]  Because that period expired as to most of the claims asserted against the individuals, trustees, and pension plans in the bellwether cases before SKAT filed suit, the claims are untimely as against the individuals, trustees, and pension plans.

Beginning in the mid-2000s, SKAT operated a dividend withholding tax refund system with the knowledge that multiple people could, in good faith, claim beneficial ownership of dividends associated with the "same shares" of a company's stock.  SKAT was repeatedly warned that it refunded dividend taxes blindly—that is, SKAT did not verify that it limited the refund of dividend withholding taxes to the actual beneficial owner of dividends.  An extraordinary internal audit in 2010 confirmed the warnings and concluded that SKAT might be refunding dividend taxes more than once per dividend.

Between 2012 and 2015, the volume of dividend reclaim applications in Denmark grew exponentially.   Given what SKAT undeniably knew about the infirmities in its dividend

---

[50]     A tolling agreement covering the RJM Plan, the Basalt Plan, and the Roadcraft Plan was in effect from January 1, 2018 through December 31, 2018.  Accordingly, if that agreement is valid and enforceable, claims accruing on or before December 31, 2014 would have expired no later than December 31, 2017, prior to the effective date of the tolling agreement.

withholding tax refund system, this explosion should have triggered an investigation.[51]   Still, despite its affirmative obligation to "ascertain all relevant information" and ensure a correct basis for issuing each refund it paid, Ørgaard Decl. ¶ 17, SKAT persevered with a policy of paying all reclaim applications that satisfied its *pro forma* requirements without conducting any meaningful review.  SKAT was so derelict in its duties that—at least once before 2015—it even paid out more in refunds than was owed in tax, which should only have been possible if multiple applicants asserted beneficial ownership to the same dividends.

Because SKAT had multiple, independently sufficient reasons to investigate the basis for each and every reclaim application submitted to it during the relevant period, it cannot avail itself of any suspension in the limitations period under Danish law.[52]   But even if SKAT's investigative obligation was not triggered upon its receipt of *each* reclaim application, its obligation was unquestionably triggered no later than December 31, 2014.   As a result, all claims related to payments made before January 2015 are, categorically, untimely.   Further, because SKAT delayed filing suit against any plan until May 4, 2018, certain claims for payments made in the first few months of 2015 also are untimely.

---

[51]   Indeed, the rise in reclaim applications to SKAT followed a significant change in the rules related to similar transactions in Germany, after which many market participants, including institutions like Barclays, ceased participating in such trades in Germany.  *E.g.*, Wade Tr. 163:22-164:1.

[52]   Although the limitations period may be suspended when a plaintiff lacks actual knowledge of its claim, no suspension is warranted when the party had a reason to investigate.  *See generally* Ørgaard Decl.  As explained below, SKAT had a duty to further investigate each and every reclaim application.  SKAT's failure to engage in any meaningful administration of its dividend withholding tax reclaim apparatus was deliberate (at worst) or indifferent (at best).

## A. Applicable Law

There is no dispute that SKAT's claims accrued in Denmark.[53] Accordingly, under New York's borrowing statute, which governs the Solo Bellwether claims, SKAT must satisfy both the applicable New York and Danish limitations periods. *See* N.Y. C.P.L.R. § 202; *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626-27 (2d Cir. 1998). Under Utah's borrowing statute, which governs the ED&F Bellwether claims, a foreign litigant like SKAT may not pursue an action in Utah courts if the action would be untimely in Denmark. Utah's borrowing statute applies in situations where the claim arises in another jurisdiction and is deemed untimely in that other jurisdiction. Utah Code Ann. § 78B-2-103 ("A cause of action which arises in another jurisdiction, and which is not actionable in the other jurisdiction by reason of the lapse of time, may not be pursued in this state[.]").[54] Because the applicable statute of limitations in Utah is equal to or longer than the Danish period of three years, for purposes of the ED&F Bellwethers, SKAT's claims are subject to a three-year limitations period.

---

[53]    Skatteforvaltningens's Mem. of Law in Opp'n to Def. Alexander Burns' Mot. to Dismiss the Am. Compl. at 11, n.18, Case No. 18-cv-04833-LAK (S.D.N.Y.), ECF No. 142 (admitting the claims accrued in Denmark); *accord IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*, 634 F. App'x 19, 21 (2d Cir. 2015) (holding German bank's fraud claim accrued in Germany for purposes of New York's borrowing statute); *see also Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 524, 529 (1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.").

[54]    Utah's borrowing statute creates a two-part test: "The first part asks whether a cause of action ... arose in another jurisdiction. The second part asks whether that cause of action is not actionable in the other jurisdiction by reason of the lapse of time. If both of these elements are satisfied, a Utah court will adopt that foreign jurisdiction's time limitations." *Federated Cap. Corp. v. Libby*, 384 P.3d 221, 227 (Utah 2016) (cleaned up). "Actions not specified in the Utah Code, including actions for unjust enrichment [and negligent misrepresentation], are subject to a four-year statute of limitations." *Belcourt v. Grivel, srl*, 2010 WL 1064466, at *3 (D. Utah Mar. 19, 2010); *see also Russell/Packard Dev., Inc. v. Carson*, 78 P.3d 616, 620 (Utah. Ct. App. 2003) (applying four-year limitations period to restitution claims), *aff'd*, 108 P.3d 741 (Utah 2005). Thus, if SKAT's non-fraud claims are untimely under Denmark's three-year limitations period, then they are not timely in Utah courts. The Utah statute of limitations for fraud-based claims, however, is three years—the same as Danish law. *See* Utah Code Ann. § 78B-2-305; *infra* § IV.B. Because the claims would be barred in Denmark, as argued below, the Court should apply the Danish statute of limitations under the two-part test set forth by the Utah Supreme Court. *Federated Cap. Corp.*, 384 P.3d at 227. If the Court determines that SKAT's claims are not controlled or barred by Danish statutes of limitations, then under the two-part test described above, the Court must still consider whether SKAT's claims are timely under Utah law. *See id.*

Under New York, Utah, and Danish law, the limitations period is assessed separately with respect to each refund paid by SKAT. *Capruso v. Vill. of Kings Point*, 23 N.Y.3d 631, 639 (2014) ("[R]epeated offenses are treated as separate rights of action and the limitations period begins to run as to each upon its commission."); *Breiggar Props., L.C. v. H.E. Davis & Sons, Inc.*, 52 P.3d 1133, 1135 (Utah 2002) (recognizing that, in the case of multiple trespasses, "the statute of limitations begins to run anew with each act"); Andersen Decl. ¶ 23 ("[T]he 3-year limitation period should be calculated for each defendant in relation to each of the claims."). This rule operates to "save all claims for recovery of damages but only to the extent of wrongs committed within the applicable statute of limitations." *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dep't 2017); s*ee also* Ørgaard Decl. ¶ 24 (discussing case reported at TfS 2002.415 LSR, where only those claims related to payments still timely can be pursued). Only SKAT's claims related to reclaim payments made *within* the statutory limitations period prior to commencing suit can be heard by the Court.

## B.     The Danish Limitations Period And SKAT's Duty Of Inquiry

Danish law generally provides a three-year limitations period for monetary claims, Ørgaard Decl. ¶ 12, running from "the *earliest* point in time where the claimant could *claim satisfaction* of its claim, unless otherwise provided by other provisions," *id*. ¶ 22. That period is suspended where the claimant was "unaware of the claim or the debtor," unless the claimant "should have become [] aware thereof." [55] *Id.* ¶ 13. There is no exception applicable to claims arising as a result of fraud

---

[55]     As the Court has already noted, any such suspension would apply in determining timeliness under Danish law. Mem. Op. at 16, *Skatteforvaltningen v. Raubritter Pension Plan*, No. 18-cv-04833-LAK (ECF No. 173) ("In applying this rule, the entire foreign statute of limitations applies, and not merely its period.") (cleaned up); *accord Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 398 (S.D.N.Y. 2019); *Williams v. Dow Chem. Co.*, 2004 WL 1348932, at *10, *16 (S.D.N.Y. June 16, 2004).

or criminal concealment.  *Id.* ¶ 35.  Thus, unless suspended, the three-year period would run from the date SKAT paid a reclaim.  *Id.* ¶¶ 24-25.

Relevant to the question of when SKAT should have known of its claims is its legal obligation, known as the inquisitorial procedure (or principle of investigation), to ascertain all relevant information before taking official action to, for example, approve a reclaim application and refund dividend withholding tax.  Ørgaard Decl. ¶¶ 15-17.  This inquisitorial procedure is derived from generally accepted administrative principles and is memorialized in SKAT's Legal Guide.  *Id.* ¶ 15.  According to the Legal Guide, SKAT "must ensure that a case is sufficiently informed to make a correct decision."  *Id.* ¶ 16 (quoting SKAT's Legal Guide at Section A.A.7.4.3).  Moreover, although SKAT may obtain relevant information from a taxpayer, "SKAT *must subsequently check whether the taxpayer's information is correct*."  *Id.* (emphasis added). "It is not sufficient for SKAT to say … that it was not aware of the existence of the claim because it lacks certain information, the relevant question is whether the tax authority should have investigated the matter further."  *Id.* ¶ 18.

A leading Danish scholar on statutes of limitations, writing about the intersection between the general duty of investigation and SKAT's particular investigative obligations, observed that "[t]he decisive factor is whether … the tax authorities did have *grounds to seek additional information to clarify the facts*—grounds that would typically appear from the information already available, but which can also be based on the tax authorities generally paying special attention to the matter in question."  Ørgaard Decl. ¶ 19 (quoting *Foraeldelse*, 2d ed., 2019, p. 601).  As the portion of the Danish government "charged with the assessment and collection of Danish taxes," JSUMF ¶ 1, SKAT was responsible for properly administering the Danish tax system, generally, and dividend withholding tax refunds, specifically.  Indeed, Danish case law reflects the reality

that SKAT has an obligation to investigate information reported to it and that, when it does not, its claim may be barred by the applicable statute of limitations.[56]

### C.    A Detailed Timeline:  What SKAT Knew And When It Knew It

#### 1.    Pre-2012:  Myriad Red Flags

In the years leading up to 2012, SKAT ignored numerous "flashing red" warnings regarding its dividend reclaim refund system.  DSMF ¶ 36.  In 2007, SKAT's then-chief internal legal officer, Leif Normann Jeppesen, identified a legal issue concerning the determination of the beneficial owner of dividends (and, consequently, entitlement to withholding tax refunds).  *Id.* ¶¶ 20-21; Bahsen Decl. Ex. 25.  In a written memorandum, Jeppesen warned that stock lending and short sales in the marketplace created the risk of multiple claims to legal ownership of the same shares, and the documents SKAT required in support of reclaim applications did not permit SKAT to establish which applicant was the beneficial owner for tax purposes.  DSMF ¶ 20.  Accordingly, SKAT could not be certain that *any* reclaim applicant was the beneficial owner of the dividend entitled to a refund of the withheld tax.

To be clear, Jeppesen did not merely identify the risk of multiple reclaims because some applicants might dishonestly seek reclaims to which they knew they were not entitled.  Jeppesen also identified an open legal question about who, as between the owner who lends shares and a buyer who subsequently buys those shares from the borrower without knowledge they are

---

[56]    For example, in TfS 1997.403 B, the Danish court found the mere fact of ambiguity in the information reported to SKAT should have led to further investigation. Ørgaard Decl. ¶ 23 (ambiguity over whether taxpayer was conducting business gave rise to obligation to investigate in the year the information was received).  In another example, TfS 2002.415 LSR, a taxpayer's ongoing submission of VAT tax returns was sufficient for the court to hold that SKAT should have known of at least some of its claims and so to dismiss them as time barred. *Id.* ¶ 24.  Relatedly, SKAT cannot delay its review of the information it receives and expect that suspension will save it.  SKAT should have known of its claims *from the time it received* the relevant information.  *Id.* ¶ 25 (discussing the Eastern High Court's decision at TfS 2002.617).  In all of these cases, claims filed more than three years after the duty to investigate was triggered were dismissed as untimely.

borrowed, is *actually* the beneficial owner of the dividend associated with those shares.  DSMF ¶ 21.  As Jeppesen explained, it was possible that *both* parties could claim in good faith to be the owner of the dividend entitled to a reclaim.[57]  Jeppesen Tr. 124:2-13, 125:1-126:6.  It was up to SKAT then, as a matter of Danish tax law, to determine which one of the two applicants was the beneficial owner entitled to a refund.  *Id.* at 143:2-18.

Among other things, Jeppesen recommended that SKAT request information from reclaim applicants on whether the shares were borrowed.  DSMF ¶ 22.  That recommendation was not adopted at any time before August 2015, Ekstrand Tr. 248:11-25; Rømer Tr. 162:9-12; Brøchner Tr. 143:16-144:5, nor did SKAT ever ask a claimant if it purchased shares from a short-seller.  JSUMF ¶ 42.  Even SKAT's current guidance, *see* n.577, indicates that SKAT has not fully resolved the legal question.

At an absolute minimum, the open legal question highlighted by Jeppesen's 2007 memorandum established a fundamental ambiguity in the documentary evidence SKAT collected in support of reclaim applications.  This is precisely the kind of ambiguity that triggers SKAT's duty of investigation and begins the running of the three-year limitations period.  Ørgaard Decl. ¶ 23.  With the knowledge that SKAT might, for any given dividend, receive two or more good faith claims for reimbursement of withholding tax, SKAT had a choice:  It could either investigate the claims and determine whether the applicant was entitled to a reclaim before paying it, or it could process the claim based on the information before it.  Both might technically be valid choices

---

[57]      Indeed, both the Ministry of Taxation and SKAT suggest that a purchaser of shares from a borrower of those shares is the beneficial owner of any dividends associated with those shares.  Ekstrand Tr. 137:7-19; Bahnsen Decl. Ex. 20.  At the same time, as between the lender and the borrower, the *lender* "remains the beneficial owner of dividends and the actual shareholder even after he has lent the shares."  Bahnsen Decl. Ex. 20 at 3.

as a matter of sovereign tax administration. What SKAT could not do, however, is pretend that it lacked "any indications that should have pointed to the need for further investigations." *Id.* ¶ 18.

Jeppesen's 2007 memorandum was not the earliest—nor the only—warning SKAT received regarding its fundamental blindness in the administration of dividend withholding tax refunds. During the time that she was in charge of dividend withholding tax refund administration at SKAT (2002-13), Lisbeth Rømer made multiple attempts to inform senior SKAT management of problems with SKAT's process for issuing refunds of withheld dividend tax. Rømer Tr. 27:4-27:10, 30:8-31:12, 31:24-32:2, 32:25-33:18; Bahnsen Decl. Ex. 41 ("Daugaard Tr.") 72:22-73:8 (noting his concern upon learning that Rømer's warnings had not been taken seriously). SKAT's own internal audit division, SIR, also issued a number of reports critical of SKAT's administration of dividend withholding taxes in the years leading up to 2012, including a 2006 report concluding that SKAT did not satisfactorily control the administration of dividend withholding tax refunds. DSMF ¶ 15.

Rømer described a perennially overlooked administrative apparatus that lacked the basic ability to perform any essential control function over the dividend reclaim applications it received. *See* Rømer Tr. 125:23-25 ("So there was no one having the responsibility of the things happening in dividend tax."); *id*. 211:13-17 ("[W]e will rely on the information we get, but we can cross-check nowhere. And when you are in the tax administration, you know that cross-checking is not a bad thing.").

At least two things contributed to SKAT's derelict operations. *First*, as Rømer explained, the dividend unit was treated within SKAT as purely an accounting function. Rømer Tr. 188:12-13 ("We were a bookkeeping unit, no means of investigation skills, no nothing."). Rømer's successor testified that from the end of 2013, when she took over supervision of the dividend

withholding tax administration, through August 2015, she never thought about the issue of beneficial ownership. Bahnsen Decl. Ex. 45 ("Madsen Tr.") 142:3-7. This is an astonishing admission from the person in charge of an office that issued refunds based on beneficial ownership of dividends in excess of DKK 1 billion per *month* at some points in 2014. JSUMF ¶ 59.

*Second*, SKAT knew that it was unable to identify the foreign beneficial owner of the dividends for which a reclaim was sought. Omnibus (nominee) accounts within the custody chain meant that SKAT did not receive particularized information about the identity of the ultimate foreign beneficial owner of shares. *E.g.*, Rømer Tr. 188:2-7 ("[S]hareholders [in omnibus accounts] are unknown to us."); *id.* 196:19-25. Instead, SKAT claimed it had visibility only into the identity of the bank through which those ultimate foreign beneficial owners held their shares. Rømer Tr. 155:4-15. Understandably concerned, Rømer raised the issue in written memoranda on numerous occasions. *See, e.g.*, Rømer Tr. 122:17-23 and Bahnsen Decl. Ex. 22 (warning in 2005 that it was not possible to confirm whether the refund claimant was the recipient of the dividend); Rømer Tr. 170:17-171:13 and Bahnsen Decl. Ex. 26 (warning in August 2008 that SKAT's inability to identify foreign shareholders of Danish securities persisted); Bahnsen Decl. Ex. 27 (warning in memo dated December 2, 2009 that it was not possible to ensure the accuracy of dividend reclaims paid to foreign shareholders).[58]

In 2010, concerned that SKAT might be refunding more in dividend withholding tax to foreigners than was paid to SKAT, the then-head of the Department of the Ministry of Taxation,

---

[58]    In 2006, Rømer and others drafted a document entitled "Problemkatalog" that identified several deficiencies in the administration of dividend withholding taxes and proposed solutions. Bahnsen Decl. Ex. 24; Rømer Tr. 146:18-147:21, 149:23-150:10, 152:11-153:5, 155:2-15, 159:17-160:9. The Problemkatalog identified both the existence of nominee (omnibus) accounts and the practice of stock lending as potentially resulting in a loss of tax revenue. Bahnsen Decl. Ex. 24; *id.* Ex. 43 (Zester Tr. 95:10-16). The Problemkatalog also recommended changes to the documentation requirements associated with dividend withholding tax reclaim applications. The recommended changes were not adopted. Ekstrand Tr. 248:11-25; Rømer Tr. 162:9-12; Brøchner Tr. 143:16-144:5.

Peter Loft, asked SIR to investigate. DSMF ¶¶ 33-34. SIR's report, issued in May 2010, confirmed Loft's fears and concluded that SKAT might be refunding dividend taxes more than once per dividend. *See id.* ¶ 35; Bahnsen Decl. Ex. 30; Daugaard Tr. 123:16-18 ("[T]he major problem here was that there was no way to actually check who was the share owner."). The 2010 SIR report also concluded that there was "no check as to whether dividend tax is requested more than once per share," and "no checks in connection with refund requests as to whether the investor is *actually* a shareholder and whether the investor is, in fact, liable for tax in Denmark or not." Bahnsen Decl. Ex. 30 at 8 (emphasis added).

Despite the 2010 SIR Report's clear findings, SKAT carried on as it always had, issuing refunds so long as the reclaim applications included all the requested documentation. As a matter of practice, SKAT did not further verify the information from third-party financial institutions, nor from foreign tax authorities, nor from the claimants, before paying refunds. JSUMF ¶ 33. SKAT did not analyze whether the claimant purchased shares from a seller who had borrowed the shares sold, or whether the claimant had loaned the shares for which it was seeking a refund. *Id.* ¶ 64. In other words, despite its clear understanding that it *was not verifying beneficial ownership*, SKAT took no action to assure itself of the basis for the reclaims it paid.

### 2. 2012-2015: Exponential Rise In Reclaim Payments

SKAT inexplicably ignored an explosion in the volume of dividend withholding tax reclaims paid starting in 2012. At the time, SKAT knew it was paying vast sums in reclaims. JSUMF ¶ 53; Madsen Tr. 48:15-49:25 (discussing awareness of increase in June 2014). SKAT even paid dividend withholding tax refunds *in excess of* the dividend withholding tax liability owed to SKAT for a particular dividend distribution on at least one occasion prior to January 2015. JSUMF ¶ 62.

The following chart summarizes SKAT's payments of dividend withholding tax reclaims from January 2010 through December 2014:

| Year | Total Reclaims Paid (DKK) | Paid via Reclaim Forms (DKK) | Reclaim Form Payments as % of Total Reclaims Paid |
|---|---|---|---|
| 2010 | 0.7 billion | 0.2 billion | 29% |
| 2011 | 1.1 billion | 0.3 billion | 27% |
| 2012 | 1.5 billion | 0.4 billion | 27% |
| 2013 | 2.8 billion | 1.5 billion | 54% |
| 2014 | 6.1 billion | 4.1 billion | 67% |

JSUMF ¶¶ 53-60. Every possible way of looking at these facts signals a "need for further investigation." Ørgaard Decl. ¶ 18.

In each of May and June 2014, SKAT paid almost DKK 1 billion more in refunds than it had in the same months in 2013. JUSMF ¶ 59. In just the first seven months of 2014, SKAT had refunded approximately *DKK 1.3 billion more than in all of 2013*. *Id*. ¶ 60. During the same period in 2015, SKAT refunded an eye-watering DKK 8.7 billion. *Id*. ¶ 61. SKAT paid more in reclaims via submission of reclaim forms in 2013 than it had in the prior three years combined. In 2014, it paid nearly *twice* the amount from the prior three years combined. By December 2013, SKAT knew that the percentage of total reclaims paid following submission of reclaim forms had *doubled* from the prior year, and the total amount refunded through that scheme had more than *tripled* during the same time. By the end of 2014, payments to applicants seeking reclaims via SKAT's forms accounted for more than two-thirds of all reclaims, despite having held steady at under 30% from 2010 through 2012. In absolute terms, too, the numbers are striking. SKAT went from paying DKK 0.4 billion in reclaims in response to applications provided on SKAT's forms

68

in 2012 to DKK 4.1 billion two years later.[59]  Of the DKK 8.7 billion refunded in the first seven months of 2015, at least DKK 6 billion was paid in response to requests for reclaims submitted using SKAT's forms.[60]

By the end of 2013, SKAT had ample reason to investigate what, at a minimum, appeared to be an aberration within the administration of dividend withholding taxes via submission of reclaim applications.  By the end of 2014, SKAT faced an undeniable problem.  In the flurry of all the extra dividend reclaim activity, SKAT had refunded *more* in connection with at least one dividend than was actually due in taxes.  JSUMF ¶ 62.  By definition, SKAT had erred in its administration of withholding tax, and it is not credible for SKAT to claim that it did not then have an obligation to investigate how that happened.[61]

### 3. The Upshot:  The Statute of Limitations Began Running On The Date Of Each Reclaim Payment, Or, At The Latest, On December 31, 2014

Because of the red warning flags that so obviously existed before 2012, the Danish limitations period began running on the date of each reclaim payment and expired three years later.  SKAT cannot seriously suggest that its systemic and persistent failure to verify the accuracy of the

---

[59]     Only *one person* at SKAT was primarily responsible for processing all incoming reclaim form applications during this time.  JSUMF ¶ 51; Ekstrand Tr. 32:15-33:10; Rømer Tr. 60:6-13, 81:25-82:19, 87:15-21; Madsen Tr. 24:8-28:9.  It is impossible that this person would not have recognized the increase.

[60]     SKAT alleges a total combined loss of DKK 12.7 billion related to activities from 2012 to 2015.  Assuming that 100% of the refunds paid via reclaim form applications in 2012 – 2014 are included in SKAT's DKK 12.7 billion figure, that leaves DKK 6.7 billion necessarily related to reclaims paid in 2015.

[61]     Even if SKAT had confined its investigation to the narrow question of payments in excess of the associated dividend tax liability—an unreasonable limitation, given the numerous and consistent warning signs already detailed—it is apparent that such investigation "could have given [SKAT] sufficient information to assert the claim," Ørgaard Decl. ¶ 18 (quoting von Eyben at 445), as to *at least* one recipient of refunded dividend tax.  That the discovery of one such claim might have led to more is equally apparent.  In fact, SKAT *already* knew the rise in refunds was attributable to U.S. pension plans.  Rømer Tr. 86:12-87:14 (reflecting on "significant increase" in reclaim applications by U.S. pension plans after change in law giving plans full dividend withholding tax exemption); Madsen Tr. 48:15-49:25 (explaining that jump in refunds in June 2014 relative to June 2013 might be explained by U.S. pension plans, and that this explanation was reported up within SKAT); *see also* Bahnsen Decl. Ex. 35 (SKAT's monthly Final Accounting Approval memo for June 2014, offering U.S. pension plans as explanation for the increase).  SKAT would only have needed to determine from the records in its possession *which* recipient(s) received a reclaim.

dividend withholding tax refunds excuses its failure to uncover its claims within three years from their accrual. This is especially so in light of the inquisitorial procedure that *mandates* that SKAT develop a correct basis for the positions it takes, Ørgaard Decl. ¶ 15, and Danish legislation that gave SKAT *six months* to investigate individual reclaims before it paid them. Pilgaard Decl. ¶ 141. Granting SKAT the benefit of any suspension in the limitations period under these circumstances would serve to nullify the inquisitorial procedure. As with the ambiguity in the records demonstrated in Jeppesen's 2007 memorandum, SKAT's known blindness to the identity of the foreign beneficial owner, at a minimum, required further investigation. Accordingly, all claims related to payments made more than three years (subject to tolling) before SKAT filed suit against the relevant bellwether defendants are untimely.

Even if the Court disagreed, at a minimum the Danish limitations period began running by December 31, 2014. That is because of the patency of the issues presented by the rapid rise in reclaims. Thus, SKAT's duty to investigate any reclaims paid in 2013 and 2014 was triggered no later than December 31, 2014, and so all claims filed beyond December 31, 2017 are time-barred.[62]

---

[62]    Regardless of the other bases for the application of the statute of limitations as to the AIG Bellwether defendants, SKAT's claims against Robert Crema are untimely. SKAT added Crema as a defendant on March 27, 2020. SKAT, however, knew of its claims against Crema as of December 2015, and certainly by no later than October 2016. In December 2015, SKAT possessed (i) the plan document for the AIG Plan, executed by Crema as trustee and as a partner of the AIG Plan's sponsor; and (ii) the Security-and-Set-Off Deed agreed to by ED&F and the AIG Plan, executed by Robert Crema as trustee of the AIG Plan. JSUMF ¶¶ 386-89. By October 2016 SKAT knew that Crema was the sole participant of the AIG Plan. *Id.* ¶¶ 390-91. Moreover, in October 2016, SKAT stated its belief that "[the AIG Plan], as a pension fund—with a single participant and the resulting limited amounts of deposits—did not have the sufficient capital basis to be able to make investments in Danish shares of the amount underlying … previous requests for payment of withheld dividend tax"—i.e., those at issue in this SKAT's claims against Crema before this Court. *See* SKAT_MDL_001_008120. Thus, under the Danish three-year limitations period, all of SKAT's claims against Crema needed to be filed by October 2019 to be timely. Even if the Utah statutes of limitations applied, SKAT's fraud-based claims should have likewise been filed by October 2019. *See* Utah Code Ann. § 78B-2-305 (imposing three-year limitations on fraud-based claims).

### D. SKAT'S Unjust Enrichment Claims Are Barred By The Three-Year Limitations Period Under New York Law[63]

Unjust enrichment claims seeking only monetary relief are governed by a three-year statute of limitations. *See Bascunan v. Elsaca*, 2021 WL 3540315, at *6 & n.5 (S.D.N.Y. Aug. 11, 2021). No statutory discovery period applies to SKAT's non-fraud claims, including unjust enrichment. N.Y. C.P.L.R. §§ 213(1), 214(3); *accord* Memorandum Opinion at 9, *Skatteforvaltningen v. Raubritter Pension Plan*, No. 18-cv-04833-LAK (ECF No. 173) (the "Burns Opinion"). Here, the three-year period runs from no later than the date SKAT paid the allegedly erroneous reclaims. *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 171 (1st Dep't 2003). Further, for the reasons the Court already explained in the Burns Opinion, the claims accrued at the time SKAT paid the allegedly erroneous reclaims to the payment agents, and *not* at some later time when the plans obtained some possessory interest in the property. Burns Opinion at 10-12. SKAT alleges as to each bellwether Plan, as it did with respect to the Raubritter plan, that the payment agents received payment of the refunds from SKAT on behalf of the plan. *E.g.*, Am. Compl., *SKAT v. Basalt Ventures LLC Roth 401(K) Plan*, ¶ 65 ("Basalt Am. Compl."). That payment to the plan's agent is sufficient to start the running of the statute.[64] As a result, all of SKAT's claims for unjust enrichment relating to reclaim payments made more than three years (subject to tolling) before SKAT asserted the claims are out of time and must be dismissed.

---

[63] Except as discussed in this section, New York law prescribes a six-year statute of limitations for all of SKAT's claims. *See Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 500 (S.D.N.Y. 2005) (payment by mistake, money had and received); *Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 446 (S.D.N.Y. 2006) (negligent misrepresentation); *Krog Corp. v. Vanner Grp., Inc.*, 72 N.Y.S.3d 178, 182-83 (3d Dep't 2018) (fraud). Fraud claims are also subject to a discovery rule under New York law, meaning that they must be brought within "the greater of six years from the date the cause of action accrued or two years from the time … plaintiff … discovered the fraud, or could with reasonable diligence have discovered it." *Id.* (quoting N.Y. C.P.L.R. § 213(8)). Because Danish law supplies the shorter of the two periods, further discussion of New York law on this point is not necessary.

[64] The Court also already correctly rejected SKAT's claim that equitable tolling might apply to any of SKAT's non-fraud claims because the alleged misrepresentations sufficient to toll the period "are the same facts underlying SKAT's substantive causes of action." Burns Opinion at 10.

## V. Summary Judgment Should Be Granted On SKAT's Claims For Reasons Particular To Each Claim

### A. Summary Judgment Should Be Granted On SKAT's Equitable Claims Because SKAT Has An Adequate Remedy At Law

A federal court sitting in diversity only has subject-matter jurisdiction over equitable claims if the plaintiff lacks an adequate remedy at law. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S. Ct. 894, 900 (1962) ("The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is … the absence of an adequate remedy at law.").

SKAT's payment by mistake, unjust enrichment, and money had and received claims are equitable claims. *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010) (payment by mistake, unjust enrichment, and money had and received claims are equitable).[65] They fail as a matter of law because two plain, adequate and complete

---

[65] *See also Litvinoff v. Wright*, 54 N.Y.S.3d 22, 25 (2d Dep't 2017) ("The action [for money had and received] depends upon equitable principles in the sense that broad considerations of right, justice and morality apply to it."); *Nat'l Bank of Canada v. Artex Indus., Inc.*, 627 F. Supp. 610, 616 (S.D.N.Y. 1986) ("The cause of action for recovery of money paid by mistake is based upon the principle of unjust enrichment, and as such is undoubtedly equitable in nature.") (cleaned up); *Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421 (1972) ("[A]ny action for unjust enrichment or restitution … is undoubtedly equitable and depends upon broad considerations of equity and justice.") (cleaned up); *CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532, 1546 (D. Utah 1993) (explaining unjust enrichment, money had and received, and overpayment claims "arise from equitable theories of implied and quasi-contract"), *aff'd sub nom. CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996); Basalt Am. Compl. ¶ 94 ("It is against equity and good conscience to permit Defendants to keep these monies[.]"); Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Am. Compl. at 14-15, *Skatteforvaltningen v. Raubritter Pension Plan*, No. 18-cv-04833-LAK, ECF No. 496 (SKAT refers to its unjust enrichment, money had and received, and payment by mistake claims as "its restitution claims").

legal remedies exist.[66] First, SKAT's equitable claims seek the same monetary damages as its legal claims in this case, rendering the latter plain, adequate and complete remedies for the former. Second, SKAT declined to pursue substantially similar claims in Denmark's courts which, if successful, offered SKAT relief comparable to what it seeks through its equitable claims here.

Monetary damages are an adequate remedy at law when they place the injured party in the same position in which they would have been had they not suffered such injury. *McDonald v. Piedmont Aviation, Inc.*, 793 F. Supp. 75, 78 (S.D.N.Y. 1992); *see Magi XXI, Inc. v. Stato Della Cita Del Vaticano*, 22 F. Supp. 3d 195, 207 (E.D.N.Y. 2014) (holding that the equitable remedy of rescission fails as a matter of law where plaintiffs suffered a financial loss for which damages were an adequate remedy). SKAT's equitable claims seek "the amount of dividend withholding tax refund payments [the Defendants] received from SKAT to which they were not entitled, plus interest." Basalt Am. Compl. ¶ 91; *see id.* ¶ 86 (seeking the amount of "the payments that SKAT made in error to the Defendants, plus interest"); *id.* ¶ 94 (seeking "the amount of withholding tax refund payments [Defendants] received … plus interest"). SKAT seeks identical relief through all of its other claims in this case. *See id.* ¶¶ 72 (calculating damages as the amount, plus interest, of withholding tax refunds), 79, 99. If SKAT prevails on any of its legal claims, that will effectively

---

[66] Applying the limits of federal equity jurisdiction to SKAT's unjust enrichment claims comports with the Supreme Court's command that the "outcome" of a lawsuit should be "substantially the same" regardless of whether it is filed in state or federal court, *see Guar. Tr. Co. of New York v. York*, 326 U.S. 99, 109, 65 S. Ct. 1464, 1470 (1945), because it is "well-established under New York law that 'equity will not entertain jurisdiction where there is an adequate remedy at law.'" *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) (citing *Boyle v. Kelley*, 42 N.Y.2d 88, 91 (1977)); *see In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *38 (S.D.N.Y. June 11, 2021) (dismissing unjust enrichment claim because New York antitrust statutes provided "[a]n adequate remedy"); *Brumfield v. Trader Joe's Co.*, 2018 WL 4168956, at *5 (S.D.N.Y. Aug. 30, 2018) (dismissing unjust enrichment claim because plaintiff's statutory and tort claims were adequate remedies at law, where unjust enrichment, statutory, and tort claims were all "premised on the same alleged misrepresentation"). Under New York law, SKAT's unjust enrichment claims would be barred because its legal claims are adequate remedies and because all its claims are premised on the same underlying allegations that defendants made material misrepresentations to SKAT, rendering the unjust enrichment claims duplicative. *See Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015) (collecting cases).

restore SKAT to its pre-injury position. SKAT's legal claims therefore seek a plain, adequate and complete legal remedy such that its equitable claims should be dismissed. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming dismissal of equitable restitution claim due to existence of adequate legal remedy, where complaint sought "the same amount of money for the exact same harm" via legal damages claim); *cf. Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613-14 (2d Cir. 2010) (applying New York law and affirming dismissal of unjust enrichment claim where "the complaint reveals that [plaintiff] seeks only monetary relief on" that claim).

SKAT squandered another adequate legal remedy in Denmark when it declined to pursue its claims in Danish court before the limitations period expired. SKAT possesses the power to bring legal claims against foreign taxpayers in Denmark's courts. Pilgaard Decl. ¶¶ 83, 86 (noting that SKAT's Legal Guide contemplates suits against foreign taxpayers claiming compensation "considered in consultation with legal counsel to the Danish government"). SKAT did just that when it sued Canada's Health Care of Ontario Pension Plan (HOOPP) and nine non-Danish banks in Danish civil courts. *Id.* ¶ 84. In that lawsuit, SKAT "is seeking to recover 900 million DKK worth of dividend tax that SKAT paid out between 2011 to 2014." *Id.*

SKAT could have brought an action for damages in Denmark against the Defendants based upon the same factual allegations contained in the complaints in this case. Pilgaard Decl. ¶¶ 85-87. If successful on such an action, SKAT could have obtained judgment "in the full amount of the reclaims that were wrongfully paid." *Id.* ¶ 105. SKAT's ability to seek an enforceable judgment against the Defendants in a Danish civil suit constitutes a plain, adequate and complete legal remedy. *Cf. Gras v. Stevens*, 415 F. Supp. 1148, 1153 (S.D.N.Y. 1976) (holding that state

proceedings constituted adequate remedy at law negating plaintiff's ability to seek a declaratory judgment in federal court).[67]

### B. Summary Judgment Should Be Granted On SKAT's Payment By Mistake Claim Because Undisputed Facts Show No Mistake Was Made

A party claiming payment by mistake "can hardly be characterized as truly mistaken when he or she intentionally proceeds without further investigation of his or her rights." *Est. of Hatch, ex rel. Ruzow v. NYCO Mins. Inc.*, 704 N.Y.S.2d 340, 341 (3d Dep't 2000). SKAT never sought to ascertain the facts about which it now claims it was "mistaken" when it issued the refunds. Upon receipt of Forms 06.003 and supporting documents issued to the Plans by third parties, SKAT reflexively issued refunds without any investigation or factual analysis. SKAT paid refunds "blindly," knowing that it could not confirm the identity of non-Danish beneficial owners of shares held in omnibus accounts. *See* DSMF ¶¶ 17, 30-36, 38, 53-54. That intentional conduct fatally undermines SKAT's claims that it made a "mistaken" assessment of any particular claim's merits, let alone the specific claims at issue in this case. Any overpayments by SKAT were the product of conscious—not mistaken—decisions. Thus, SKAT's payment by mistake claim cannot succeed. *See ITT World Directories, Inc. v. CIA Ed. de Listas, S.A.*, 525 F.2d 697, 702 (2d Cir. 1975) (affirming dismissal, after bench trial, of payment by mistake claim, when "the overpayment may well have been the result not of a mistake but of a conscious decision," and there was no

---

[67] When resolving claims of *forum non conveniens*, courts consistently hold that foreign forums offer adequate remedies when they are capable of adjudicating the same subject matter as the U.S. action—even if there are procedural differences (including those that make it less desirable for the plaintiff to bring suit abroad), and even when the causes of action or remedies available abroad are not precisely equivalent to those asserted in a U.S. complaint. *See Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 542 (S.D.N.Y. 2001), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002); *Ferrera v. Borgships, Inc.*, 1996 WL 80106, at *3 (E.D. La. Feb. 16, 1996) ("Plaintiff has presented no countervailing evidence of the inadequacy of the Danish forum other than the amount of recovery he was awarded. The remedies available are not so clearly inadequate as to preclude dismissal in this forum. Dismissal based on *forum non conveniens* is not precluded solely because the remedy available in the alternative forum is substantively less generous than the present forum."), *aff'd*, 98 F.3d 1337 (5th Cir. 1996).

"evidence of how the mistake had been made, who was responsible for it, and why it was not discovered until one and one-half years later").

All of the facts about which SKAT now claims to have been mistaken were instead details that SKAT simply never made any effort to ascertain.[68]  It is impossible for SKAT to have been mistaken about facts SKAT never sought to learn in the first place.  Specifically:

- SKAT claims it mistakenly believed the Plans were funded in accordance with the Internal Revenue Code.  *See, e.g.*, Basalt Am. Compl. ¶ 44.  But SKAT never even inquired into, let alone verified, the source of any contribution to any U.S. pension plan claiming a refund of dividend withholding tax.  JSUMF ¶ 40.

- SKAT claims it mistakenly believed the LLCs sponsoring the pension plans conducted trades or business, and had multiple employees.  Basalt Am. Compl. ¶ 44.  But, again, SKAT did not inquire into or verify the nature of any business activities conducted by any sponsoring entity associated with any U.S. pension plan claimant.  JSUMF ¶ 41.

- SKAT claims it mistakenly believed the pension plans did not carry on any debt-financed activities.  Basalt Am. Compl. ¶¶ 40, 45.  They did not, but that does not matter; again, SKAT simply never asked any U.S. pension plan claimant, in connection with any claim, if it financed 100% of the cost of the shares referenced in any claim.  JSUMF ¶ 43.

- SKAT claims it mistakenly believed the plans operated for the exclusive benefit of their sponsoring entities' employees and were intended to be permanent, which, SKAT alleges, they were not.  Basalt Am. Compl. ¶¶ 42-43.  But SKAT never made inquiries to any U.S. pension plan claimant about those issues before paying refunds.  JSUMF ¶¶ 38-41.

Even assuming SKAT's attacks on the Plans' qualifications under 26 U.S.C. § 401(a) are correct—and they are not, *see generally* Reish Report § VI—SKAT accepted a copy of IRS Form 6166 as sufficient evidence that the relevant claimant was a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code.  JSUMF ¶

---

[68]     In any event, as described above, many of SKAT's supposedly "mistaken" beliefs would not affect whether the plans were beneficial owners and thus entitled to the refunds they claimed.

38.  SKAT performed no further analysis of factual issues related to Plan formation, funding, and operations.  *Id.* ¶¶ 38-39.  SKAT made a conscious decision to rely on the Forms 6166 as sufficient evidence for reclaim purposes and not to delve into factual matters underlying the IRS's determination.  This is not a situation where the alleged victim made a mistaken assessment of facts.  Here, SKAT never sought to ascertain the facts.

Likewise, SKAT cannot now claim it was mistaken about beneficial ownership when, knowing that it could not identify foreign beneficial owners, SKAT accepted DCAs issued by custodians as sufficient evidence that the Plans beneficially owned and received dividends from shares they owned.  SKAT knew it was possible that it might receive multiple DCAs pertaining to the same shares.  *See* DSMF ¶ 35.  Accordingly, SKAT knew for years before it paid the refunds in this case that DCAs were not a fail-safe indicator of beneficial ownership under Danish law.  *Id.* ¶¶ 20, 35.  Because SKAT *chose* to rely entirely on DCAs to prove beneficial ownership and receipt of the net dividend, SKAT's payment by mistake claim fails.  *See Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329, 339-41 (S.D.N.Y. 2019) (holding that certain payments were not "mistaken" when the alleged mistake related to a term's definition and the record showed the payor fully understood that definition).

Furthermore, between January 1, 2012, and August 31, 2015, SKAT never asked a claimant any of the following questions that would have shed light on the beneficial ownership question about which SKAT now claims it was mistaken:

- Whether the claimant purchased shares from a short-seller.  JSUMF ¶ 42; *see also* DSMF ¶ 19.

- What the settlement terms were for the claimant's purchase of Danish shares.  JSUMF ¶ 44.

- How long the claimant owned a stock prior to the declaration of a dividend, or how long the claimant held the stock in connection with any claim.  JSUMF ¶¶ 45, 48.

SKAT knew at the time it paid the refunds in this case that the answers to these questions might inform its view of whether the claimant was entitled to a refund, yet SKAT chose not to make any such inquiry.[69]

It is undisputed that SKAT undertook no analysis or investigation of any information contained within the four corners of the DCAs.  JSUMF ¶¶ 32-33.  Instead, SKAT reflexively issued refunds upon receipt of Forms 06.003 that were properly filled out and attached the requisite records.  DSMF ¶¶ 13, 46, 50-51.  That SKAT's internal guidance on processing reclaims did not speak to the issue of beneficial ownership during the period at issue reflects the rote nature of SKAT's review of reclaim submissions and payments.  *See id.* ¶ 46.  In fact, SKAT assigned a single employee to the task of processing all incoming paper reclaim applications.  JSUMF ¶¶ 51-52.  Such staffing decisions reflect SKAT's conscious choice not to undertake analysis or investigation of reclaim submissions, but instead simply to pay them if they were proper in form.  Making repeated, regular, and increasing payments under such circumstances cannot be construed as a mistake.  *See Est. of Hatch*, 704 N.Y.S.2d at 341-42 (a party claiming payment by mistake "can hardly be characterized as truly mistaken when he or she intentionally proceeds without further investigation of his or her rights"); *see also ITT World Directories*, 525 F.2d at 702-03 (affirming dismissal of payment by mistake claim when record revealed plausible explanations for plaintiff's conscious decision to make certain payments).  SKAT paid reclaims without

---

[69]     SKAT did not make any such inquiry even after a change in Danish law increased from 30 days to six months the time in which SKAT could process a reclaim before interest started accruing.  Pilgaard Decl. ¶ 141.

undertaking any analysis of the facts about which it now claims to be mistaken (or, in some cases, never even seeking the information in the first place)—a conscious, not mistaken, decision.[70]

### C.   Summary Judgment Should Be Granted On SKAT's Negligent Misrepresentation Claim Because SKAT's Reliance On The Alleged Misrepresentation Was Unreasonable

A claim for negligent misrepresentation requires that the plaintiff reasonably rely on the alleged misrepresentation.  *See J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144 (2007). Reliance is unreasonable as a matter of law where the plaintiff ignores red flags.  *See Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98-99 (2d Cir. 1997) (finding plaintiff's reliance on defendant's misrepresentation that estate owned rights to every Andy Warhol work unreasonable, when sheer number of Warhol works would have led reasonable person to investigate, not rely upon, misrepresentation); *Andersen v. Homecomings Fin., LLC*, 2011 WL 3626828, at *3 (D. Utah Aug. 17, 2011) (under Utah law, to prove negligent misrepresentation, a plaintiff must show he "reasonably relied on the defendant's representation").   Reliance on another party's misrepresentations is particularly unreasonable where the relying party possesses or can easily access information casting doubt upon those representations.  *See Doehla v. Wathne Ltd., Inc.*, 1999 WL 566311, at *11 (S.D.N.Y. Aug. 3, 1999) (observing that reliance has been held unreasonable as a matter of law "where the evidence has established that a sophisticated plaintiff had indisputable access to truth-revealing information").  Finally, reliance is unreasonable when the relying party "failed to make use of the means of verification that were available to it[.]"  *UST Priv. Equity Invs. Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dep't 2001);

---

[70]    SKAT's decision not to take further steps to investigate applicants' entitlement to reclaims plausibly can be explained by Denmark's stated goal to encourage and facilitate foreign investment in Danish businesses and SKAT's concern with "service," a desire to relieve burdens on Danish businesses and taxpayers.  *See* DSMF ¶ 60.  SKAT consciously chose service and investment in Denmark over proper controls over the administration of dividend tax reclaims.

*see Jardine v. Brunswick Corp.*, 423 P.2d 659, 662-63 (1967) (similar under Utah law); *Klas v. Van Wagoner*, 829 P.2d 135, 141 n. 9 (Utah Ct. App. 1992) (affirming dismissal of fraud and misrepresentation counterclaims where "the means of knowledge were available to defendants and … they failed to avail themselves of these means"). As noted above, SKAT was also under a Danish legal obligation to ascertain all relevant information before taking official action by issuing refunds. *See supra* § IV.B (describing the inquisitorial procedure memorialized in SKAT's Legal Guide).

SKAT's negligent misrepresentation claim cannot withstand scrutiny because, as noted above, it was thoroughly aware of the risks associated with its dividend tax administration. As a result, its reliance on deficient documentation of beneficial ownership was unreasonable. SKAT, a sophisticated party with significant resources, ignored warning signs—including repeated, specific warnings issued by its own employees and auditors—and made no use of available means of verification. And "[i]n evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) (collecting cases); *Richmond v. Weston*, 2004 WL 440187, at * 2 (Utah Ct. App. Mar. 11, 2004) (holding where "facts should make it apparent to one of [the relying party's] knowledge and intelligence … that he is being deceived … [he] is required to make his own investigation" and therefore finding reliance unreasonable as a matter of law). It is difficult to conceive of a plaintiff more sophisticated than SKAT in the matters at issue here. SKAT issued the refunds in this case within the context of years of experience administering dividend withholding taxation. SKAT was advised of the risks in its dividend tax administration by employees with ample educational background, training, and experience. *See* Rømer Tr. 22:3-11 (recounting legal education and 35 years of government service dealing with tax issues); Daugaard

80

Tr. 11:11-16:9 (describing auditor's degree in accounting and financial management and courses and certifications in auditing). The reasonableness of SKAT's alleged reliance on the Plans' representations must be evaluated with a particularly critical eye, given SKAT's sophistication regarding the transactions at issue.

SKAT's exclusive reliance on Form 06.003 and the attached documents was unreasonable because the information in those documents, as well as voluminous data at SKAT's fingertips, called out for further inquiry. SKAT now alleges that the Plans could not have traded the volumes of shares reflected on the DCAs because they lacked sufficient capital. *See* Basalt Am. Compl. ¶¶ 40, 45 (alleging the Basalt Plan carried out debt-financed investment activity). But SKAT was in possession of those very DCAs and never sought additional information from the Plans about their assets or how they financed the purchase of the shares. Furthermore, SKAT knew in real time that the volume of dividend withholding tax reclaims paid began to balloon in 2012. JSUMF ¶¶ 53-61. SKAT was aware, at least by mid-2014, that increased investment in Danish corporations by U.S. pension plans was a factor driving the explosion in reclaims. *See* Rømer Tr. 86:12-87:14; Madsen Tr. 48:15-49:25, 52:10-24; *see also* Bahnsen Decl. Ex. 35. Continuing to issue reclaims without further inquiry was unreasonable. *See Doehla*, 1999 WL 566311, at \*11; c*f. HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 66 (1st Dep't 2012) (reliance on alleged misrepresentations was unreasonable when the risk of such reliance "could have been ascertained from reviewing market data or other publicly available information").

SKAT possessed ample information that should have caused it to pursue further inquiry before issuing refunds. With all of that knowledge, SKAT—a sophisticated entity with an independent duty of inquiry—chose to issue refunds without taking even basic steps to verify information, like requesting additional documentation from reclaim applicants (as SKAT's former

chief legal officer Jeppesen recommended as early as 2007). In light of SKAT's abject failure to pursue means of verification available to it, SKAT's negligent misrepresentation claim fails as a matter of law.

> **D.** **Summary Judgment Should Be Granted On SKAT's Fraud And Negligent Misrepresentation Claims Because Defendants In The ED&F Bellwethers Did Not Possess The Requisite Scienter And Were Not Negligent**

Under Utah law, fraud claims may be premised only on statements "which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation." *Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982) (quoting *Pace v. Parrish*, 247 P.2d 273, 275 (Utah 1952)); *see also Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 537 (Utah 2002) ("To have made a false representation recklessly, defendants *would have to know* that they had insufficient knowledge upon which to base the representation made.") (emphasis in original); *Hussein v. UBS Bank USA*, 446 P.3d 96, 103 (Utah Ct. App. 2019). Every element must be proven by "clear and convincing evidence." *Mikkelson*, 641 P.2d at 126. For negligent misrepresentation, the party making the statement is culpable where the statement is made "carelessly or negligently," and the party has "a pecuniary interest in the transaction" and "is in a superior position to know material facts." *Jardine*, 423 P.2d at 662.

The summary judgment record demonstrates that the ED&F Bellwether defendants did not possess the requisite scienter. For every transaction, Acer, on behalf of the pension plans, received trade confirmations showing the execution of trades on the trade date, account statements reflecting long positions in the Danish securities, account statements reflecting dividend payments net of withholding tax, and a tax voucher from ED&F indicating dividend amounts received and

withholding tax suffered.[71]  *See supra* SOF at 10; Kaminer Decl. ¶¶ 6-18.  This is true both for the transactions that SKAT's expert acknowledges resulted in the payment of "real dividends," *see* Wade Report ¶ 162, and for those that SKAT's expert does not.  Critically, at no time did any of the ED&F Bellwether defendants receive anything that would have led them to question the information provided by ED&F.  Kaminer Decl. ¶¶ 6-18.  There is nothing in the record to suggest otherwise.  Accordingly, it cannot be said that the ED&F Bellwether defendants knew that any of the challenged representations with respect to beneficial ownership, receipt of dividends, or tax withholding were false, nor were they in any superior position to know the material facts than was SKAT.

### E.    Utah Does Not Recognize Claims For Aiding And Abetting Fraud

Utah law does not recognize the claim of aiding and abetting fraud, and SKAT's claims based on an undefined theory of aiding and abetting are, therefore, unsustainable.  *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 n.1 (D. Utah 2017) ("Utah courts have not yet recognized a claim for aiding and abetting fraud."); *see, e.g.*, *Martineau v. Currutt*, 2022 WL 180735, at *6 n.6 (D. Utah Jan. 19, 2022) ("[I]t is unclear whether aiding and abetting fraud is even a cause of action under Utah law."); *DiTucci v. Ashby*, 2020 WL 956890, at *5 (D. Utah Feb. 27, 2020) (applying *Rabo Agrifinance, Inc.* to dismiss aiding and abetting fraud as not cognizable under Utah law).  Accordingly, all of the aiding-and-abetting claims in the ED&F Bellwethers are improper as a matter of law.

---

[71]    Acer acted as agent for the Riverside and AIG Plans with respect to the plans' trading through ED&F. JSUMF ¶¶ 286, 287.  Schulman and Crema relied on Acer/Kaminer, who reviewed and received information directly from ED&F, with respect to their pension plans' transactions.  DSMF ¶¶ 112 17, 381, 382; Kaminer Decl. ¶¶ 6-18.

**VI.    Summary Judgment Should Be Granted On SKAT's Equitable/Quasi-Contract Claims And To The Extent It Seeks Restitution As To Defendants Who Did Not Receive Monies From SKAT**

      **A.    SKAT's Equitable Claims Against the Lehman and Bradley Defendants Should be Dismissed Because SKAT Cannot Prove That the Introductory Broker Fees They Received Were Actually Paid At SKAT's Expense**

Under New York law, "in order to sustain an unjust enrichment claim, '[a] plaintiff must show that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (N.Y. 2018) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011)). "However, this doctrine is a narrow one; it is 'not a catchall cause of action to be used when others fail.'" *Id.* (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (N.Y. 2012)). "It is available only in unusual situations." *Corsello*, 18 N.Y.3d at 790. "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

Significant to this matter, "[i]f a plaintiff did not pay the fees in question, the plaintiff cannot recover under an unjust enrichment theory." *Bibicheff v. PayPal, Inc.*, 2020 WL 2113373, at *6 (E.D.N.Y. May 4, 2020) (citing *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016)), *aff'd*, 844 F. App'x 394 (2d Cir. 2021). Simply because a defendant has been "enriched" does not establish a cognizable cause of action "under an unjust enrichment theory *where the plaintiff did not pay the fees in question*." *Mueller*, 225 F. Supp. 3d at 209 (emphasis added) (discussing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (N.Y. 2009)). This is not a novel concept. *See Mueller*, 225 F. Supp. 3d at 309 ("Other courts applying New York law have similarly rejected unjust enrichment claims where the plaintiff seeks to recover fees it did not pay.") (collecting cases); *cf. Clark v. Daby*, 751 N.Y.S.2d 622, 623 (3d

Dep't 2002) ("[T]he mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment.").

In the Lehman and Bradley cases, it is undisputed that SKAT did not "pay the [introductory broker] fees" that it seeks as equitable damages from Defendants Lehman and Bradley. According to SKAT's own forensic accounting expert, Bruce Dubinsky, while Defendant Lehman "invoiced" millions of dollars "from Ganymede or other Shah-controlled entities," "[n]o money from the refunds was paid to Lehman's Plans," including The FWC Capital Plan. DSMF ¶ 101. Likewise, Dubinsky confirms that "[n]one of these funds [paid to Defendant Bradley] were paid to Bradley's Plans or associated LLCs," including The Proper Pacific Plan. *Id.* ¶ 103.

SKAT has not, and cannot, trace specific amounts of monies paid by SKAT as tax refund claims to Defendants Lehman and Bradley (as well as the other "Roger Lehman Defendants") or their associated pension plans. The monies SKAT paid to the tax reclaim agents for tax reclaims filed on behalf of The FWC Capital and The Proper Pacific Plans never reached those Plans or the Plans' respective bank accounts. All of the tax reclaim monies—every single penny—were pilfered prior to that payment being made by the various intermediary actors in this matter. *See* DSMF ¶ 103 (Dubinsky Report depicting 0.0% of tax reclaim monies paid to The FWC Capital and The Proper Pacific Plans).

SKAT has not produced any evidence whatsoever that could provide the basis of a specific and precise allocation of monies paid by the so-called "Shah-controlled entities" to Defendants Lehman and Bradley which are directly attributable to the specific Defendant Plans within the

bellwether cases actually being litigated on this motion for summary judgment.[72]   Under New

York law, "the 'benefit must be 'specific' and 'direct' in order to support an unjust enrichment

claim.'"   *Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 248 (E.D.N.Y. 2014) (quoting *In re Bayou*

*Hedge Fund Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007)); *accord Richard Parks*

*Corrosion Tech., Inc. v. Plas-Pak Indus., Inc.*, 2015 WL 5708539, at *5 (D. Conn. Sept. 29, 2015)

("Like a breach of contract claim, a plaintiff must prove damages are not speculative to prevail on

an unjust enrichment claim."); *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 581 (S.D.N.Y.

2010) ("Under New York law, compensatory damages for all economic injury 'must be established

with reasonable certainty' and 'may not be based on pure speculation and conjecture.'") (quoting

*Kramer v. Showa Denko K.K.*, 929 F. Supp. 733, 743 (S.D.N.Y. 1996)).

Rather, the bank records SKAT has dug up in discovery reveal that Defendants Lehman

and Bradley received payments from non-party entities such as Schmet Investments Ltd. and

Equilibrium Ventures Limited GA.   *See*, *e.g.*, JPM00002214.   Dubinsky (again, SKAT's own

forensic accounting expert) confirmed that he did not review any bank statements or other financial

records from such non-parties that were allegedly associated with the so-called "Shah-controlled

entities."   *See* Bahnsen Decl. Ex. 76 (Dubinsky Tr. 197:23-199:15).   Thus, SKAT is left

*speculating* and *conjecturing* that the introductory broker fees that Defendants Lehman and

Bradley received were somehow derived from SKAT's initial payment of tax reclaim monies.   But

such speculation and conjecture is not the "specific" and "direct" proof that is required to sustain

---

[72]      It appears that SKAT may attempt with its own motion for summary judgment to seek entry of a final money judgment against Defendants Lehman and Bradley, personally, for all monies they were allegedly "enriched" by the so-called "Shah-controlled entities" for each and every Plan they introduced into the activities underlying this MDL. That, of course, would be improper because SKAT has never availed itself of a Rule 18(a) joinder of claims.  Instead, it filed, and continues to litigate, separate, independent civil actions against each of the defendants' associated pension plans.

an unjust enrichment claim. *Legurnic*, 63 F. Supp. 3d at 248. Indeed, SKAT's tax reclaim payments become even more attenuated from the introductory broker fees received by Defendants Lehman and Bradley when one accounts for the fact that these Defendants and their associated Plans filed tax reclaim applications in other jurisdictions such as Belgium and Austria through the Solo platform. *See* DSMF ¶ 104.[73]

At bottom, SKAT's unjust enrichment claims against Defendants Lehman and Bradley fail for a lack of proof. SKAT simply cannot, and will never be able to, prove that the introductory broker fees that Defendants Lehman and Bradley received were paid by SKAT in the first instance, and therefore at SKAT's expense. Speculation and conjecture cannot carry the day.[74]

---

[73] SKAT has not produced any documents or testimony corroborating their complete speculation that the introducing broker fees paid to Lehman and Bradley by numerous nonparty entities, such as Schmet Investments Ltd. ("Schmet"), was SKAT money. Further, SKAT has not produced any evidence even connecting the numerous nonparty entities that paid Lehman and Bradley, such as Schmet, to Solo Capital. For instance, SKAT does not explain with evidence how its reclaim payments are directly related to a payment by some entity called Schmet Investments Ltd to Defendant Bradley.

[74] SKAT also asserted equitable causes of action for (1) money had and received and (2) payment by mistake against the Bradley Defendants, *see* 1:18-cv-04051-LAK (ECF No. 77), and an equitable cause of action for money had and received against the Lehman Defendants, *see* 1:18-cv-10098-LAK (ECF No. 74). These additional equitable causes of action must all fail under the same reasoning and rationale set forth above regarding SKAT's unjust enrichment claims.

Claims for (1) money had and received, (2) payment by mistake, and (3) unjust enrichment are all "claims for restitution premised on the principle that recovery is to be had *ex aequo et bono*, according to what is equitable and good." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010). To prove a claim for money had and received, a plaintiff must show that "(1) *defendant received money belonging to plaintiff*; (2) defendant benefited from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *T.D. Bank, N.A.*, 2010 WL 4038826, at *5 (emphasis added) (cleaned up). "The elements of a claim for payment by mistake are that plaintiff made a payment under a mistaken apprehension of fact, that defendant derived a benefit as a result of this mistaken payment, and that equity demands restitution by defendant to plaintiff." *Id.*

As argued above, SKAT cannot prove the first element of the money had and received cause of action because it cannot prove that the introductory broker fees received by Defendants Lehman and Bradley belonged to SKAT in the first instance. Similarly, SKAT cannot prove the payment by mistake cause of action because the purported "benefit" Defendants Lehman and Bradley derived in this matter is too attenuated from the original "payment by mistake" SKAT allegedly made to the reclaim agents. *See Staten Island Univ. Hosp.*, 2011 WL 1841795, at *5 ("Accordingly, both common law claims [payment by mistake and unjust enrichment] turn on whether the Lederman defendants have benefitted from what is rightfully the government's such that equity and good conscience demand restitution."); *id.* at *6 ("And if the Lederman defendants did not themselves receive the payments at issue, they will not be required to make restitution.").

## B.      SKAT Cannot Prove Entitlement To Restitution In ED&F Bellwether Cases

Unjust enrichment under Utah law requires (1) "a benefit conferred on one person by another;" (2) "the conferee must appreciate or have knowledge of the benefit;" and (3) "there must be 'the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'" *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000).

Similarly, SKAT's claims for money had and received require that SKAT show that in equity and good conscience, any money belonging to SKAT should be returned. *See Baugh v. Darley*, 184 P.2d 335, 337 (Utah 1947). "The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." *Id.* Indeed, under Utah law, "there must be some misleading act, request for services, or the like, to support [restitution claims]." *Com. Fixtures & Furnishings, Inc. v. Adams*, 564 P.2d 773, 774 (Utah 1977). As an initial matter, SKAT cannot prove it conferred a benefit on Acer, Kaminer, Schulman, or Crema. It is undisputed that the AIG Plan and Riverside Plan each received the full amount of the refunds paid by SKAT. JSUMF ¶¶ 381-82. It follows that none of the other ED&F Bellwether defendants or ED&F received the refunds paid by SKAT. *See id.* Even if SKAT can show a benefit conferred to the ED&F Bellwether defendants, however, SKAT cannot establish that any one of those defendants engaged in inequitable conduct or some other "misleading act" to warrant restitution.[75]

---

[75]      *See Deer Crest Assocs. I, L.C. v. Deer Crest Resort Grp., L.L.C.*, 2006 WL 722216, at *2 (D. Utah Mar. 16, 2006) (recognizing "[i]nequitable circumstances involve "some misleading act" and entering judgment against complaining party on unjust enrichment claim) (citing *In re Fitzgerald*, 117 F.3d 1428 (10th Cir. 1997) (unpublished opinion)), *aff'd sub nom. Deer Crest Assocs. I, L.L.C. v. Avalon Deer Valley, L.L.C.*, 566 F.3d 1246 (10th Cir. 2009); *Knight v. Post*, 748 P.2d 1097, 1101 (Utah Ct. App. 1988) (determining it would not be inequitable for the defendant to retain any value it had received, because "[plaintiff] introduced no evidence to indicate that [defendant] requested services of [plaintiff] or *deliberately* misled him." (emphasis added)).

As discussed above, the summary judgment record demonstrates that the ED&F Bellwether defendants were unaware of any falsities with respect to the refund submissions and certainly did not "deliberately misle[a]d" SKAT. *Knight v. Post*, 748 P.2d 1097, 1101 (Utah Ct. App. 1988); *see supra* § V.D. Because SKAT is unable to prove a "misleading act" or other inequitable conduct, summary judgment should enter against SKAT on its restitution claims. *See Com. Fixtures & Furnishings, Inc.*, 564 P.2d at 774.

## VII. Defendant Altbach Is Entitled To Partial Summary Judgment on the Fraud Claims[76]

### A. The Fraud Count Against Altbach Must Be Dismissed

For a defendant to be held responsible for fraud, a plaintiff must prove that he knowingly made false statements. But Defendant Ronald Altbach did not communicate with SKAT at any time. DSMF ¶ 90; Altbach Decl. ¶ 9. Instead, the allegedly false statements that SKAT attributes to Altbach were made by Goal to SKAT. Bahnsen Decl. Ex. 82. Altbach had no contact whatsoever with Goal and was not even aware that Goal had submitted to SKAT those reclaim applications. DSMF ¶¶ 90, 93; Altbach Decl. ¶¶ 9, 12. Nor did Altbach authorize Goal to make the allegedly false statements: The Power of Attorney that Goal provided to SKAT identified only the Roadcraft Plan, not Altbach, as its principal. Bahnsen Decl. Ex. 81. SKAT also cannot argue that Goal's knowledge should be imputed to Altbach, both because he was not Goal's principal and because the record contains no evidence of Goal's knowledge or scienter.

#### 1. SKAT Cannot Adduce Evidence Of Any False Statements By Altbach

SKAT cannot adduce any evidence that Altbach was aware of or made any purportedly

---

[76] The facts relevant to this section of the omnibus motion are set forth in paragraphs 80 - 99 to the DSMF and the Declaration of Ronald Altbach, dated April 29, 2022 ("Altbach Decl."), which is submitted contemporaneously with this motion.

false statement. Indeed, Altbach expressly denies making these statements or being made aware of these statements. DSMF ¶ 93; Altbach Decl. ¶ 12; Bahnsen Decl. Ex. 73.

SKAT also cannot argue that Altbach authorized Goal to make the allegedly false statements. Goal was authorized to prepare and submit the relevant tax reclaim applications on behalf of the Roadcraft Plan by the Goal POA, prepared and executed by Ben-Jacob, as the Roadcraft Plan's attorney-in-fact. DSMF ¶ 91; Bahnsen Decl. Ex. 81. The Goal POA clearly identifies the principal as the "Roadcraft Technologies LLC Roth 401(K) Plan," which the power of attorney defines as "The Plan." It also makes clear that Goal is the agent of the Roadcraft Plan:

> The Plan hereby appoints Goal TaxBack, ("GTB") to be the attorney of The Plan and in The Plan's name and otherwise on The Plan's behalf and as The Plan's act and deed to sign, seal, execute, deliver, perfect and do all deeds… for or in connection with the provision of any tax services provided to The Plan from time to time, including the reclaiming from any taxation authority in any jurisdiction (as appropriate) amounts in respect of payments made to The Plan, or through GTB on behalf of The Plan.

*Id.*

Goal included the Goal POA to SKAT in reclaim applications it submitted on behalf of the Roadcraft Plan. DSMF ¶ 95; Bahnsen Decl. Ex. 82. Accordingly, SKAT was on notice that Goal had "apparent authority" to act on the Roadcraft Plan's behalf.[77] *Precedo*, 33 F. Supp. 3d at 254 ("[T]he existence of apparent authority hinges upon the principal's communications to the third party."). SKAT cannot argue, however, that Goal had "apparent authority" to act on behalf of

---

[77] A principal can be held liable for fraudulent statements made by its agent when the agent acts with apparent authority. *See City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 416, 441-42 (S.D.N.Y. 2020), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021). The relationship between a principal and agent is a contractual one. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) ("An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent."). Thus, the rights and duties of the agent and principal are governed by and in accord with the agency contract, here the Goal POA. *See* Restatement (Second) of Agency § 34 cmt. h (when the extent of agent's authority is delineated in a formal instrument, "it is assumed that the document represents the entire understanding of the parties"). Once the agency relationship is established, the agent serves as the principal's fiduciary. *See, e.g.*, *Pensee Assocs., Ltd. v. Quon Indus., Ltd.*, 241 A.D.2d 354, 359 (1st Dep't 1997).

Altbach.  The power of attorney expressly identifies a different principal and there is no other communicative act between Altbach and SKAT demonstrating an agency relationship between Goal and Altbach.  DSMF ¶¶ 91, 93; Altbach Decl. ¶ 10, 13.  Because "apparent authority is dependent upon verbal or other acts by a principal which reasonably give an appearance of authority," apparent authority cannot exist when the third party and the principal never communicated with each other.  *City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 416, 443 (S.D.N.Y. 2020) (no apparent authority where alleged principal had no interactions with the plaintiff or relevant third parties), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021).[78]  And, to the extent that SKAT harbored any concern as to whether Goal had the authority to act for any principal other than was identified in the Goal POA, SKAT's acceptance of the reclaim applications prepared and submitted by Goal without further inquiry precludes SKAT from arguing now that there is some other principal, such as Altbach.  *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 472-73 (1973) ("One who deals with an agent does so at his peril, and must make the necessary effort to discovery the actual scope of authority.  Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third parry to bind the principal.").

### 2. SKAT Cannot Adduce Any Evidence That Goal Made The Allegedly False Statements With Knowledge Of Their Falsity

Even assuming *arguendo* that Altbach served as Goal's principal—which he did not—SKAT must prove nonetheless that Goal had actual knowledge that the statements it made in the

---

[78] *See also Precedo*, 33 F. Supp. 3d at 255-56 (no apparent authority where plaintiffs conceded that they never interacted with the alleged principal); *McGarry v. Miller*, 158 A.D.2d 327, 328 (1st Dep't 1990) (no apparent authority where "neither [defendant] had any contact with plaintiff" and, therefore, plaintiff could not demonstrate that he "reasonably relied on [purported agent's] misrepresentations because of some misleading conduct on the part of the principal").

reclaim applications submitted for the Roadcraft Plan were false when it made them for such knowledge to be imputed to its principal. *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 474 (S.D.N.Y. 2010) ("Acts performed and knowledge acquired by [an agent] within the scope of [authority] are imputed to the [principal].").  SKAT can make no such showing.

To hold a principal liable for an agent's misstatements, a plaintiff must prove that the agent who made the statement knew the statement was false. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428 (S.D.N.Y. 2017) (dismissing fraud claims); *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d at 474-75 & n. 137 (granting summary judgment for defendant on fraud claim because employees did not know that failure to disclose certain valuations was misleading); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 259 (S.D.N.Y. 1988) (plaintiffs failed to prove that any employee knew of falsity), *aff'd*, 869 F.2d 175 (2d Cir. 1989).

Significantly, the record contains no evidence that Goal knew that any statement in the reclaim applications was false.  Accordingly, there is no "knowledge of the falsity of the statements" that can be imputed to Goal's actual principal, the Roadcraft Plan, much less to Altbach.  DSMF ¶ 93; Altbach Decl. ¶¶ 11, 12, 13; Bahnsen Decl. Ex. 73 (Altbach Tr. 139:5-140:21).

### 3.    SKAT Cannot Adduce Any Evidence That Goal Made The Allegedly False Statements With The Intent To Deceive SKAT

SKAT also cannot establish that Goal had the requisite scienter when it prepared and submitted to SKAT the reclaim applications on behalf of the Roadcraft Plan.  To hold a principal liable for an agent's communication of statements that it knows to be false, a plaintiff also must prove that the agent acted with scienter.  *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[t]o prove liability against a [principal], of course, a plaintiff must prove that an agent … committed a culpable act with the requisite

scienter"). There is no record evidence that Goal intended to deceive SKAT, let alone by the preparation and submission of the reclaim applications on behalf of the Roadcraft Plan.

### 4. SKAT Cannot Establish That It Reasonably Relied On Any Statement Made By Altbach

SKAT also cannot establish reasonable reliance—vis-à-vis Altbach—based on the representations made by Goal. In the absence of any communication or communicative act by Altbach relating to the allegedly false statements in the tax reclaim applications, SKAT cannot establish that it relied on Altbach specifically. To the extent SKAT relied on anything in approving the Roadcraft Plan's reclaim applications, it was the Goal POA, which states on its face that Goal's principal was the Roadcraft Plan. DSMF ¶ 95; Bahnsen Decl. Ex. 81. It accordingly would be unreasonable, as a matter of law, for SKAT to argue that such statements were made or authorized by Altbach. *See, e.g.*, *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003) (plaintiff was not entitled to summary judgment on its claim that licensor had apparent authority to act for defendant Time Warner, Inc.; plaintiff's reliance on written agreement where licensor was the signatory, not Time Warner, was unreasonable).[79]

---

[79]    *See also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (dismissing fraud claims where plaintiffs did not "point[] to any misrepresentation from a defendant bank on which it relied"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 410 (S.D.N.Y. 2019) ("Plaintiffs cannot sustain a claim of actual reliance against Defendants, who did not communicate with Plaintiffs directly."), *aff'd*, 13 F.4th 247 (2d Cir. 2021).

### B.    The Aiding And Abetting Fraud Count Against Altbach Must Be Dismissed

To establish Altbach's liability for aiding and abetting fraud, SKAT must show (1) the existence of a fraud (committed by some persons or entities other than Altbach);[80] (2) Altbach's knowledge of the fraud; and (3) that Altbach provided substantial assistance in advancing the fraud.  *See, e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).  SKAT can make no such showing.

To establish the knowledge element of an aiding and abetting fraud claim, which must be established by clear and convincing evidence, "[p]laintiffs must allege actual knowledge on the part of the defendant."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*, LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).  "Allegations of constructive knowledge or recklessness are insufficient."  *Id.*  Altbach must be shown to have had actual knowledge of the alleged fraud.  *Id.*[81]

Altbach expressly denies having any knowledge of the reclaim applications or of the contents of those applications.  DSMF ¶ 93; Bahnsen Decl. Ex. 73 (Altbach Tr. 139:5-140:21); Altbach Decl. ¶ 12.  SKAT cannot adduce contrary evidence.  *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) (Kaplan, J.)

---

[80]    It must be assumed that Counts I and II are pleaded in the alternative because Mr. Altbach cannot be liable both for the underlying fraud and for aiding and abetting that underlying fraud.  When a plaintiff asserts claims for fraud and aiding and abetting fraud, "the appropriate summary judgment question is whether the evidence on the record could support a reasonable jury finding that the plaintiff has shown each element of *either* a fraud or an aiding and abetting claim by clear and convincing evidence."  *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 440 (S.D.N.Y.), *reconsideration granted in part on other grounds*, 888 F. Supp. 2d 478 (S.D.N.Y. 2012), *aff'd sub nom. Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir. 2014) (emphasis added); *see also Canosa v. Ziff*, 2019 WL 498865, at *9 (S.D.N.Y. Jan. 28, 2019) (defendant cannot be held liable "for aiding and abetting … his own alleged intentional torts").

[81]    Unlike claims for fraud, actual knowledge cannot be imputed from an agent to a principal in an aiding and abetting fraud case.  *See, e.g.*, *Wardley Better Homes & Gardens v. Cannon*, 61 P.3d 1009, 1016 (Utah 2002) ("Generally, because imputed knowledge is constructive, it cannot be used when determining an individual's subjective mental state"); *Jehly v. Brown*, 327 P.3d 351, 354 (Colo. App. 2014) (agent's knowledge cannot be imputed to an individual principal to satisfy actual knowledge element of fraudulent concealment claim; "'actual knowledge,' as the term itself connotes, is different from 'imputed' knowledge").

(dismissing aiding and abetting claim where the plaintiff did not "assert any specific facts that would give rise to an inference that PwC actually knew of Lucent's allegedly fraudulent activities"). This is dispositive.

Nor can SKAT establish substantial assistance. Because the alleged fraud is based on misrepresentations in a document, SKAT must adduce evidence that Altbach provided "substantial assistance to the making and dissemination of that document." *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 371. But Altbach did not authorize Goal to prepare and submit the tax reclaim applications; indeed, the record evidence demonstrates unequivocally that Altbach had no knowledge of them. DSMF ¶ 93; Bahnsen Decl. Ex. 73 (Altbach Tr. 139:5-140:21); Altbach Decl. ¶ 12. Altbach also was not aware of Goal's existence and never communicated with Goal. DSMF ¶ 90; Altbach Decl. ¶ 90. Therefore, SKAT cannot establish that Altbach provided substantial assistance in support of any alleged fraud.

## C. The Negligent Misrepresentation Count Against Altbach Must Be Dismissed

To survive a motion for summary judgment on negligent misrepresentation under New York law, "a plaintiff must produce facts sufficient to permit a reasonable jury to find: (1) the existence of a special relationship between Defendants and Plaintiffs; (2) Defendants' negligent provision of incorrect information; and (3) Plaintiffs' reasonable reliance on that information." *Silvercreek Mgmt. Inc. v. Citigroup Inc.*, 346 F. Supp. 3d 473, 499 (S.D.N.Y. 2018). SKAT's negligent misrepresentation claim against Altbach fails for the same reasons SKAT's fraud claims fail. SKAT cannot adduce any evidence of a misrepresentation by Altbach and cannot establish SKAT's reasonable reliance on any such representation at least vis-à-vis Altbach. *See In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213, 220 (S.D.N.Y. 2019) (plaintiffs lacked a basis for negligent misrepresentation claim where allegedly false statements were "not attributable to defendants"); *Canon Fin. Servs., Inc. v. Meyers Assocs., LP*, 2014 WL 4829641, at *4-5 (N.Y.

Sup. Ct., Sept. 26, 2014) (negligent misrepresentation counterclaim based on false statements of a purported agent dismissed where counterclaim plaintiff "fail[ed] to identify any conduct or representations by [the principal] that would result in a manifestation of apparent authority"), *aff'd*, 139 A.D.3d 575 (1st Dep't 2016).

The claim also fails because SKAT cannot establish a special relationship with Altbach. Restatement (2d) of Agency § 7.08 cmt. c. When a negligent misrepresentation claim is based on an "apparent authority" theory, the principal can only be liable for an agent's misstatements when the principal owes a duty of care to the third party. Rest. (2d) of Agency § 7.08 cmt. c. *See also Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) ("Under New York law, a plaintiff asserting a claim for negligent misrepresentation must allege, *inter alia*, that 'the defendant had a duty, as a result of a special relationship, to give correct information.'") (quoting *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)), *aff'd*, 712 F.3d 136 (2d Cir. 2013). Indeed, New York generally limits negligent misrepresentation claims "to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993) (cleaned up).

Here, even assuming that the reclaim applications created some sort of contractual relationship or near contractual relationship between Goal and SKAT or between the Roadcraft Plan and SKAT, there is no such contractual relationship between Altbach and SKAT or even between Altbach and Goal. As noted above, the Goal POA makes clear that Altbach was not Goal's principal. Thus, there can be no triable issue as to the special relationship element of the negligent misrepresentation claim and summary judgment is appropriate. *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*, 976 F. Supp. 198, 204 (S.D.N.Y. 1996).

There also cannot be a "special relationship" when information is provided pursuant to statutory or regulatory requirements. *Jurgensen v. Felix Storch, Inc.*, 2012 WL 2354247, at *9 (S.D.N.Y. June 14, 2012) ("The obligation of defendants to provide information regarding the[ir product's] energy consumption arose out of federal law, not out of some sort of 'special relationship.'"). The alleged misstatements were made by Goal in government forms submitted to SKAT, a governmental tax authority. Thus, even Goal and its principal, the Roadcraft Plan, were not in a special relationship with SKAT.

SKAT's inability to connect the allegedly false statements to Altbach, establish any other communication or conduct creating a relationship between Altbach and SKAT, or establish reasonable reliance on Altbach, requires judgment to be entered in favor of Altbach on SKAT's negligent misrepresentation claim.

## CONCLUSION

The Court should enter judgment in Defendants' favor on all claims asserted in the bellwether complaints.

Dated: April 29, 2022

Respectfully submitted,

*/s/ Alan Schoenfeld*
Alan Schoenfeld
Julia Pilcer Lichtenstein
Michael Bongiorno
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
julia.lichtenstein@wilmerhale.com
michael.bongiorno@wilmerhale.com


*/s/ Andrew S. Dulberg*
Andrew S. Dulberg
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel. (617) 526-6352
andrew.dulberg@wilmerhale.com


*Attorneys for Bellwether Defendants Richard
Markowitz and RJM Capital Pension Plan*

*/s/ Sharon L. McCarthy*
Sharon L. McCarthy
Nicholas S. Bahnsen
KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Fl.
New York, NY 10007
Tel. (212) 808-8100
Fax: (212) 808-8108
smccarthy@kflaw.com
nbahnsen@kflaw.com


*Attorneys for Bellwether Defendants Basalt
Ventures LLC Roth 401(k) Plan and John van
Merkensteijn*

/s/ John C. Blessington
John C. Blessington (*pro hac vice*)
Brandon R. Dillman (*pro hac vice*)
Michael R. Creta (*pro hac vice*)
John L. Gavin (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel. (617) 261 3100
Fax: (617) 261 3175
john.blessington@klgates.com
brandon.dillman@klgates.com
michael.creta@klgates.com
john.gavin@klgates.com

*Attorneys for Bellwether Defendants American
Investment Group of New York, L.P. Pension Plan,
Riverside Associates Defined Benefit Plan, Robert
Crema, David Schulman, Stacey Kaminer, and Acer
Investment Group, LLC*

/s/ Michelle Rice
Michelle Rice
Consuelo Mejer
KAPLAN RICE LLP
142 W. 57th Street
Suite 4A
New York, NY 10019
Tel. (212) 333-0227
Fax: (212) 235-0301
mrice@kaplanrice.com
cmejer@kaplanrice.com

*Attorneys for Bellwether Defendants Roadcraft
Technologies LLC Roth 401(K) Plan
and Ronald Altbach*

/s/ Zhanna A. Ziering
Zhanna A. Ziering
MOORE TAX LAW GROUP LLC
11 Broadway, Ste. 615
New York, NY 10004
Tel. (646) 357-3875
Fax: (312) 549-9991
zhanna.ziering@mooretaxlawgroup.com

*Attorney for Bellwether Defendants RAK Investment Trust and Robert Klugman*

*/s/ Thomas E.L. Dewey*
Thomas E.L. Dewey
Sean K. Mullen
DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue, 37th Fl.
New York, NY 10017
Tel. (212) 943-9000
Fax: (212) 943-4325
tdewey@dpklaw.com
smullen@dpklaw.com

*Attorneys for Bellwether Defendant Michael Ben-Jacob*

*/s/ Joseph LoPiccolo*
Joseph LoPiccolo
John N. Poulos
Daniella DaCunzo Dalia
POULOS LOPICCOLO PC
311 West 43rd Street
11th Floor, Suite 124
New York, NY 10036
Tel. (732) 757-0165
Fax: (732) 358-0180
lopiccolo@pllawfirm.com
poulos@pllawfirm.com
ddalia@pllawfirm.com

*Attorneys for Bellwether Defendants Doston Bradley, The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401K Plan, and Roger Lehman*

*/s/ Neil S. Binder*
Neil S. Binder
BINDER & SCHWARTZ, LLP
366 Madison Avenue, Sixth Floor
New York, NY 10017
Tel. (212) 510-7008
Fax: (212) 510-7299
nbinder@binderschwartz.com

100

*Attorney for Third-Party Defendant*
*ED&F Man Capital Markets, Ltd.*